UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
LANDMEN PARTNERS INC., Individually        :    Civil Action No. 1:08-cv-03601-CM
and On Behalf of All Others Similarly Situated, :
                                           :    CLASS ACTION
                    Plaintiff,             :
                                           :
                                           :
        vs.                                :
                                           :
                                           :
THE BLACKSTONE GROUP L.P., et al.,         :
                                           :
                    Defendants.            :
                                           :
———————————————————— :
TIMOTHY McADAM, Individually and On        :    Civil Action No. 1:08-cv-03838-CM
Behalf of All Others Similarly Situated,   :
                                           :    CLASS ACTION
                    Plaintiff,             :
                                           :
                                           :
        vs.                                :
                                           :
THE BLACKSTONE GROUP L.P., et al.,         :
                                           :
                    Defendants.            :
———————————————————— x

[Caption continued on following page.]

AFFIDAVIT OF DAVID ROSENFELD IN SUPPORT OF MARTIN LITWIN'S
OPPOSITION TO THE "BX INVESTOR GROUP'S" MOTION FOR
APPOINTMENT AS LEAD PLAINTIFF

------------------------------------------------ x

DAVID W. JAKEMAN, Individually and On     :     Civil Action No. 1:08-cv-04064-CM
Behalf of All Others Similarly Situated,        :
                                                :     <u>CLASS ACTION</u>
                              Plaintiff,        :
                                                :
              vs.                               :
                                                :
THE BLACKSTONE GROUP L.P., et al.,              :
                                                :
                              Defendants.       :
------------------------------------------------ 
DAVID B. GALCHUTT, Individually and On    :     Civil Action No. 1:08-cv-04110-CM
Behalf of All Others Similarly Situated,        :
                                                :     <u>CLASS ACTION</u>
                              Plaintiff,        :
                                                :
              vs.                               :
                                                :
THE BLACKSTONE GROUP L.P., et al.,              :
                                                :
                              Defendants.       :
------------------------------------------------ x

I, DAVID A. ROSENFELD, swear as follows:

1.      I am an attorney duly licensed to practice before the courts of the State of New York. I am a member of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, counsel for Martin Litwin and proposed lead counsel for the class. I make this declaration in support of Martin Litwin's Opposition to the "BX Investor Group's" Motion for Appointment as Lead Plaintiff. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Attached are true and correct copies of the following exhibits:

Exhibit 1:      Letter from Mark Levine to The Honorable Colleen McMahon dated June 20, 2008;

Exhibit 2:      Chart of Movants' Losses;

Exhibit 3:      Brower Piven press release dated June 9, 2008;

Exhibit 4:      Brower Piven press release dated April 18, 2008;

Exhibit 5:      Excerpt from Northern District of Georgia Local Civil Rules;

Exhibit 6:      *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, Order (D. Ariz. Apr. 4, 2008); and

Exhibit 7:      (*Day Trading: Your Dollars at Risk*, available at http://www.sec.gov/investor/pubs/daytips.htm; *Testimony of Arthur Levitt, Chairman of the U.S. Securities and Exchange Commission, Before the Senate Permanent Subcommittee on Investigations Committee on Governmental Affairs, Concerning Day Trading* (Sept. 16, 1999), available at http://www.sec.gov/news/testimony/testarchive/1999/tsty2099.htm; and *Day Trading*, available at http://www.sec.gov/answers/daytrading.htm).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20th day of June, 2008, at Melville, New York.

s/ David A. Rosenfeld
DAVID A. ROSENFELD

S:\CasesSD\Blackstone Group\AFF00052167-Opp.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 20, 2008.

s/ David A. Rosenfeld
DAVID A. ROSENFELD

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

E-mail: drosenfeld@csgrr.com

S:\CasesSD\Blackstone Group\AFF00052167-Opp.doc

- 1 -

# Mailing Information for a Case 1:08-cv-03601-CM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bruce Domenick Angiolillo**
  bangiolillo@stblaw.com,managingclerk@stblaw.com

- **David A.P. Brower**
  brower@browerpiven.com

- **Jason Robert D'Agnenica**
  jasondag@ssbny.com

- **Jack Gerald Fruchter**
  JFruchter@FruchterTwersky.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com,amartin@csgrr.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Jonathan K. Youngwood**
  jyoungwood@stblaw.com,managingclerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

EXHIBIT 1

# STULL, STULL & BRODY

*ATTORNEYS AT LAW*
*6 EAST 45th STREET*
*NEW YORK, N.Y. 10017*

*TELEPHONE*
*212-687-7230*

*TELECOPIER*
*212-490-2022*

**June 20, 2008**

<u>Via Facsimile 212-805-6326</u>
**The Honorable Colleen McMahon**
**United States District Judge**
**Daniel Patrick Moynihan United States Courthouse**
**500 Pearl Street, Room 640**
**New York, NY 10007**

     Re:   *Landmen Partners, Inc. v. The Blackstone Group L.P.*, 08-cv-3601 (CM)
           *McAdam v. The Blackstone Group, L.P.*, 08-cv-3838 (CM)
           *Jakeman v. The Blackstone Group, L.P.*, 08-cv-4064 (CM)
           *Galchut v. The Blackstone Group, L.P.*, 08-cv-4110 (CM)
           *Rettino Insurnace Agency v. The Blackstone Group, L.P.*, 08-CV-05447 (   )

Dear Judge McMahon,

    We are counsel for plaintiff David W. Jakeman and other lead
plaintiff movants Roderick Hernandez, Linda Hernandez, Tsang Tak Keung,
Alice Tu and Yixtn Tu (collectively the "Jakeman Group").   On behalf of the
Jakeman Group we respectfully submit this letter to withdraw those
movants' application for appointment of Lead Plaintiff.

                **Respectfully submitted,**

                **STULL, STULL & BRODY**

                By: _____
                    Mark Levine

cc: Bruce Angiolillo, Esq. (all by fax and e-mail)
    Paul Sirkis, Esq.
    David A.P. Brower, Esq.
    Samuel H. Rudman, Esq.
    David A. Rosenfeld, Esq.
    Ralph M. Stone, Esq.
    Lisa M. Pollard, Esq.

EXHIBIT 2

Blackstone Group

| Movants | Losses | Number of Shares Purchased | Actual Shares Sold During Class Period | Number of Net Shares Purchased | Net Fund Expended |
|---|---|---|---|---|---|
| Max Poulter | ($488,558.31) | 130,213 | 130,213 | 0 | ($488,558.31) |
| Francis Brady | ($78,842.76) | 14,268 | 9,436 | 4,832 | ($162,581.32) |
| **Brower Piven Total** | **($567,401.07)** | **144,481** | **139,649** | **4,832** | **($651,139.63)** |
| | | | | | |
| | | | | | |
| **Litwin, Martin** | **($287,070.00)** | **21,000** | **0** | **21,000** | **($651,000.00)** |

EXHIBIT 3

**Press Release**                    Source: Brower Piven, A Professional Corporation

# Brower Piven Encourages Investors Who Have Losses in Excess of $200,000 From Investment in The Blackstone Group L.P. to Inquire About the Lead Plaintiff Position in Securities Fraud Class Action Lawsuit Before the June 16, 2008 Lead Plaintiff Deadline

Monday June 9, 5:34 pm ET

BALTIMORE, MD--(MARKET WIRE)--Jun 9, 2008 -- Brower Piven, A Professional Corporation announces that a class action lawsuit has been commenced in the United States District Court for the Southern District of New York on behalf of purchasers of the common units of The Blackstone Group L.P. ("Blackstone" or the "Company") (NYSE:BX - News) pursuant to the Company's initial public offering on or about June 25, 2007 through on or about March 12, 2008 (the "Class Period"). No class has yet been certified in this action.

ADVERTISEMENT

## China's Profit Miracle

Morgan Stanley's chief economist calls this, "The biggest economic story to come out of China in 25 years."

It should make an entire generation of U.S. investors rich, but most will surely miss out.

Discover the simple action you can take today to make sure you profit. A free Global Investor Update from The Motley Fool reveals: "The Two Most Lucrative Words Since Silicon Valley."

**Click here to claim your report... it's FREE!**

Members of the Class will be represented by the lead plaintiff and counsel chosen by the lead plaintiff. If you wish to choose counsel to represent you and the Class, you must apply to be appointed lead plaintiff no later than June 16, 2008 and be selected by the Court. The lead plaintiff will direct the litigation and participate in all important decisions including whether to accept a settlement and how much of a settlement to accept for the Class in the action. The lead plaintiff will be selected from among applicants claiming the largest loss from investment in the Company during the Class Period. If you have a net loss in excess of $200,000 incurred from transactions in Blackstone common units during the Class Period and are interested in directing the course of this litigation for plaintiffs, please contact Brower Piven (hoffman@browerpiven.com or 410/332-0030) to answer any questions you may have in that regard.

If you have suffered a net loss for all transactions in Blackstone common units during the Class Period, you may obtain additional information about this lawsuit and your ability to become a lead plaintiff by contacting Brower Piven at www.browerpiven.com, by email at hoffman@browerpiven.com, by calling 410-332-0030, or at Brower Piven, A Professional Corporation, The World Trade Center-Baltimore, 401 East Pratt Street, Suite 2525, Baltimore, Maryland 21202. Attorneys at Brower Piven have combined experience litigating securities and class action cases of over 40 years. If you choose to retain counsel, you may retain Brower Piven without financial obligation or cost to you, or you may retain other counsel of your choice.

*Contact:*

        CONTACT:
        Charles J. Piven
        Brower Piven, A Professional Corporation
        Baltimore, Maryland

```
410/332-0030
Email Contact
```

_____

Source: Brower Piven, A Professional Corporation

EXHIBIT 4

Case 1:08-cv-03601-HB    Document 19-5    Filed 06/20/2008    Page 2 of 2

**Press Release**                              Source: Brower Piven, A Professional Corporation

# Brower Piven Announces the Filing of a Class Action Lawsuit Against The Blackstone Group L.P.

Friday April 18, 9:10 pm ET

BALTIMORE, MD--(MARKET WIRE)--Apr 18, 2008 -- Brower Piven, A Professional Corporation announces that a class action lawsuit has been commenced in the United States District Court for the Southern District of New York on behalf of purchasers of the common stock of The Blackstone Group L.P. ("Blackstone" or the "Company") (NYSE:BX - News) pursuant and/or traceable to the Company's initial public offering on or about June 25, 2007 (the "Class Period").

ADVERTISEMENT



## Time to Get Greedy?

Legendary investor Warren Buffett once advised, "Be greedy when others are fearful."

Thanks to a fear-filled summer, many top notch stocks are still trading well below their potential, giving savvy investors the opportunity to strike it rich.

In a just-released special report from The Motley Fool you can get 5 buy-now stocks handpicked by a team of the nation's top independent analysts — and it won't cost you a cent!

▸ **Click here for "5 Gifts from the Market Gods."**
-- **it's FREE!**

Blackstone, together with its subsidiaries, provides alternative asset management and financial advisory services worldwide. The complaint charges Blackstone and certain of its officers and directors with violations of the Securities Act of 1933.

No class has yet been certified in the above action. If you are a member of the proposed Class, you may, no later than June 16, 2008, ask the Court to allow you to serve as lead plaintiff for the proposed Class. To serve as a lead plaintiff, you must satisfy certain legal requirements. In making your decision, you should take into account that those with large financial losses resulting from the alleged federal securities law violations are given preference in being appointed lead plaintiff.

If you purchased or otherwise acquired Blackstone securities pursuant or traceable to the Company's initial public offering on or about June 25, 2007, you may obtain additional information about this lawsuit and your ability to become a lead plaintiff by contacting Brower Piven (without obligation or cost to you) at www.browerpiven.com, by email at hoffman@browerpiven.com, by calling 410-986-0036, or at Brower Piven, The World Trade Center-Baltimore, 401 East Pratt Street, Suite 2525, Baltimore, Maryland 21202. Attorneys at Brower Piven have combined experience in securities and class action litigation of over 40 years. If you choose to retain counsel, you may retain Brower Piven, or you may retain other counsel of your choice.

*Contact:*

```
CONTACT:
Brower Piven, A Professional Corporation
Baltimore, Maryland
Charles J. Piven
410/986-0036
Email Contact
```

---

Source: Brower Piven, A Professional Corporation

EXHIBIT 5

(2) **Court Annexed Program.**   Neutrals in the court-annexed ADR program are required to list their fee schedules as part of their applications.  The court will review fee schedules for reasonableness.  Daily rather than hourly rates are encouraged.  Any issues with regard to fees will be resolved by the ADR administrator.

(3) Before being placed on the roster for the court's annexed ADR program, a neutral must agree to provide pro bono hours and hours at reduced rates to defray ADR costs for parties with limited ability to pay.  The number of hours required will be determined by the judges.

# IV.   PARTIES

## LR 23:    CLASS ACTIONS

## LR 23.1  CLASS ACTIONS

### A.        Complaint, Counterclaims, Crossclaims

(1) **Caption.**   For all class actions the complaint shall bear next to the style of the case the designation "Complaint - Class Action."

(2) **Class Action Allegations.**   Under a separate heading titled "Class Action Allegations", the complaint shall provide the following information:

(a)  The section of Fed.R.Civ.P. 23 which is claimed to authorize maintenance of suit by class action.

(b)  The size (or approximate size) and definition of the alleged class.

(c)  The basis of the named plaintiff's or plaintiffs' claim to be an adequate representative of the class or, if defendants, the basis of the named defendant's or defendants' claim to be an adequate representative of the class.

(d)  The alleged questions of law and fact which are common among members of the class.

(e)  The allegations necessary to satisfy the criteria of section (b)(1) or (b)(2) of Fed.R.Civ.P. 23 or to support the findings required by section (b)(3) of Fed.R.Civ.P. 23.

(f)   For actions requiring a jurisdictional amount, the basis for determination of that amount.

The foregoing provisions shall apply, with appropriate adaptions, to any counterclaim or crossclaim alleged to be brought for or against a class.

**B.  Class Certification.**  The plaintiff shall move within ninety (90) days after the complaint is filed for a determination under Fed.R.Civ.P. 23(c)(1) as to whether the suit may be maintained as a class action. Notwithstanding the foregoing, in any class action brought pursuant to the Private Securities Litigation Reform Act of 1995, or a class action in which one or more defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12 in lieu of an answer to the complaint, or a class action in which one or more parties file a motion for coordination and/or consolidation of multiple actions before the Judicial Panel on Multidistrict Litigation, the plaintiff shall move for a determination under Fed.R.Civ.P. 23(c)(1) within thirty (30) days after all defendants have filed an answer to the complaint. The court may extend the time upon a showing of good cause.

## C.  Communications with Actual or Putative Class Members.

**(1)    Purpose.**  The administration of justice often requires that limited restrictions be placed on counsel and parties in cases in which class certification is sought or has been granted.  In class actions where a putative class member is permitted to elect not to participate in the class action, there is an inherent risk that a class member's decision may, in the absence of court regulation of communications regarding the class action, not be based on a complete and balanced presentation of the relevant facts. Special management of class actions is often necessary to protect the interests of both formal parties and absent class members.

**(2) Restrictions on Communications.**  When class certification is sought in a case, all parties and/or their counsel are required to confer jointly to determine whether proper management of the case or the interests of putative class members require the entry of an order limiting either the parties or counsel in communications with putative class members.  The conference shall occur as soon as practicable, but in no event later than twenty (20) days after the complaint is served.  Within ten (10) days after the conference, counsel shall submit to the court a joint statement of their collective or individual views as to whether an order should be entered limiting communications.  If counsel agree no order is necessary, they shall so state in their report to the court.  If counsel agree that an order limiting communications should be entered, they shall submit the proposed content of such order and the grounds justifying entry of same.  If counsel cannot agree whether an order should be entered or what the content of such an order should be, they shall report this to the court and either submit stipulated facts for the court's consideration or request a hearing to present evidence on the issue.  Based on the record before the court, an order limiting communications may be entered upon a finding that a failure to so limit communications would likely result in imminent and irreparable injury to one of the parties.  Except as set forth in LR 23.1(c)(4)(a), neither the parties nor their counsel shall

initiate communications with putative class members regarding the substance of the lawsuit until counsel presents the required report to the court and any necessary order is entered pursuant to the report.

(3) **Restrictions Applicable to All Class Actions.** In all cases where class certification is sought or granted, the following shall apply:

(a) All parties and counsel are forbidden to solicit fees and expenses or agreements to pay fees and expenses from prospective or actual class members who are not formal parties or who do not plan to become formal parties.

(b) All parties and counsel are forbidden to communicate with prospective or actual class members in a way which tends to misrepresent the status, purpose, and effects of the action or of any actual or potential court orders therein, which may create impressions tending without cause to reflect adversely on any party, any counsel, the court, or the administration of justice.

(4) **Class Actions Under the Private Securities Litigation Reform Act of 1995.** The Private Securities Litigation Reform Act of 1995 ("Reform Act") provides for a notice to be published following the commencement of a securities class action. 15 U.S.C. §§ 78u-4(a)(3)(A)(i), 77z-1(a)(3)(A)(i). The court finds that certain practices in Reform Act class actions have the potential to harm the interests of class members and/or defendants and can interefere with the orderly administration of justice. For example, the court finds that numerous notices of the same litigation have been released, thereby creating the potential for confusion for potential class members and potential damage to the interests of shareholders and businesses. The court finds further that the measures adopted herein are reasonably necessary to protect the interests of class members, realize the goals of the Reform Act, and balance the rights of those who wish to prosecute a Reform Act class action or communicate about it.

(a)    **Notice of the Reform Act Class Action.**

(i) **Contents of the Notice.** Consistent with the provisions of 15 U.S.C. §§ 78u-4(a)(3)(A)(i) , 77z-1(a)(3)(A)(i), following the filing of any Reform Act class action in this District, each law firm on a complaint may choose to publish a notice. Such notice shall have as its headline "Notice of Filing Securities Class Action Against [Defendant or Defendants]" and shall provide the following information as required by the Reform Act:

1) the pendency of the action;

2) the claims asserted therein;

3) the purported class period;

4) that, not later than sixty (60) days after the date on which the first notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class; and

**5)** contact information for the law firm issuing the notice, including the name of a contact person who is designated to discuss the lawsuit with putative class members, an address, a telephone number, and a website and e-mail address, if applicable. However, the notice shall not contain a promotional statement for any law firm.

**(ii) Type of Publication.** The one notice pursuant to subsection (i) shall be published in a widely circulated national business-oriented publication or wire service.

**(iii)    Only One Notice Per Law Firm.** Unless otherwise ordered by the court, there shall be only one notice per law firm regardless of the number of complaints filed in this Court arising out of the same or similar set of facts or circumstances. No attorney seeking to represent the putative class shall initiate any other communication with putative class members unless approved in advance by the court. Such court approval will be granted if the communication is deemed by this Court to be reasonably necessary to achieve the purposes of the Reform Act. This rule does not affect the rights or obligations of defendants to give notice of the pendency of the suit, nor does it preclude counsel for either party from contacting class members whom they believe to be fact witnesses or with whom they have an attorney-client relationship.

**(b)    Motion for Appointment of Lead Plaintiff.** Pursuant to 15 U.S.C. §§ 78u-4(a)(3)(B)(i) and (v) , 77z-1(a)(3)(B)(i) and (v), the court shall consider any motion for appointment of lead plaintiff and lead plaintiff's counsel in a Reform Act class action within ninety (90) days after the date on which the first Notice is published pursuant to 15 U.S.C. §§ 78u-4(a)(3)(A)(i), 77z-1(a)(3)(A)(i), and this rule or as soon thereafter as practicable. Consistent with the purpose and terms of the Reform Act, in considering and ruling upon such a motion as to appointment of lead plaintiff and lead counsel, the court will consider, among other relevant factors, the following:

**(i)** the proposed lead plaintiff's financial loss, recognizing that the presumption that the person with the largest financial interest in the relief sought is the most adequate lead plaintiff is rebuttable;

**(ii)** whether the proposed lead plaintiff's counsel has complied with the Local Rules of this Court;

**(iii)** whether the proposed lead plaintiff's counsel promotes the efficient conduct of the litigation; and

**(iv)** the relevant experience of the proposed lead plaintiff's counsel.

**(c)    Certification of Proposed Lead Counsel.** Any law firm seeking to be appointed lead counsel pursuant to the Reform Act, 15 U.S.C. §§ 78u-4(a)(3)(B)(v) , 77z-1(a)(3)(B)(v), shall submit with its motion papers a sworn certification stating that with regard to the case at bar, such law firm:

**(i)** has issued or caused to be issued no more than one notice to putative class members (except as authorized by LR 23.1(C)(4)(a)(iii));

**(ii)** has complied with the Local Rules of this Court; and

**(iii)** has complied with applicable State Bar of Georgia ethical rules.

**(5) Ethical and Other Obligations Not Affected.** The obligations and prohibitions of the foregoing rule are not exclusive. All other ethical, legal, and equitable obligations to which counsel and/or parties are subject are not affected by this rule.

# V.  DEPOSITIONS AND DISCOVERY

## LR 26:   GENERAL PROVISIONS GOVERNING DISCOVERY; DUTY OF DISCLOSURE

## LR 26.1  INITIAL AND EXPERT  DISCLOSURES

**A.**      **Applicability.**  The parties to civil actions shall make the initial disclosures required by Fed.R.Civ.P. 26(a)(1) at or within thirty (30) days after the appearance of a defendant by answer or motion.  Expert disclosures shall be made as required by Fed.R.Civ.P.26(a)(2) and by LR 26.2(C).  Pretrial disclosures (Fed.R.Civ.P. 26(a)(3)) are addressed in LR 16.4, Consolidated Pretrial Order.

**B.**      **Procedures.**

**(1) Standard Form.** The court has prepared a form, Initial  Disclosures, which counsel shall be required to use. A copy of the form is included as Form I in Appendix B and copies of the form may be obtained by counsel at the public filing counter in each division. No modifications or deletions to the form shall be made without prior permission of the court. All disclosures must be answered fully in writing in compliance with Fed.R.Civ.P. 26. See also Fed.R.Civ.P. 37 regarding failure to make disclosures.

**(2) Multiple Parties**. If there is more than one (1) plaintiff or more than one (1) defendant in the action, each plaintiff and each defendant must submit the disclosures separately unless a disclosure is the same for all plaintiffs or all defendants.

**(3) Attorney's Signature Required**. Initial Disclosures shall be certified as directed by Fed.R.Civ.P. 26(g)(1). Sanctions, if appropriate, will be imposed according to Fed.R.Civ.P. 26(g)(3)and 37(c).

EXHIBIT 6

1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Teimuraz Tsirekidze, On Behalf of)    No. CV-07-2204-PHX-FJM
     Himself and All Others Similarly Situated,)
10                                    )    **ORDER**
                 Plaintiff,           )
11                                    )
     vs.                              )
12                                    )
13   Syntax–Brillian Corp., Vincent F. Sollitto,)
     Jr., and Wayne Pratt,            )
14                                    )
                 Defendants.          )
15   ——————————————————————————)    **CONSOLIDATING**
16

17   The Nagel Family Trust, On Behalf of)    No. CV-07-2454-PHX-ROS
     Itself and All Others Similarly Situated,)
18                                    )
                 Plaintiff,           )
19                                    )
     vs.                              )
20                                    )
     Syntax–Brillian Corp. A.K.A. Olevia)
21   International Group, Inc., Vincent F.)
     Sollitto, Jr., James Ching Hua Li, Man Kit)
22   (Thomas) Chow, and Wayne Pratt,  )
                                      )
23               Defendants.          )
24   ——————————————————————————)    [caption continued on following page]

25

26

27

28

| | | |
|---|---|---|
| 1 | Angelko Bogdanov, On Behalf of Himself) and All Others Similarly Situated, | No. CV-07-2524-PHX-ROS |
| 2 | ) | |
| 3 |       Plaintiff, ) | |
| 4 | vs. ) | |
| 5 | Syntax–Brillian Corp., Vincent F. Sollitto,) Jr., James Li, and Wayne Pratt, | |
| 6 | ) | |
| 7 |       Defendants. ) | |

Angelko Bogdanov, On Behalf of Himself) and All Others Similarly Situated,    No. CV-07-2524-PHX-ROS

        Plaintiff,

vs.

Syntax–Brillian Corp., Vincent F. Sollitto, Jr., James Li, and Wayne Pratt,

        Defendants.

_____

Paula Langley, Individually and On Behalf) of All Others Similarly Situated,    No. CV-07-2525-PHX-SRB

        Plaintiff,

vs.

Syntax–Brillian Corp., Vincent F. Sollitto, Jr., and Wayne Pratt,

        Defendants.

_____

    Four securities class actions have been filed in this district against defendant Syntax–Brillian Corp. and several of its officers. Five members of the proposed class now move for consolidation of the actions, for appointment as lead plaintiff, and for approval of lead counsel. The court has before it the following documents: Syntax Investor Group's motion, (doc. 6), supporting memorandum (doc. 7), memorandum in response to competing motions (doc. 27), and reply in further support of its own (doc. 36); the McCullough Family's motion (doc. 23), supporting memorandum (doc. 8), supporting declaration of Gustavo Bruckner (doc. 9), response to competing motions (doc. 28), and reply in further support of its own (doc. 37); Angelko Bogdanov, John Gardini, and Bloomfield, Inc.'s motion (doc. 11), supporting memorandum (doc. 12), and supporting declaration of Frank

1    Verdame (doc. 14);[1] the Farrukh Group's motion and supporting memorandum (doc. 15),

2    response to competing motions (doc. 30), and reply in support of its own (doc. 38); and the

3    City of St. Clair Shores Police and Fire Retirement System's motion (doc. 17), supporting

4    memorandum (doc. 18), supporting declaration of Michael Salcido (doc. 19), response to

5    competing motions (doc. 32), and reply in further support of its own (doc. 40).

6                                        **I**

7        All four complaints name as defendants Syntax–Brillian Corp. ("Syntax"), a

8    manufacturer and distributor of high definition televisions based in Tempe, Arizona; Vincent

9    Sollitto, Jr., who is chairman of the company's board of directors and served as chief

10   executive officer until September 30, 2007; and Wayne Pratt, who was the company's chief

11   financial officer and vice president until September 30, 2007.  Two of the complaints name

12   additional defendants.  One adds James Ching Hua Li, a company director who became

13   chief executive officer in October 2007;[2] the other adds James Ching Hua Li as well as

14   Man Kit Chow, the company's executive vice president and chief procurement officer.[3]

15       All four complaints seek recovery under Sections 10(b) and 20(a) of the Securities and

16   Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t (2006).  Plaintiffs allege that defendants

17   overstated profits and projections, concealed shortfalls, and otherwise misled investors,

18   which caused an artificial inflation of Syntax stock price.  The complaints propose a class of

19   investors who suffered losses when the stock dropped precipitously on September 13, 2007,

20   following a company announcement that Syntax revenues were much lower than anticipated.

21   Three complaints propose essentially the same "class period"—that the class be open to those

22

23

24

---

25       [1] The court also has before it the Bogdanov Group's supporting memorandum that

26   appears only on the docket of No. CV-07-2524-PHX-ROS (doc. 41).

27       [2] No. CV-07-2524-PHX-ROS

28       [3] No. CV-07-2454-PHX-ROS

                                       - 3 -

1  who acquired Syntax stock roughly between May 1, 2007, and September 13, 2007. One

2  complaint proposes a longer class period, February 9, 2007, to November 14, 2007.[4]

3  <center>II</center>

4  Under Rule 42, Fed. R. Civ. P., we may consolidate "actions involving a common

5  question of law or fact." The complaints in these four actions are nearly identical, and the

6  minor differences in proposed class periods and named individual defendants are not

7  obstacles to consolidation. Olsen v. N.Y. Comm. Bancorp, Inc., 233 F.R.D. 101, 104–105

8  (E.D.N.Y. 2005). Therefore, the motions to consolidate are granted.

9  The method for appointing a lead plaintiff in a securities class action is governed by

10  the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 (2006).

11  The party who files the action must publicize its pendency, the proposed class period, and

12  the nature of the claims. § 78u-4(a)(3)(A)(i). The publication must also inform potential

13  class members that they have 60 days to come forward and move to be appointed lead

14  plaintiff. § 78u-4(a)(3)(A)(ii). If, as here, multiple class actions are brought asserting

15  substantially the same claims, publication is required only of the first to file, in this case

16  Syntax Investor Group. § 78u-4(a)(3)(A)(ii). Once the 60-day window closes, the court

17  determines the lead plaintiff ("most adequate plaintiff").

18  Under the PSLRA, the court "shall adopt a presumption that the most adequate

19  plaintiff is the person or group of persons that . . . has the largest financial interest in the

20  relief sought by the class" *and* "otherwise satisfies the requirements of Rule 23 of the

21  Federal Rules of Civil Procedure." § 78u-4(a)(3)(B)(iii)(I). Only two requirements of

22  Rule 23, commonly referred to as "typicality" and "adequacy," are relevant to the selection

23  of lead plaintiff. In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002). First, the claims or

24  defenses of the lead plaintiff must be "typical of the claims or defenses of the class." Second,

25  the lead plaintiff must be able to "fairly and adequately protect the interests of the class."

26  Fed. R. Civ. P. 23(a)(3)–(4). Once the presumption is established, other potential lead

27  _____

28  [4] No. CV-07-2524-PHX-ROS

<center>- 4 -</center>

1    plaintiffs may rebut it with proof that the "presumptively most adequate plaintiff" *does not*

2    satisfy the two requirements of Rule 23. § 78u-4(a)(3)(B)(iii)(II). This perplexing statutory

3    scheme suggests that the initial determination on typicality and adequacy "should be a

4    product of the court's independent judgment, and that arguments by members of the

5    purported plaintiff class . . . should be considered *only* in the context of assessing whether

6    the presumption has been rebutted." In re Cendant Corp. Litig., 264 F.3d 201, 263–64

7    (3d. Cir. 2001).

8        Therefore, we must first rank potential lead plaintiffs in order of financial interest.

9    Beginning with the potential lead plaintiff who has the greatest financial interest, we make

10   a determination on typicality and adequacy, relying only on that party's "complaint and

11   sworn certification." In re Cavanaugh, 306 F.3d at 730. If the party has made a prima facie

12   showing of typicality and adequacy, that party becomes the presumptive lead plaintiff, and

13   we then consider rebuttal evidence from competing movants for lead plaintiff.  If the

14   presumption is not rebutted, lead plaintiff is determined.  If, however, the presumption is

15   either not established or is successfully rebutted, we go back and consider the typicality and

16   adequacy of the potential lead plaintiff who has the *next greatest* financial interest,

17   proceeding so on until a lead plaintiff is found. Id. at 731.

18       Before applying the PSLRA approach, we note that its enactment was an effort by

19   Congress to counteract the tendency of securities class actions to be "lawyer driven." Before

20   PSLRA, lead plaintiff status generally went to the first to file.  This resulted in a "race to

21   the courthouse," and eager counsel rounded up "lead" plaintiffs who effectively exercised

22   no control over the litigation.  PSLRA's notice requirement slows the race and gives

23   seriously interested class members an opportunity to step forward. The presumption in favor

24   of the movant with the greatest financial interest (who satisfies Rule 23) assumes that a class

25   member with much at stake, often a large institutional investor, will have the most incentive,

26   and be in the best position, to actually exert influence over lead counsel. See id. at 729.

27

28

1    Though Congress has attempted to shift the balance with PSLRA, a review of the

2    documents filed so far in this action makes clear that counsel have nonetheless succeeded in

3    keeping themselves at the forefront of securities class actions.  We have before us six inches

4    of briefing that has precious little to do with the merits of the claim and less to do with the

5    fitness of any class member to steer this litigation.  What we have in abundance is

6    unwelcome sniping among counsel.

7                                        **III**

8    The potential lead plaintiffs must be ranked in terms of their "financial interest" in the

9    litigation.[5]  Courts have proposed several metrics by which to measure financial interest.

10   Fortunately, there is little dispute among the parties on this point.  The parties essentially

11   agree to a ranking in terms of estimated financial loss as follows:  1) the Farrukh Group

12   (about $ 300,000), 2) the McCullough Family (about $ 165,000), 3) the Syntax Investor's

13   Group (about $155,000), 4) St. Clair Shores Police and Fire Retirement System ($28,800),

14   and 5) the Bogdanov Group ($17,590).

15   To begin, we decide whether the Farrukh Group, the proposed lead plaintiff with

16   the largest financial interest, satisfies the requirements of Rule 23 based on its motions and

17   declarations.  We note that a "district court has latitude as to what information it will consider

18   in determining typicality and adequacy." In re Cavanaugh, 306 F.3d at 732.  On the question

19   of adequacy, we focus on the Farrukh Group's status as a "group."  Although the PSLRA

20   allows groups to serve as lead plaintiffs, "courts have uniformly refused to appoint as lead

21   plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating

22   their claims in an effort to become the presumptive lead plaintiff." In re Gemstar-TV Guide

23   Int'l, Inc. Sec. Litig., 209 F.R.D. 447, 451 (C.D. Cal. 2002).  For the most part, to "allow an

24   aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing

25

26   ─────────────

27   [5] Two of the parties who filed complaints, Paula Langley (CV-07-2525-PHX-SRB)
     and the Nagel Family Trust (CV-07-2454-PHX-ROS), have not moved to be appointed lead
28   plaintiff, so we have no way to determine their financial interest.

a lead plaintiff." In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157 (S.D.N.Y. 1997). Such a group is unlikely to "fairly and adequately represent the class" because it is unlikely to engage in the litigation in a meaningful way at all. Fed. R. Civ. P. 23(a)(4). What is more, when unrelated investors are cobbled together, the clear implication is that counsel, rather than the parties, are steering the litigation. See In re Donnkenny Inc. Sec. Litig., 171 F.R.D. at 158 ("[With the PSLRA,] Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff.").

From their papers, it appears that the Farrukh "Group" consists of three completely unrelated individuals from different parts of the country. There is no suggestion how they plan to work together as a cohesive unit. As far as we can tell, each individual has so far participated only to the extent of signing his name onto a boilerplate "certification in support of application of lead plaintiff." See Motion of the Farrukh Group (doc. 15), Ex. A. At one point, the group suggests that we pluck one of its top-two constituents to serve as lead plaintiff "if this Court does not appoint a group as the lead plaintiff." Reply of the Farrukh Group (doc. 38) at 6. We decline to do so. The Farrukh Group moved for lead plaintiff as a group and will be evaluated as such. The willingness to abandon the group only suggests how loosely it was put together.

Given no evidence of cohesiveness, we are not convinced that the Farrukh Group will adequately represent this class. Cf. In re Northwestern Corp. Sec. Litig., 299 F. Supp. 2d 997, 1006 (D.S.D. 2003) (approved group had established a plan for conducting litigation, including mechanisms to call meetings and resolve disagreements). Even if the Farrukh Group had established itself as presumptive lead plaintiff, there is rebuttal evidence. Competing movant Syntax Investor Group has brought to our attention a "press release" issued by the Farrukh Group's counsel the day before the lead-plaintiff window closed, which "urges" Syntax investors to sign up with the firm. Sytnax Investor Group's Reply at 8–9. All members of the Farrukh Group signed certifications in support of lead plaintiff status the next day, January 15, 2008, the day lead plaintiff motions were due.

- 7 -

1
2
3
4
5
6
7

The Farrukh Group does not contest that their participation was a product of counsel's "press release." They even suggest that their signing certifications on the same day (the day motions were due) is evidence of the group's cohesiveness. Farrukh Group's Response (doc. 30) at 9. We are not persuaded. Without determining the ethical implications of counsel's patent effort to solicit clients, we conclude that the Farrukh Group's formation runs directly contrary to the goals of the PSLRA—to reduce lawyer-driven litigation. The Farrukh Group will not be appointed lead plaintiff.

8
9
10
11
12
13
14

Next, we turn to the McCullough Family group, which has the second greatest financial interest. Oddly, the group's principal member, Robert McCullough, Jr., was initially named as a member of a competing proposed lead plaintiff, the Syntax Investor Group. Syntax Investor Group's Motion (doc. 6), Ex. B. In his sworn declaration, McCullough states that he sent his lead-plaintiff certification to the wrong firm "in error." Memorandum of the McCullough Family (doc. 28), Ex. A. Such a blatant gaffe does not bode well for the adequacy of his group to lead this litigation.

15
16
17
18
19
20
21
22
23
24
25
26

The McCullough Family also has difficulty under the typicality prong of Rule 23. Typicality is not satisfied when a proposed lead plaintiff is subject to a unique defense, which could become the focus of the litigation. Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d. Cir. 1976). A review of Robert McCullough, Jr.'s trading history reveals that he was unusually active, making as many as 80 separate transactions of Syntax-Brillian stock in a single day. Declaration of Gustavo Bruckner (doc. 9), Ex. 3. Such a high-volume day trader might be subject to the unique defense that frantic trading belies any true reliance on company reports or even on the integrity of the stock price itself. See In re Safeguard Scientifics, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (noting that day traders often focus on technical price movements rather than price). While a day trader is not ipso facto disqualified from the lead plaintiff role, McCullough's unique trading pattern combined with questions about adequacy establish that his group should not represent the class.

27
28

- 8 -

Next in terms of financial interest is the Syntax Investor Group. This group fails the adequacy prong of Rule 23 for much the same reason as the Farrukh Group. There is simply no evidence that this "group" has a meaningful connection. The group's lack of cohesion is clearly evidenced by the fact, mentioned above, that its initial motion included Robert McCullough, Jr. as a member, even though he had retained separate counsel and was soon filing competing motions of his own.

We next turn to the City of St. Clair Shores Police and Fire Retirement System ("St. Clair"). This is the first group that satisfies both prongs of Rule 23. The opposing movants make no argument against St. Clair other than pointing out its relatively low financial stake in the litigation. But we have thoroughly applied the In re Cavanaugh test, and St. Clair is the first to meet its standards. We are especially encouraged that the client is a public retirement fund and thus more likely to control counsel. We have reviewed St. Clair's proposal of Coughlin Stoia Geller Rudman & Robbins, LLP, as its proposed lead counsel, and Buckley King as its proposed liaison counsel. We conclude that these firms are more than capable of conducting this litigation in the best interests of the class.

Finally, the Bogdanov Group will not be appointed lead plaintiff because the group has less of a financial interest than St. Clair. The Bogdanov Group's contention that one of its constituents is uniquely capable of bringing certain claims is without merit.

## IV

Accordingly, **IT IS HEREBY ORDERED** that St. Clair's motion for consolidation, appointment as lead plaintiff, and approval of counsel (doc. 17) is granted in full. **IT IS FURTHER ORDERED** that all other motions (docs. 6, 11, 15 & 23) are **GRANTED** insofar as they move for consolidation, but are otherwise **DENIED**.

DATED this 4th day of April, 2008.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge

- 9 -

EXHIBIT 7



## U.S. Securities and Exchange Commission

# Day Trading:
# Your Dollars at Risk

Day traders rapidly buy and sell stocks throughout the day in the hope that their stocks will continue climbing or falling in value for the seconds to minutes they own the stock, allowing them to lock in quick profits. Day traders usually buy on borrowed money, hoping that they will reap higher profits through leverage, but running the risk of higher losses too.

While day trading is neither illegal nor is it unethical, it can be highly risky. Most individual investors do not have the wealth, the time, or the temperament to make money and to sustain the devastating losses that day trading can bring.

Here are some of the facts that every investor should know about day trading:

- **Be prepared to suffer severe financial losses**

    Day traders typically suffer severe financial losses in their first months of trading, and many never graduate to profit-making status. Given these outcomes, it's clear: day traders should only risk money they can afford to lose. They should never use money they will need for daily living expenses, retirement, take out a second mortgage, or use their student loan money for day trading.

- **Day traders do not "invest"**

    Day traders sit in front of computer screens and look for a stock that is either moving up or down in value. They want to ride the momentum of the stock and get out of the stock before it changes course. They do not know for certain how the stock will move, they are hoping that it will move in one direction, either up or down in value. True day traders do not own any stocks overnight because of the extreme risk that prices will change radically from one day to the next, leading to large losses.

- **Day trading is an extremely stressful and expensive full-time job**

    Day traders must watch the market continuously during the day at their computer terminals. It's extremely difficult and demands great concentration to watch dozens of ticker quotes and price fluctuations to spot market trends. Day traders also have high expenses, paying their firms large amounts in commissions, for training, and for computers. Any day trader should know up front how much they need to make to cover expenses and break even.

- **Day traders depend heavily on borrowing money or buying stocks on margin**

  Borrowing money to trade in stocks is always a risky business. Day trading strategies demand using the leverage of borrowed money to make profits. This is why many day traders lose all their money and may end up in debt as well. Day traders should understand how margin works, how much time they'll have to meet a margin call, and the potential for getting in over their heads.

- **Don't believe claims of easy profits**

  Don't believe advertising claims that promise quick and sure profits from day trading. Before you start trading with a firm, make sure you know how many clients have lost money and how many have made profits. If the firm does not know, or will not tell you, think twice about the risks you take in the face of ignorance.

- **Watch out for "hot tips" and "expert advice" from newsletters and websites catering to day traders**

  Some websites have sought to profit from day traders by offering them hot tips and stock picks for a fee. Once again, don't believe any claims that trumpet the easy profits of day trading. Check out these sources thoroughly and ask them if they have been paid to make their recommendations.

- **Remember that "educational" seminars, classes, and books about day trading may not be objective**

  Find out whether a seminar speaker, an instructor teaching a class, or an author of a publication about day trading stands to profit if you start day trading.

- **Check out day trading firms with your state securities regulator**

  Like all broker-dealers, day trading firms must register with the SEC and the states in which they do business. Confirm registration by calling your state securities regulator and at the same time ask if the firm has a record of problems with regulators or their customers. You can find the telephone number for your state securities regulator in the government section of your phone book or by calling the North American Securities Administrators Association at (202) 737-0900. NASAA also provides this information on its website at www.nasaa.org/QuickLinks/ContactYourRegulator.cfm.

*http://www.sec.gov/investor/pubs/daytips.htm*

We have provided this information as a service to investors. It is neither a legal interpretation nor a statement of SEC policy. If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.

Home | Previous Page                                        Modified: 04/20/2005

Home | Previous Page

## U.S. Securities and Exchange Commission

**Testimony of**
**Arthur Levitt , Chairman of the**
**U.S. Securities and Exchange Commission**
**Before the Senate Permanent Subcommittee on Investigations**
**Committee on Governmental Affairs, Concerning Day Trading**

*September 16, 1999*

Chairman Collins, Ranking Member Levin, and Members of the
Subcommittee:

I appreciate the opportunity to appear before this subcommittee today to
discuss the recent developments in day trading and the concerns raised by
day trading, and the current initiatives to address these concerns. The
Securities and Exchange Commission ("Commission") has been actively
monitoring this novel trading strategy and I commend the Chairman, the
Ranking Member, and Members of the Subcommittee for holding these
timely hearings.

### I. Introduction

Technology developments, in recent years, have had a fundamental impact
on securities markets. New systems and the explosive growth of the
Internet have provided millions of Americans with unprecedented access to
these markets and introduced many new investors to the benefits of
investing. Technology and the Internet are valuable tools for investors, who
can now monitor, manage, and trade their own portfolios. Investors have
access to a wealth of information, which enables them to make their own
investment decisions. These developments have also had a great impact on
the securities markets by increasing market liquidity and transparency.

Technological advances have also fostered the development of a new kind
of broker-dealer. These firms promote day trading, which discards many
established investing principles, such as choosing securities to buy and sell
based upon company fundamentals and performance. This new trading
phenomenon, while well-publicized, is relatively limited in its reach, with
the number of day traders estimated to be less than 7,000. By comparison,
there are close to 80 million individuals that own stock and more than 5
million investors using the Internet for brokerage services. The Commission
also does not believe that day trading currently presents systemic problems
for our markets.

Nevertheless, the Commission is well aware of the potential for individuals
to be seduced by promises of easy profits by day trading without fully
understanding the risks. Investors should understand that day trading
involves significant risk of loss, and that they should not trade with funds
they cannot afford to lose. Accordingly, in pursuit of the Commission's
mission to ensure fair and orderly markets, and to protect investors, our

regulatory, examination, and enforcement staff are looking closely at the activities of firms that promote day-trading activities. The Commission achieves its mission through the application and enforcement of a regulatory scheme based largely on full and fair disclosure. Further, the Commission's investor education efforts reinforce the most important message about day trading – that it is very risky. We are diligently pursuing those firms that do not fully comply with the securities laws. Ultimately, however, if full disclosure is made, the securities laws do not prohibit day trading.

This testimony is designed to inform the Subcommittee about the differences between day trading and other types of electronic, or on-line trading, the Commission's principal concerns about day-trading activities, and some initiatives taken by the Commission, the self-regulatory organizations ("SROs") and the industry to address these concerns.

## II. What is Day Trading?

The practice of marketing day trading on a retail basis appears to have started about three years ago when advances in computer software allowed individuals to have direct links to the securities markets in a way previously available only to registered professionals. Because the level of individual trading activity varies across a wide spectrum, it is difficult to clearly define "day trading" or "day trader." On one end of the spectrum lie investors who trade occasionally – sometimes on-line – and hold their investments for the longer term. Moving along the spectrum, an increasing number of individuals use their on-line accounts both to invest longer term and to trade short term on momentum or small changes in the price of a stock. On the far end of the spectrum are so-called "day traders," who exclusively buy and sell stock rapidly throughout the day trying to make money on short-term market moves.

A fundamental distinction between a day trader and a more traditional retail investor who manages investments on-line is the kind of broker-dealer through which he or she trades. The typical broker-dealer the Commission identifies as a day-trading firm advertises the day-trading services it offers along with the benefits of day trading, and solicits individuals to become full-time day traders. Most day-trading firms also teach individuals to engage in strategies based on rapid-fire buying and selling of price-sensitive stocks and then encourage these individuals to use this strategy on an ongoing basis. For a fee, some firms --or their affiliates – provide training on how to make money trading on small price movements. Day-trading firms also frequently provide their traders with proprietary software and systems that analyze and chart activity in particular stocks. Typically, day-trading firms offer these services at on-site trading facilities, rather than through Internet web sites. On-line firms, by contrast, merely offer an electronic order entry service to their customers and do not encourage the use of any particular trading strategy.

A second distinction between traditional brokerage and day-trading firms is that day-trading firms provide individuals with "real time" links to the major stock markets and the Nasdaq. These linkages give individuals substantial market information not readily available to the average retail investor and provide direct entry to the firms' order processing systems. This direct access to market-operated order execution systems allows these individuals

to send their orders to a particular market or market maker. Through these systems, day traders can receive a trade execution within seconds.

While on-line and traditional retail brokerage firms often provide real-time quotation information, they do not provide the linkages that day-trading firms do to markets and market makers that allow individuals to make their own order routing decisions.[1] Instead, traditional and on-line firms' systems have pre-set algorithms that determine where a customer's order is routed for execution.

Although broker-dealers are not required to identify themselves as "day-trading firms," 62 broker-dealers, with 287 branch offices, were recently characterized as day-trading firms by the North American Securities Administrators Association ("NASAA").[2] The Commission estimates that the number of day-trading firms, in fact, exceeds 100, and believes that there are approximately 5,800-6,800 persons trading full time through day-trading firms.[3]

## III. Organization of Day-Trading Firms

Day-trading firms are typically organized in one of two ways. Most day-trading firms – like most other broker-dealers – have customers who open accounts with the firm and use the assets in their own accounts to trade. These day-trading firms are registered with the Commission and are members of the National Association of Securities Dealers ("NASD"). As such, they are subject to all Commission and NASD rules.

Other day-trading firms choose to organize as entities such as limited liability companies ("LLCs"), which sell interests in the firm to individuals wishing to day trade. These firms are registered as broker-dealers, but because individuals who day trade at these firms are part owners of the day-trading firms, they are not considered "customers." Instead, these individuals are "associated persons" of the firm. The day-trading firm allows these individuals to trade using a portion of the firm's capital often an amount tied to the amount of each individual's capital contribution.

There are several implications of day traders being part owners of the firm, rather than customers. First, although the firms are registered as broker-dealers with the Commission, day-trading firms organized as LLCs can avoid becoming NASD members, and are therefore not subject to NASD rules. Rule 15b9-1 under the Securities Exchange Act of 1934 ("Exchange Act")[4] exempts a broker-dealer from the requirement of being a NASD member if the broker-dealer does not have customer accounts and is a member of a national securities exchange. Although this exemption was intended primarily for exchange specialists, a number of day-trading firms are organized as LLCs and are using this exemption as a means to maintain membership only in the Phlx. About 12 to 15 day-trading firms are currently members only of the Phlx. Second, as discussed further below, day traders who trade a firm's capital can lawfully use leverage significantly beyond the levels permitted by the customer margin requirements promulgated by the Board of Governors of the Federal Reserve System ("Federal Reserve") and the SROs.

## IV. Risks and Concerns Raised by Day Trading

Investing in securities always involves some degree of risk. The critical issue is whether the investor fully understands the level of risk he or she is assuming. While technology provides innumerable benefits to investors by making trading easier and faster, new and relatively inexperienced investors may be using this technology to trade in ways that do not match their goals and risk tolerance. The Commission believes that the riskiness of day-trading strategies must not be hidden. While individuals should be allowed to make their own investing and trading decisions, they need a clear and complete understanding of what the risks are so that they can make an *informed* decision.

The Commission's mission is to preserve market integrity by promoting fair, orderly, and transparent markets, and to protect investors. An essential component of market integrity is investor confidence. Investors lose confidence when misleading information and exaggerated claims are allowed to go unchecked. Accordingly, the Commission supports efforts to ensure that day traders completely understand the risk implications of their trading decisions, and understand that a day-trading strategy carries high costs. Day traders invariably generate hefty commissions and often pay fees for computer and other electronic services. Consequently, they need to make significant profits simply to cover the costs of their trades. If day traders are adequately apprised of the risks of their day-trading strategy, the Commission believes that individual day traders bear responsibility to make sure that they do not trade with funds they cannot afford to lose.

The Commission staff is currently undertaking examinations of more than 40 day-trading firms.[5] Day-trading firms are registered broker-dealers and, as such, must comply with a panoply of Commission and SRO rules. These firms and their principals can be held liable for violations of the securities laws. Our examinations preliminarily indicate that some day-trading firms are not in compliance with applicable rules and regulations. To date, however, we have not found marked and widespread fraud by these firms. Nonetheless, we have concerns that some day-trading firms may not maintain adequate books and records, or comply with the broker-dealer capital rule, the short sale rule, or margin requirements. These rules are important, and the Commission will vigorously pursue any firms that violate them.

We discuss in greater detail below the Commission's areas of concerns about day-trading firms' operations and the current initiatives to address these concerns.

1. Disclosure and Advertising Practices

The Commission has concerns about the disclosure and advertising practices of broker-dealers that promote day trading and provide facilities for day traders. We also have concerns about some web sites sponsored by unregistered persons that are catering to day traders by providing them with "hot tips" and "expert advice."

The Commission's partnership with the states is a critical part of our efforts in this area. A number of states have been leaders in pursuing false and misleading information disseminated about day trading – not only as a potential violation of securities laws, but also as a violation of state consumer protection laws.

The Commission's concerns are more fully discussed below.

### a. Promotion of Day Trading by Registered Broker-Dealers

Certain of the disclosure and advertising practices of day-trading firms raise concerns under the federal securities laws. Deceptive advertising can be a violation of the antifraud provisions of the federal securities laws. It can also violate the NASD's rules prohibiting exaggerated, unwarranted, or misleading statements or claims and requiring members to observe just and equitable principles of trade. Because the Commission believes that firms should not give day traders unrealistic expectations about the potential to profit and should provide day traders with a full explanation of the risks of their trading activities, our ongoing examinations are focused on identifying advertising and other promotions that are inconsistent with the antifraud provisions or NASD rules.

Day-trading firms use various forms of advertising to solicit potential customers. Newspapers, magazines, and web sites are among the most popular advertising mediums. These firms promote to potential day traders such benefits as "maximum leveraged capital of 10 to 1," "state-of-the-art trading systems," "after-hours trade execution capability," "maximum profit potential," and "training by experienced professionals." In some cases, firms claim to offer services that they do not actually provide. The Commission is most concerned with unbalanced advertising and exaggerated claims of profitability, in other words, advertisements that detail the benefits of day trading without disclosing the associated risks and costs. In some cases, representations by day-trading firms that promise profits without disclosing the inherent risks of the day-trading strategy, including available information on probability of profit, may rise to the level of fraud.

The Commission staff recently reviewed the risk and related disclosures on web sites of more than 20 day-trading firms. Many of these sites had little or no risk disclosure, and some contained statements that were not fulsome about, or even downplayed the risks associated with, day trading. Nevertheless, half of the web sites had considerable disclosure about those risks. In our ongoing examinations of these firms, we are evaluating whether other materials that are given to customers include exaggerated or misleading claims as well as the adequacy of risk disclosure.

We are also concerned about the promotion by some day-trading firms of lending between day traders to cover margin deficiencies without fully disclosing all of the risks. This practice is often referred to as journaling. Regulation T, which governs extensions of credit by and to broker-dealers,[6] provides that a firm may arrange for the extension of credit to or for any customer by any person, provided the broker-dealer does not willfully arrange credit in violation of Regulations U or X.[7] Traditionally, journaling has been used in rare instances when one individual – often a relative – agrees to cover the margin deficiencies of another individual. Typically, these loans are made on an overnight basis to traders who would otherwise face a margin call. The borrowers are typically charged interest of one-tenth of 1 percent daily, which amounts to 36.5 percent on an annual basis. The increasing use of journaling raises significant concerns, particularly if day-trading firms are actively promoting such lending between customers without fully disclosing all of the risks to both lenders and borrowers. It also

raises the concern that some day traders may not fully understand that they are trading beyond their own means.

*b. Advertising by Unregulated Web Sites*

The Commission is also concerned about web sites that, although not operated by day-trading firms, are trying to capitalize on the day-trading phenomenon. These sites offer, for a fee, so-called "expert investment advice." Often the sites will provide stock recommendations on a daily basis to day traders. Many of these sites feature prominent advertising that trumpets the potential rewards of day trading by use of their recommendations. These sites rarely make sufficient risk disclosure. Whether these sites are operating as unregistered investment advisers, however, depends on the facts and circumstances of a particular case.[8] Some of these web sites may provide the type of individualized investment advice that could be covered by the Investment Advisers Act of 1940.

## 2. Leverage

Leverage is a common element in day-trading firms' and their customers' trading. In general, both the broker-dealer net capital rule and customer margin requirements limit leverage. The relative importance of these rules to day traders is directly related to the structure of the firm through which they trade.

When a firm has customers who are day traders, those customers may only day trade in margin accounts. In addition, the firm may only lend to these customers in compliance with both the initial margin requirements of Regulation T and the maintenance margin requirements under SRO rules. Regulation T allows broker-dealers to lend to their customers up to 50 percent of the initial purchase price of stock ("initial margin"). After the initial purchase, the SROs' margin rules require customers to maintain equity in their accounts equal to at least 25 percent of the value of the stock held in the account ("maintenance margin").

Margin requirements are calculated at the end of each day. Accordingly, to comply with Regulation T, a customer must have on deposit in his or her margin account equity (consisting of cash or fully paid securities) equal to 50 percent or more of the purchase price of any stock purchased that day and still held in the account at the end of the day. To comply with SRO maintenance margin requirements, a customer must leave on deposit in his or her margin account equity equal to at least 25 percent of the value of stock held in that account at the end of the trading day.

Because margin requirements are only calculated at the end of each day, a day trader[9] who has no positions in his or her account at the end of the day would have neither an initial margin nor a maintenance margin requirement, assuming no losses in the account. Nonetheless the day trader and, to the extent credit is extended, the firm are at risk during the day.

To address this risk, the SROs established separate margin rules for day traders, which require day traders to demonstrate that they have the ability to meet the initial margin requirements for at least their largest open

position during the day. More specifically, these rules require a customer to deposit in his or her account at the end of the day, the margin that would have been required under Regulation T ( *i.e.*, the 50 percent initial margin requirement) if the customer had not liquidated the positions during the trading day.[10]

If a customer's account is below the initial or maintenance margin minimums, the broker-dealer must ask the customer to deposit additional cash or securities to satisfy the margin deficiency. This request is known as a margin call. Customers typically have 15 days to meet a margin call. Customers who are day traders, however, only have 7 days to meet a call for additional cash or securities.

One purpose for establishing margin requirements was to prevent broker-dealers from lending too much money against collateral whose value had the potential to fall quickly ( *i.e.,* stock). While margin requirements are designed to protect the financial integrity of broker-dealers that provide credit, they also protect customers from taking on too much leverage. Accordingly, the Commission has concerns when firms fail to comply with margin requirements or fail to adequately disclose the risks and costs associated with borrowing money. The Commission's staff has found isolated instances where day-trading firms appear to have failed to comply with margin requirements or properly disclose terms and conditions of loans in contravention of SEC rules.[11] We continue to scrutinize these issues.

As mentioned above, when day-trading firms are organized as LLCs and individual day traders contribute to the firm's capital, the day traders are permitted to trade using the firm's capital. These LLC firms typically participate in joint back office ("JBO") arrangements, which allow them to enhance their borrowing power.[12] JBO arrangements have become popular because they allow day-trading firms to receive preferential margin treatment from their clearing firms. Specifically, a day-trading firm that participates in a JBO arrangement can receive credit from its JBO clearing firm on "good faith" terms. As a result, the customer margin requirements found in Regulation T and SRO rules do not limit the extension of credit to a JBO participant. Rather, credit can be extended for up to 100 percent of the purchase price of the securities. As discussed below, the SROs have proposed revisions to their rules that would make these JBO arrangements more difficult to use.

Because of the borrowing power permitted by JBO arrangements, the leverage of day-trading firms organized as LLCs is limited only by the net capital rule. This essentially allows firms to leverage their position 6 to 1, rather than the 2 to 1 leverage allowed day traders under SROs' rules.

3. Unregistered Broker-Dealer and Investment Adviser Activities

Some day-trading firms are reportedly encouraging individual day traders to take on "partners" or other third parties from whom the day traders would obtain additional funds for trading. Depending on the facts, these activities could be characterized as unregistered broker-dealer or investment adviser activities. The definitions of broker and dealer under the Exchange Act are very broad and could potentially encompass these day traders' third party activities. Specifically, an individual who "is engaged in

the business of effecting transactions in securities for the account of others" ( *i.e.,* a broker),[13] or an individual who is "engaged in the business of buying and selling securities for his own account" *(i.e.,* a dealer),[14] would be required to register as a broker or dealer under Section 15(b)[15] of the Exchange Act. To the extent that individuals are handling funds and securities for others, receiving transaction-based compensation or purchasing securities for third parties, they may be acting as "brokers" or "dealers."

In addition, while investment advisers with less than $25 million of assets under management do not have to register with the Commission, they may have to register in one or more states. Some states have found that individuals at some day-trading firms were operating as unregistered investment advisers.[16]

4. Short Sale Rule Violations

Selling short is a trading strategy that enables an investor, who believes that the price of a security will decline, to profit from the security's decline by selling the security without actually owning it. If the security's price does decline, the investor can purchase the security at the lower price to deliver to the initial purchaser ( *i.e.,* "cover" the short position). If, however, the security's price rises, the investor will have to pay the higher price to cover his short sale and thus incur a loss on the transaction.

The short sale rule prohibits investors from selling an exchange-listed stock short unless the stock's last trade was at the same price or higher than the previous trade – the uptick rule. In addition, firms that sell a stock short or allow their customers to sell short must first make sure that the shares can be borrowed or that delivery of the securities can be made to the purchaser by the settlement date.[17] Although the Commission's short sale rule does not prohibit short selling of Nasdaq stocks, the NASD's rules do.[18]

There have been reports of day traders executing short sales in violation of the short sale rule. Examinations preliminarily indicate that some firms may be deliberately circumventing the short sale rule by falsely designating trades as "long" sales when they are actually short sales. This is an area of focus in the Commission's inspections of day-trading firms.

In addition, under the Exchange Act registered broker-dealers have a duty to supervise their associated persons with a view to preventing violations of the federal securities laws. In the case of firms that are formed as LLCs, day traders are associated persons. Therefore, these LLCs have a responsibility to ensure that their traders fully comply with the securities laws. Accordingly, if a day trader who is trading an LLC firm's capital is found to violate any provision of the federal securities laws, the firm itself could potentially be held responsible and sanctioned by the Commission. Our examinations have found that day-trading firms do not have strong supervisory structures in place, and in particular, may lack the surveillance systems needed to prevent and detect short sale violations by day traders.[19]

When day traders are trading using the firm's capital, and the firm's aggregate position in a stock is "short," the firm must ensure that no trader

at the firm executes any trade that violates the short sale rule. In other words, a firm must have procedures designed to prevent a trader from selling on a down tick when the firm's aggregate position in the stock is short. The Commission found that traders at some LLC firms do not have access to the firm's aggregate position, and would therefore be unable to determine whether they were complying with the short sale rule.

Overall, the Commission has concerns that many day-trading firms may not be complying with the short sale rule and, further, some may have no mechanism for ensuring compliance with this rule.

## V. Commission, SRO and Industry Initiatives

1. Revising Exchange Act Rule 15b9-1

17 CFR 240.15b9-1.

Broker-dealers that are members of a national securities exchange currently do not have to become members of the NASD if they do not have customer accounts. A number of day-trading firms have taken advantage of this exemption and are members only of the Phlx. The Commission staff is considering revisions to this exemption, found in Rule 15b9-1, to require day-trading firms conducting off-floor activities to become members of the NASD and comply with NASD rules. We are considering this revision because we do not think the existing rule structure of the regional exchanges is well-suited for the day-trading business. By amending Exchange Act Rule 15b9-1, all day-trading firms would be subject to NASD rules.

Rule 15b9-1 was intended to exempt exchange specialists from the requirement under Exchange Act Section 15(b)(8)[21] that a broker-dealer be a member of a national securities association. Of course, in adopting any change to the exemption in Rule 15b9-1, we will be careful not to interfere unduly with the valuable market making functions firms, such as specialists, provide to exchanges.

2. Leverage Issues

The Commission and the SROs are reviewing the broker-dealer financial responsibility rules and margin rules to determine whether these rules should be modified or enhanced to better address the increase in day trading. The Commission is also studying credit risk practices at day-trading firms to determine whether the firms are applying prudent credit risk procedures when setting trading limits for customers.

- **Loans Between Customers**

  The Commission is reviewing the use of customer-to-customer unsecured loans ( *i.e.*, journaling). While lawful, we are concerned about this practice, particularly where broker-dealers are actively facilitating these loans. The Commission is evaluating the adequacy of the disclosure made to lenders and borrowers to ensure that it adequately discloses the risks to both parties.

In addition to the disclosure issues, we are looking at these customer-to-customer loans that are used to satisfy day traders' margin requirements. Rather than serving as a guarantee between accounts, these customer-to-customer loans often take the form of a letter of authorization, where the lender agrees that it will make funds available to the borrower for the purpose of meeting margin calls. Generally, these unsecured loans between customers do not violate margin regulations. The Commission and the SROs, however, do not believe that relying on these letters of authorization is a prudent credit practice. Instead, lenders should be required to commit to transfer funds if, for example, there is a loss in the borrower's account.

Some market participants are also concerned about this practice. It was recently reported that Spear, Leeds & Kellogg, a broker-dealer that clears trades for some day-trading firms, is no longer willing to engage in the practice of journaling for its correspondent firms.

- **SRO Actions on Margin and Capital**

As part of the Commission's and SROs' overall review of day-trading firms, the New York Stock Exchange ("NYSE") recently issued an Information Memorandum reminding broker-dealers that they are required to maintain sufficient net capital at all times, not just at the end of the day.[22] This means that day-trading firms organized as LLCs must be able to demonstrate that they have sufficient net capital for intra-day positions, even if the intention of the firm is to liquidate or cover the positions before the end of the same day. Accordingly, a firm must develop procedures for closely monitoring the day-trading activities of its day-trader members to ensure that the firm is not leveraged beyond what is permitted under the Commission's net capital rule.

Generally, the net capital rule requires broker-dealers to take a capital charge if a customer fails to meet a margin call. With respect to outstanding margin calls in customer day-trading accounts, the Commission is working with the NYSE on an Information Memorandum that will remind broker-dealers that they must take a capital charge for outstanding special maintenance margin calls associated with day-trading accounts. The Memorandum will clearly state that a capital charge applies to day-trading margin calls as well as other types of margin calls. The Notice also will remind firms that they should be taking this capital charge even for margin calls on day-trading positions that were liquidated at the end of the day.

In addition, the NASD, in December of 1998, released a Notice to Members clarifying member understanding of margin calculations, under Regulation T and NASD Rule 2520, for day-trading and cross-guaranteed accounts.[23] Further, the Notice to Members clarified that members must be in compliance with the Commission's net capital requirements under Exchange Act Rule 15c3-1.[24]

Specifically, the NASD stated that customers may day trade only in margin accounts because day trading in a cash account could amount

to free riding ( *i.e.*, purchasing a security and then selling it without having paid for the purchase). Thus, day-trading firms must be in compliance with both Regulation T and NASD margin rules at all times. This requires day-trading firms to perform two separate calculations for each customer, one for Regulation T and one for the NASD rule, at the end of each day. Moreover, the NASD reiterated that just because broker-dealers must calculate customer margin at the end of each day does not mean that they can disregard intra-day risk and that they may impose margin calls based on intra-day calculations. However, broker-dealers may not grant additional buying power to customers on the basis of intra-day calculations.

- **Capital Contributions**

  In response to day-trading firms organized as LLCs, the Commission staff is preparing a letter to the SROs to restate the Commission's position that an investor must make a long term investment in the broker-dealer before that investment may be included in the firm's net capital. Under current net capital rules, day traders who invest in an LLC cannot withdraw their investment a short time later if they simply decide to stop day trading. In fact, the investor may not be able to withdraw his investment at all if the withdrawal would jeopardize the firm's net capital position. We are examining firms to ensure that they have treated funds contributed by these investors appropriately, including whether investors in day-trading firms received adequate disclosures regarding the restrictions on their ability to withdraw their investment in the firm. Preliminarily, however, we have not found problems with these agreements.

- **Joint Back Office Arrangements**

  Margin and other credit issues are further being addressed through a series of SRO rule filings that propose capital and equity requirements for members participating in JBO arrangements. As discussed earlier, JBO arrangements allow day-trading firms to borrow from their clearing firm on "good faith terms." In other words, the margin requirement is any amount mutually agreed upon by the parties. JBO arrangements are attractive to day-trading firms because they enable these firms to borrow at lower interest rates and for up to 100 percent of the purchase price of securities. The SRO proposals would limit day-trading firms' ability to use JBO arrangements by establishing significant capital and equity requirements. These new requirements would ensure that clearing firms extend good faith credit to day-trading firms under JBO arrangements in a prudent manner.

3. NASD Sales Practice Proposal

The NASD submitted to the Commission, on August 20, 1999, proposed rule changes designed to address the sales practices of day-trading firms.[25] The first initiative would require firms that promote day-trading activities to disclose to customers, prior to opening accounts, the risks associated with that type of trading. The disclosure would include several points for customers to consider before engaging in day-trading activities, including that the customer should be prepared to lose all of the funds used for day

trading and that day trading on margin may result in losses beyond the initial investment.

The second initiative would require day-trading firms to make a threshold determination that day trading is appropriate for a particular customer. Specifically, a day-trading firm, in approving an account for day trading, would need reasonable grounds for believing that a day-trading strategy is appropriate for a customer by gathering essential facts about the customer. This determination would not be required if the customer signs an agreement stating that he or she does not intend to use the account for day-trading activities. If the firm later discovers that the account is used for day-trading activities, the firm would be required to approve the account for day trading within 10 days of discovery.

The Commission published these proposed rules for comment on September 14, 1999.[26] The comment period will end twenty-one days after the notice has been published in the *Federal Register.*

## 4. Investor Education

The Commission believes that investor protection – at its most basic and effective level – starts with the investor. In this day and age, there is no substitute for investor awareness and caution. Four months ago, the Commission unveiled its new investor education web site, http://www.sec.gov/investor.shtml. The site offers investors the best information and advice we have about investing – including on-line trading and day trading.

Day trading is risky, and it is therefore critical for day traders to understand three things. First, investors should make sure the firm is registered with the Commission and the state in which it does business. Second, investors should check with their state regulator to see whether the firm has a disciplinary record or history of complaints. Finally, investors should understand that day trading may result in severe financial losses, with little expectation of ever making a profit.

## 5. Series 7 Exam

Because some day-trading firms have been able to maintain membership solely in the Phlx, the Commission recently approved a proposed rule change by the Phlx to require persons who are associated with member firms and who trade off the floor of the Phlx to successfully complete the Series 7 Exam.[27] The Series 7 Exam is the basic examination used to qualify persons for registration as general securities representatives. The new rule primarily affects about 1800 day traders at 12 to 15 Phlx member firms, which are organized as LLCs or similar structures.

The rule will help to ensure that these day traders have a basic knowledge of the securities markets and laws, as well as investment products and risks. It will also bring the Phlx qualification requirements in line with those of the NYSE, the American Stock Exchange, and the Chicago Stock Exchange, which require securities traders who do not solicit public business to pass the Series 7 Exam. The Pacific Exchange has filed a similar proposal, which the Commission is currently considering.

### 6. Enforcement Efforts

The Commission's Division of Enforcement is pursuing several active investigations concerning day-trading operations.[28] The bulk of the investigations stem from referrals based upon examinations by the Commission's Office of Compliance Inspections and Examinations; others have arisen from customer complaints. The investigations cover a wide array of potential violations described above, including: margin violations, short sale violations, net capital deficiencies, and misleading advertising.

The Division of Enforcement is also investigating several web sites that, while not day-trading operations themselves, are trying to capitalize on the day-trading phenomenon. These web sites provide self-proclaimed expert stock recommendations on a daily basis to day traders in exchange for a fee. The staff is investigating certain web sites that feature advertising trumpeting the potential rewards of day trading by use of their stock recommendations, while making little or no risk disclosure. In addition to potential misleading advertising, these investigations are also focusing on whether anyone associated with these web sites receives compensation to tout any security without making proper disclosure, or whether anyone is illegally trading ahead of the recommendations.

### Conclusion

The Commission is concerned that all day traders fully understand the costs and risks of engaging in this strategy, and that they only trade with funds they can afford to lose. As discussed above, the Commission is concerned with some day-trading firms' advertising and disclosure practices, the use of leverage, unregistered broker-dealer and investment adviser activities, and short sale rule violations. The Commission, together with the states and the SROs, will continue to vigorously enforce existing laws to protect investors and the integrity of our markets.

[1]

A few on-line firms are beginning to offer their customers services that allow those customers to make their own order routing decisions. However, these services are not promoted as tools for day trading.

[2]

See NASAA, *Day Trading Project Group Report*, August 9, 1999.

[3]

The Electronic Traders Association ("ETA") − a national association that represents order entry and other related firms − estimates that there are 4,000 to 5,000 day traders. The ETA's estimate, however, does not include individuals associated with limited liability companies affiliated with the Philadelphia Stock Exchange ("Phlx"). The Phlx represents that there are approximately 1,800 day traders associated with Phlx member day-trading firms.

4

17 CFR 240.15b9-1.

5

The NASD has also inspected over 20 day-trading firms.

6

Section 7 of the Exchange Act prohibits broker-dealers and other persons from extending credit in contravention of the rules and regulations promulgated by the Federal Reserve. In accordance with its statutory authority, the Federal Reserve promulgated Regulation T "to regulate extensions of credit by broker-dealers." 12 CFR 220.

7

12 CFR 220.13. Regulation U applies to margin stock credit extended by banks and persons other than broker-dealers. Regulation X requires that credit obtained within or outside the U.S. comply with Regulations T and U.

8

In *Lowe v. SEC*, the U.S. Supreme Court held that a publisher of a securities newsletter which provides impersonal investment advice and commentary to subscribers was not covered by the Investment Advisers Act of 1940. 472 U.S. 181 (1985).

9

Under SRO rules, a day trader is a person who buys and sells the same security on the same day at least three times in a calendar year.

10

*See, e.g.*, New York Stock Exchange Rule 431 (f)(8)(B).

11

*See* Exchange Act Rule 10b-16, 17 CFR 240.10b-16.

12

Section 220.7(c) of Regulation T authorizes the creation of JBO arrangements. These JBO arrangements permit "a creditor [to] effect or finance transactions of any of its owners if the creditor is a clearing and servicing broker or dealer owned jointly or individually by other creditors." 12 CFR 220.7(c).

13

Exchange Act § 3(a)(4), 15 U.S.C. 78c(a)(4).

14

Exchange Act § 3(a)(5), 15 U.S.C. 78c(a)(5).

15

Exchange Act § 15(b), 15 U.S.C. 78o(b).

16

*See In Re Day Trade, Inc., et al.,* (Tex. SSB Ref. 98-020) (April 6, 1998).

17

*See* Exchange Act § 10(a), 15 U.S.C. 78j(a) and Exchange Act Rule 10a-1, 17 CFR 240.10a-1; and Exchange Act Rule 10a-2, 17 CFR 240.10a-2. *See also* New York Stock Exchange Rule 440B.

18

See NASD Rule 3350. The NASD's short sale rule applies only to National Market System securities and prohibits short sales of such securities at or below the current best (inside) bid when the current best (inside) bid as displayed on Nasdaq is below the preceding best (inside) bid.

19

In the case of day-trading firms that are not organized as LLC, day traders are customers rather than associated persons. Therefore, these firms do not have a duty to supervise their day-trading customers.

21

15 U.S.C. 78o(b)(8).

22

NYSE Interpretation Memorandum No. 99-8 (August 1999).

23

NASD Notice to Members 98-102 (December 1998).

24

17 CFR 240.15c3-1.

25

The NASD, as part of its recent sales practice and disclosure rule proposal, proposed the following definition of day-trading strategy: "An overall trading strategy characterized by the regular transmission by a customer of intra-day orders to effect both purchase and sale transactions in the same security or securities." See SR-NASD-99-41 (August 20, 1999).

26

Exchange Act Release No. 41875.

27

Securities Exchange Act Release No. 41776 (August 20, 1999) 64 FR 47214 (August 30, 1999).

28

Commission rules and privacy considerations prohibit identification of any firm or individual involved in any of these investigations until such time as the Commission may bring an enforcement proceeding. See SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118 (3d Cir. 1981).

Read the Chairman's oral testimony on this issue.

http://www.sec.gov/news/testimony/testarchive/1999/tsty2199.htm



**U.S. Securities and Exchange Commission**

## Day Trading

Day traders rapidly buy and sell stocks throughout the day in the hope that their stocks will continue climbing or falling in value for the seconds to minutes they own the stock, allowing them to lock in quick profits. Day trading is extremely risky and can result in substantial financial losses in a very short period of time. If you are a day trader, or are thinking about day trading, read our publication, <u>Day Trading: Your Dollars at Risk</u>. We also have <u>warnings and tips</u> about online trading and day trading.

Under the rules of NYSE and NASD, customers who are deemed "pattern day traders" must have at least $25,000 in their accounts and can only trade in margin accounts. For more information, you can read the NASD's <u>Notice to Members</u> and the New York Stock Exchange's <u>Information Memo</u>.

The Connecticut Council on <u>Problem Gambling</u> has a quiz to help you decide if you are gambling in our markets and where to go for help.

*http://www.sec.gov/answers/daytrading.htm*

We have provided this information as a service to investors. It is neither a legal interpretation nor a statement of SEC policy. If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.

Modified: 10/11/2005