UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

LANDMEN PARTNERS INC., Individually
and On Behalf of All Others Similarly Situated,

Plaintiff,

vs.

THE BLACKSTONE GROUP L.P., et al.,

Defendants.

—————————————————— x

: Civil Action No. 08-CV-03601-HB
:
: <u>CLASS ACTION</u>
:
: CONSOLIDATED AMENDED CLASS
: ACTION COMPLAINT FOR VIOLATIONS
: OF FEDERAL SECURITIES LAWS
:
:
:
:
:

Lead Plaintiffs Martin Litwin, Max Poulter and Francis Brady (collectively referred to as "Lead Plaintiffs" or "Plaintiffs") make the following allegations based upon the investigation undertaken by their counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about The Blackstone Group L.P. ("Blackstone" or the "Company"), interviews of former Blackstone employees, interviews of people knowledgeable about Blackstone's business and investments, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a Class consisting of all those who purchased Blackstone common units, which represent limited partnership interests in Blackstone, pursuant and/or traceable to Blackstone's initial public offering on or about June 25, 2007 (the "IPO" or the "Offering"). This action seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") relating solely to strict liability and negligence claims.

2.      Defendant Blackstone describes itself as "a leading global alternative asset manager and provider of financial advisory services" and "one of the largest independent alternative asset managers in the world, with assets under management of approximately $88.4 billion as of May 1, 2007." This case concerns Blackstone's $4 billion IPO. Virtually all of the IPO proceeds went to the Individual Defendants and other Blackstone executives.

3.      The Company earns management fees from its limited partners for managing money in its various funds. Blackstone charges a management fee of 1.5% on its assets under management and also earns performance fees of a twenty (20) percent of the profits generated on a return on

capital it invests for its limited partners.  Historically, the Company's key revenue driver has been performance fees.

4.  Importantly, the value of most of Blackstone's investments, and thus whether the Company has earned performance fees, is determined by Blackstone itself.  These valuations are critical to the Company's generation of performance fees as they determine when Blackstone is entitled to performance fees and they also determine when Blackstone is subject to a "claw-back" of performance fees.  Under Blackstone's agreements with its investment partnerships, the Company is required to refund earned performance fees that have already been paid if the investments perform poorly.

5.  At the time of the IPO, Blackstone reported increasing revenues and earnings and appeared poised for continued revenue growth.  For the last quarter completed before the IPO, the period ending March 31, 2007, Blackstone reported that it earned approximately $653 million in performance fees.

6.  By the time of the IPO, however, certain of Blackstone's portfolio companies were experiencing significant problems which meant that the Company would have to write-down the value of its investments in those companies, have performance fees related to those investments clawed-back and would not generate additional performance fees.  For example, Blackstone had a significant investment in FGIC Corporation ("FGIC").  After Blackstone acquired its interest in FGIC, FGIC expanded from its core business – insuring municipal bond issuances – to insuring collateralized debt obligations ("CDOs"), including CDOs backed by subprime mortgages to higher-risk borrowers and insurance on residential mortgage backed securities ("RMBS") linked to sub-prime mortgages.  As a result, by the time of the IPO, June 2007, FGIC's business was significantly deteriorating as it was exposed to increasing claims on the hundred of millions of dollars in policies

it had written on these toxic securities.  It was therefore foreseeable at the time of the IPO that the company would have performance fees associated with its FGIC investment clawed-back.  As detailed further herein, other Blackstone investments, including but not limited to Freescale Seminconductor, Inc. ("Freescale") and real estate investments, were declining in value and would also lead to fee claw-backs and reduced performance fees.

7.      The registration statement (the "Registration Statement") issued in connection with the IPO, however, did not specifically or adequately disclose these adverse facts and risks. Specifically, the Registration Statement misrepresented and failed to disclose, that at the time of the IPO, certain of the Company's portfolio companies were not performing well and were of declining value and, as a result, Blackstone's equity investment was impaired and the Company would not generate anticipated performance fees on those investments or would have fees "clawed-back" by limited partners in its funds.  In addition, the financial statements in the Registration Statement were materially inaccurate as they did not comply with Generally Accepted Accounting Principles ("GAAP") because they overstated the value of Blackstone's investment in FGIC by at least $122 million and materially overstated the value of its real estate investment portfolio.  The Registration Statement did not even mention Blackstone's investment in FGIC and the term "FGIC" or "Financial Guaranty Insurance Company" did not even appear in the Registration Statement.  Had the Registration Statement not been negligently prepared, it would have disclosed these adverse facts and the financial statements contained therein would have been free from misstatement.

8.      After the IPO, information slowly leaked into the market about certain of the Company's portfolio companies and the price of Blackstone units declined substantially.  Finally, on March 10, 2008, in connection with announcing its financial results for the year ended December 31, 2007, Blackstone reported that it was writing down its investment in FGIC by $122.9 million and

- 3 -

that it had suffered a significant decline in performance fees.  At present, Blackstone units trade for approximately $7.75 per unit – 75% below the IPO price of $31 per unit.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

10.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

11.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  The violations of law complained of herein occurred in substantial part in this District.

12.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

13.     Lead Plaintiffs purchased Blackstone common units, as set forth in their certifications previously filed in this case and incorporated herein by reference, pursuant and/or traceable to the Company's IPO and were damaged thereby.

14.     Defendant Blackstone describes itself as a leading global alternative asset manager and provider of financial advisory services.  Blackstone, which is organized as a limited liability partnership, was founded in 1985.  The general partner of the Company is Blackstone Group Management L.L.C. ("Blackstone Group Management").

15.     Defendant Stephen A. Schwarzman ("Schwarzman") is a co-founder and the Chairman and Chief Executive Officer ("CEO") of Blackstone and the Chairman of the Board of

Directors of Blackstone Group Management. Defendant Schwarzman signed the Registration Statement issued in connection with the IPO and, according to Blackstone's web site, has been involved in all phases of the Company's development since its founding in 1985. Schwarzman received approximately $684 million in proceeds from the IPO.

16. Defendant Peter J. Peterson ("Peterson") is a co-founder and the Senior Chairman of Blackstone and a member of the Board of Directors of Blackstone Group Management. Defendant Peterson signed the Registration Statement. Peterson received approximately $1.92 billion in proceeds from the IPO.

17. Defendant Hamilton E. James ("James") is the President and Chief Operating Officer ("COO") of Blackstone and a member of the Board of Directors of Blackstone Group Management. Defendant James is also a member of Blackstone's Management and Executive Committees and sits on each of the Company's Investment Committees. Defendant James signed the Registration Statement. James received approximately $191 million in proceeds from the IPO.

18. Defendant Michael A. Puglisi ("Puglisi") is a Senior Managing Director and the Chief Financial Officer ("CFO") of Blackstone. Defendant Puglisi serves on the Company's Management Committee and signed the Registration Statement. Puglisi received approximately $13.8 million in proceeds from the IPO.

19. Defendants Schwarzman, Peterson, James and Puglisi are collectively referred to herein as the "Individual Defendants."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

20. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all those who purchased the common units of Blackstone pursuant and/or traceable to the IPO (the "Class"). Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm,

trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  Blackstone sold more than 153 million common units in the IPO.  The precise number of Class members is unknown to Plaintiffs at this time, but is believed to be in the tens of thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Blackstone, its transfer agent or the underwriters to the IPO.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

22.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

23.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that

will be encountered in the management of this litigation that would preclude its maintenance as a class action.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued in connection with the IPO negligently omitted and/or misrepresented material facts about Blackstone and its business; and

(c)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

**SUBSTANTIVE ALLEGATIONS**

**Blackstone and its Business**

26.     Defendant Blackstone describes itself as "a leading global alternative asset manager and provider of financial advisory services" and "one of the largest independent alternative asset managers in the world."

27.     The Company's alternative asset management businesses includes the management of corporate private equity funds, real estate funds, funds of hedge funds, mezzanine funds, senior debt vehicles, proprietary hedge funds and closed-end mutual funds.  Blackstone also provides various financial advisory services, including corporate and mergers and acquisitions advisory, restructuring and reorganization advisory and fund placement services.

28.     Blackstone's predecessor organization was founded in 1985 with its business historically being operated via a large number of separately owned predecessor entities.  To facilitate the IPO, the owners of such predecessor entities completed a reorganization as of the close of

business on June 18, 2007, whereby, with certain limited exceptions, each of the operating predecessor entities and the intellectual property rights associated with the Blackstone name were contributed to five newly-formed holding partnerships (Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively, "Blackstone Holdings")) or sold to wholly-owned subsidiaries of Blackstone (which in turn contributed them to Blackstone Holdings).

29.     Blackstone, which was formed as a Delaware limited partnership on March 12, 2007, is the sole general partner of each of the Blackstone Holdings partnerships.  The Company is operated by its general partner, Blackstone Group Management, which is wholly-owned and controlled by Blackstone's senior Managing Directors and founders.

30.     As of December 31, 2007, Blackstone had sixty five senior Managing Directors and employed approximately 395 other investment and advisory professionals at its New York headquarters and in its Atlanta, Boston, Chicago, Dallas, Los Angeles, San Francisco, London, Paris, Tokyo, Mumbai and Hong Kong offices.

31.     Blackstone operates via four business segments: (1) Corporate Private Equity, which comprises its management of corporate private equity funds; (2) Real Estate, which comprises its management of general real estate funds and internationally focused real estate funds; (3) Marketable Alternative Asset Management, which is comprised of its management of hedge funds, mezzanine funds, senior debt vehicles, proprietary hedge funds and publicly-traded closed-end mutual funds; and (4) Financial Advisory, which comprises its corporate and mergers and acquisitions advisory services, restructuring and reorganization advisory services and Park Hill Group, which provides fund placement services for alternative investment funds.

32.     These business segments are differentiated by their various sources of income, with the Corporate Private Equity, Real Estate and Marketable Alternative Asset Management segments primarily earning their income from management fees and investment returns on assets under management, while the Financial Advisory segment primarily earns its income from fees related to investment banking services and advice and fund placement services.

33.     Blackstone charges a management fee of 1.5% on its assets under management.  The Company also earns performance fees of a twenty (20) percent of the profits generated on a return on the capital it invests for its limited partners.  Blackstone is also subject to a "claw-back" of performance fees which requires the Company to refund to limited partners the funds performance fees that have already been paid if the investments perform poorly.

### The IPO

34.     On or about March 22, 2007, Blackstone filed with the SEC a Form S-1 Registration Statement (the "Registration Statement"), for the IPO.  Thereafter, Blackstone filed with the SEC several amendments to the Registration Statement on Form S-1/A.

35.     On or about June 21, 2007, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, became effective and 153 million of Blackstone's common units were sold to the public at $31 per unit, thereby raising more than $4.5 billion. Blackstone's common units represent limited partnership interests in the Company and holders of the common units participate in the Company's distributions and exercise the rights or privileges available to the Company's limited partnerships under Blackstone's partnership agreement.

36.     The Individual Defendants and other Blackstone insiders received virtually all of the net proceeds from the IPO.  A small portion of the proceeds was used to repay debt.

37.     The Registration Statement represented that Blackstone's investment portfolio, which consisted almost entirely of investment funds controlled by Blackstone, made up the lion's share of

the Company's assets.  These controlled investment funds are consolidated into operating entities of the Company and are referred to in the Registration Statement as "consolidated Blackstone funds." The Registration Statement represented that the consolidated Blackstone funds made up approximately 95% the Company's total assets as of March 31, 2007.[1]  At March 31, 2007, the two largest groups of consolidated Blackstone funds were real estate funds and equity securities funds, which represented almost 40% and 25% of the consolidated Blackstone funds total, respectively.

38.     The Registration Statement described real estate and corporate private equity as being Blackstone's "two largest businesses."  The Registration Statement also represented that "the corporate private equity fund and the two real estate opportunity funds (taken together) we are currently investing [sic] are among the largest funds ever raised in their respective sectors, with aggregate capital commitments of $19.6 billion and $7.2 billion, respectively, as of May 1, 2007."

39.     As detailed further herein, the Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

### At the Time of the IPO, Blackstone Was Experiencing Undisclosed Problems with Several Portfolio Companies and Real Estate Investments

40.     At the time of the IPO, unbeknownst to the investing public, several of Blackstone's portfolio companies were performing poorly such that there was a real, palpable and almost certain risk that the Company would be subject to a claw-back of performance fees and reduced performance fees.  FGIC was being battered by its expansion into insuring sub-prime investments.

---

[1]     Blackstone's financial statements for the quarter ended March 31, 2007, were its most current financial statements in the Registration Statement and Prospectus.

Freescale was struggling with production problems and a declining market for semiconductor chips. In addition, given the substantial problems with FGIC, at the time of the IPO, the Company was required to write-down the value of its investment by $122 million, but which it failed to do until after the IPO. Finally, Blackstone's substantial real estate investments were over-valued on its financial statements accompanying the Registration Statement, required write downs, and performance fees related to those investments would be clawed-back, further reducing Blackstone's investment value.

41.    **FGIC**: At the time of the IPO, Blackstone's investment in FGIC was performing poorly. FGIC was founded in 1983 and was one of the four leading monoline financial guarantors ("monoline"). FGIC is the parent company of Financial Guaranty, its bond insurance arm. Monolines such as Financial Guaranty insure bonds that have been issued by other entities. Financial Guaranty purports to leverage its AAA financial strength rating by Moody's Investors Service ("Moody's"), Standard & Poor's Ratings Services ("Standard & Poor's") and Fitch Ratings ("Fitch") to guarantee the timely repayment of bond principal and interest of an issuer in the event the issuer defaults, thus allowing the debt issued to get the highest possible rating. Financial Guaranty's financial guarantee is designed to protect investors in the event of securities default.

42.    Blackstone owns a twenty-three (23) percent equity ownership interest in FGIC. The Company purchased its ownership in FGIC along with PMI Group Inc. ("PMI") and Cypress Group ("Cypress"). The consortium purchased an 88% interest in FGIC from General Electric Co. in 2003 for $1.86 billion. Following the acquisition, Blackstone was provided with regular access to internal information regarding FGIC's business and operations.

43.    Traditionally, Financial Guaranty focused mainly on conservative municipal bonds. In recent years, lured by larger profits and higher growth rates, Financial Guaranty began writing

insurance on CDOs, including CDOs backed by subprime mortgages to higher-risk borrowers. CDOs are a type of asset-backed security and structured credit product. CDOs repackage bonds, mortgages and other assets into new securities and then use the income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds, loans or other assets, where investors buy slices classified by varying levels of debt or credit risk. Financial Guaranty also begin writing insurance on RMBS transactions linked to sub-prime mortgages.

44.     According to an August 2003, *Standard & Poor's* ("S&P") article, prior to its sale by GE, FGIC had only selectively participated in the mortgage and home equity loan sectors. After its sale however, FGIC significantly expanded its participation into the U.S. mortgage-related securities markets.

45.     A February 24, 2004, article in the *Bond Buyer* by Helen Chang reported, "With new management and strategy in place, Financial Guaranty Insurance Co. continues to move away from the conservative approach to underwriting it took when it was owned by General Electric Co. This quarter [1st quarter of 2004], as the bond insurer completes its reorganization and additional hiring, it will take a more aggressive approach to underwriting, beginning with forays into the housing and health care sectors and structured finance, company officials said."

46.     Thereafter, FGIC continued to moved away from its traditional focus on conservative municipal bonds and began writing insurance on much more lucrative, and risky, RMBS markets, including non-prime and sub-prime mortgages, home equity loans, and high loan-to-value loans.

47.     Concerning the U.S. residential mortgage market, borrowers are generally classified as being either "prime," "non-prime" or "sub-prime." The sub-prime mortgage market generally refers to the mortgage loan market associated with borrowers who have risk profile characteristics that are correlated with a high probability of default. The risk level of potential mortgage borrowers

is often assessed by reference to Fair Isaac & Company ("FICO") scores used by credit rating companies who assess a borrower's credit history and a variety of other factors to help determine a borrower risk of default.  It is generally accepted that a borrower with a FICO score less than 620 is considered sub-prime.

48.      In addition to sub-prime mortgage market, other higher risk mortgages that have recently grown to prominence in the U.S. are "no income/no asset verification" loans, otherwise known as a "NINA" or "no-doc" loans.  These type of mortgages are generally classified as "Alt-A," which are associated with borrowers with FICO scores above 620, but are considered to be higher risk loans because they are originated with reduced or no information verification or borrower documentation.  Accordingly, Alt-A mortgages are commonly referred to as "liar loans" by mortgage industry participants – that is, mortgages which were approved without requiring proof of the borrower's income or assets.

49.      To create a RMBS, a financial institution, acting as a RMBS sponsor, purchases a large number of residential mortgages (often numbering in the thousands) from bank and/or non-bank mortgage lenders.  Usually, the purchased mortgages possess similar characteristics with respect to the quality of the borrower (prime, Alt-A or sub-prime), so that they can be easily pooled and rated.  The pooled mortgages are then sold to a separate, specially formulated, bankruptcy-remote legal entity ("SPE" or "SPV") created by the sponsor, in part so that sponsors can transfer the mortgages, and their related risks, off of their balance sheets.

50.      The SPE or SPV takes title to the individual mortgages and issues bonds or RMBS that are collateralized by the underlying mortgage pool real estate.  The RMBSs are issued in tranches, ranging from "High Grade" (AAA and AA-rated bonds), "Mezzanine" (BBB- to B-rated bonds), and an unrated equity tranche, sometimes referred to as the "residual."  AAA-rated paper is

derived from a pool of sub-prime mortgages through a prioritization of payments and the apportionment of losses among the different classes of bonds.

51.     Typically, the AAA-rated tranche of the RMBS received first priority on the cash flows from the underlying mortgages. The investors owning this higher rated RMBS tranche receive a lower interest rate, reflecting less reward for the presumed lower risk. Conversely, the equity tranche holders received the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experience defaults.

52.     The following chart illustrates the creation and structure of a typical RMBS issuance:



53.     Structurally, a CDO very much resemble RMBS. Similar to a RMBS, CDOs involve a transfer of assets to an SPE or SPV and both involve the issuance of bonds by the SPE or SPV that are collateralized with the transferred assets. The major difference between a RMBS and CDO is that RMBSs are collateralized by pools of residential mortgages and CDOs are collateralized by a pool of RMBS tranches. Ultimately, however, the RMBS and CDO are collateralized with the same real estate underlying the residential mortgages. Accordingly, a rise in real estate foreclosures will

- 14 -

result in a domino-type of decline in value of the RMBS and CDO instruments upon which their cash flow is ultimately based.

54.     Like a RMBS, CDO bonds are divided into tranches based on a prioritization of payments and the apportionment of potential losses suffered by the underlying RMBS.   The following chart illustrates the creation and structure of a typical CDO:



55.     The financial structures described above are traditional or "cash" RMBS and CDOs. In addition to these structured finance products, financial institutions created "synthetic" CDOs such as one backed by credit default swaps ("CDS"), which function as a form of insurance policy by protecting the holder of a CDO against default.   Accordingly the issuer of a CDS, *i.e.,* the insurance

seller, obtains periodic payments from the CDS purchaser, *i.e.*, insurance purchaser, in exchange for protecting the CDS purchaser from non-performance by the issuer of a CDO.

56.     In 2004, FGIC announced that it hired personnel to initiate its efforts to begin offering financial guarantees on CDOs. The guarantees FGIC issued on RMBS and CDOs were in the form of CDSs. While CDSs do, in substance, insure the holder against the risk of default, they are not, in form, an insurance contract. Accordingly, they are subject to or governed by the regulations of state insurance departments, and significantly, CDSs do not subject its issuer to the capital requirements associated with traditional insurance contracts.

57.     Thus, FGIC obtained a steady stream of payments from CDS holders in exchange for exposing itself to billions of dollars in potential liabilities in the event the non-prime mortgage-backed assets underlying the CDS declined in value – a reality that emerged when, as noted below, sub-prime and Alt-A U.S. mortgages began experiencing massive defaults throughout 2006 and 2007.

58.     Since no capital was required or cost was directly associated with them, the CDS financial guarantees issued by FGIC provided it a steady stream of periodic payments that, in essence, were "pure profits" to FGIC, and the more CDSs it issued, the more profit it made. As a result, FGIC was financially motivated to issue CDSs. By the time of the IPO, FGIC was exposed to billions of dollars in non-prime mortgages, with its total CDS exposure close to $13 billion in the summer of 2007.

59.     Three main indicators are used by industry experts to assess the current state of, and future prospects for, the U.S. mortgage market: (1) interest rates; (2) the U.S. Housing Price Index, which measures changes in home prices; and (3) delinquency rates, which monitor the percentage of mortgagors who default on their mortgage obligations.

60.     In June 2004, Federal Reserve signaled that it would began to increase key short-term interest rates.  As a result, the U.S. prime interest rate, which had remained flat at four percent for more than a year, climbed steadily throughout 2005 and 2006 before reaching 8.25% in June 2006. As key short-term and the prime rates rose, other interest rates rose as well, including those for most residential mortgage loans.  This rise in interest rates made it more difficult for borrowers to meet their payment obligations, particularly since many of the borrowers of the sub-prime mortgage pools held adjustable rate mortgages.

61.     As illustrated in the chart below, at the same time that interest rates were rising, U.S. property value appreciation began to slow significantly and actually began a decline in several U.S. markets during 2006:



62.     The combination of higher interest rates and the dramatic slowing of U.S. property appreciation was devastating to U.S. non-prime borrowers who over-extended themselves by purchasing homes that they could not afford without low initial "teaser" mortgage interest rates.

Previously, when property values were increasing, non-prime borrowers were able to refinance their loans as mortgages adjusted to higher interest rates.  As interest rates rose and property prices leveled, many non-prime U.S. borrowers were unable to refinance their existing loans when they could not meet their payment obligations.  The result – beginning in 2005 – was a significant increase in U.S. mortgage default rates, particularly for sub-prime mortgage loans.

63.     For example, in August 2005, HSBC Holdings PLC ("HSBC") issued a memo to companies from which it was buying loans.  The paper, called "Threads of Early Payment Default," reported that delinquencies were rising.  HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened fraud incidents."  When borrowers didn't have to verify their incomes, the report said they were overstating them, and they bolstered their false claims by overstating their job positions.

64.     An August 23, 2006, story on CBS' *MarketWatch* noted, "July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday."

65.     On August 29, 2006, *Dow Jones Newswires* reported "[m]ore subprime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

66.     A September 15, 2006, article on *CNNMoney.com* noted:

In August, 115,292 properties entered into foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales.  That was 24 percent above the level in July and 53 percent higher than a year earlier.

It was the second highest monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.

Some of the bellwether real estate market states are among the leading foreclosure markets. Florida had more than 16,533 properties in foreclosure in August. That led all states and was 50 percent higher than in July and 62 percent higher than in August 2005.

California foreclosures are increasing at an even faster annual rate, up 160 percent since last year to 12,506. And the formerly red-hot Nevada market recorded a spike of 24 percent compared with July and a whopping 255 percent increase from August 2005.

*      *      *

Usually, foreclosures are a lagging [market] indicator [ ] But we've never had a situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming up for adjustment over the rest of the year.

*      *      *

These exotic mortgages, which have been issued by lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate mortgages. And sub-prime loans, which are much more common than in the past, have a higher default rate as well.

67.    On November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that sub-prime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year. About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

68.    On November 30, 2006, the *National Mortgage News* reported:

**"**How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities]. We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.

Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever," he said.

**Foreclosures have also risen. And the foreclosures, like the delinquency rates, are also happening at earlier dates**. [Emphasis added.]

- 19 -

69.     On December 13, 2006, the *Associated Press* reported:

**U.S. mortgage delinquency rate rises sharply**

Late Mortgage Payments Jump in Summer

**Late mortgage payments shot up in the third quarter as higher interest rates squeezed budgets and made it harder for homeowners – especially those with weaker credit records – to keep up with their monthly obligations.**

The Mortgage Bankers Association, in its quarterly snapshot of the mortgage market released Wednesday, reported that the percentage of mortgage payments that were 30 or more days past due for all loans tracked jumped to 4.67 percent in the July-to-September quarter.

That marked a sharp rise from the second quarter's delinquency rate of 4.39 percent and was the worst showing since the final quarter of last year, when delinquent payments climbed to a 2 1/2-year high in the aftermath of the devastating Gulf Coast hurricanes.

The association's survey covers 42.6 million loans.

Delinquency rates in the third quarter were considerably higher for "subprime" borrowers – people with weaker credit records who are considered higher risks – especially those who have adjustable-rate mortgages.

Subprime borrowers had a delinquency rate of 12.56 percent in the third quarter, **the highest in more than three years**.  The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher -- at 13.22 percent in the third quarter, also the worst reading in more than three years.  [Emphasis added.]

70.     By early 2007, some of the top mortgage lenders with sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future market losses.  For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC announced that provisions for bad loans would be 20% higher than analysts expected.  On that the same day, New Century Financial, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults.

71.     Indications of turmoil in the U.S. sub-prime mortgage market continued as other mortgage lenders, including Countrywide Financial and Washington Mutual, reported huge losses.

According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on sub-prime mortgage loans in 2006 ***more than doubled*** from 2005.

72.      By March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending business completely.  Then, on April 2, 2007, New Century Financial Corporation announced that it was filing for Chapter 11 bankruptcy protection.

73.      Accordingly, by the time of the IPO, the following U.S. mortgage market events had occurred: (a) mortgage interest rates trended higher during the two years preceding the IPO; (b) home prices had stagnated and began to fall; (c) there was a dramatic rise in sub-prime mortgage loans delinquency rates; (d) there was a significant increase in early payment defaults on non-prime mortgage loans; and (e) subprime and Alt-A mortgage loan originators were closing or winding down business.

74.      In addition, numerous reports were published about non-prime loans being associated with rampant mortgage fraud, and public indices, like the ABX Index, which tracks the cost of buying protection [*i.e.*, CDSs] for sub-prime mortgage-backed securities, indicating that sub-prime mortgage loan risk has increased dramatically.

75.      Each of these factors were strong indicators that the problems being experienced by sub-prime lenders would generate huge losses for FGIC on the financial guarantees in the form of CDS arrangements it issued to its counterparties.  In fact, the likelihood that FGIC would incur huge losses on the CDSs it issued was exacerbated by the fact that, in many instances, FGIC's counterparties had the ability to accelerate payment from FGIC.  This provision allowed FGIC's CDS counterparties to accelerate and receive payment from FGIC even though a default event on the reference assets had not occurred.

- 21 -

76.     As a major investor in FGIC, Blackstone had a duty to disclose the then-known trends, events or uncertainties associated with FGIC that were reasonably likely to cause the Blackstone's financial information not to be indicative of future operating results.  These omitted facts would have been viewed by investors as substantially altering the total mix of information available to investors.

77.     **Freescale**: In addition, prior to the IPO, a major corporate private equity fund controlled by Blackstone had invested in Freescale, a semiconductor designer and manufacturer. Shortly before the IPO, Freescale lost an exclusive agreement to manufacture wireless 3G chipsets for its single largest customer, Motorola.  The loss of this exclusive arrangement had a material adverse affect on Freescale's business and the value of the major corporate private equity fund controlled by Blackstone at the time of the IPO.  In addition, at this time Freescale was experiencing declining demand for its products as demand for semiconductors has dropped dramatically.

78.     The Registration Statement represented that in 2006, corporate private equity funds controlled by Blackstone invested $3.1 billion in Freescale.[2]  This was the single largest investment by a corporate private equity fund controlled by Blackstone since 2004, dwarfing the next largest corporate private equity fund investment by more than three times.

79.     Freescale designs and manufactures embedded semiconductors and operates through three major business divisions: transportation products, wireless and mobile solutions, and network

---

[2]     The Registration Statement indicates that the amounts invested in the Blackstone's private equity funds constitutes equity invested by corporate private equity funds, and includes equity invested by Blackstone's limited partner co-investors and equity invested by limited partners of its corporate private equity funds outside of its corporate private equity funds.

and computing systems.  Prior to 2007, Freescale was the exclusive supplier of 3G wireless chipsets to its largest customer, Motorola.[3]

80.     During 2005, and then more acutely in 2006, Freescale began experiencing problems manufacturing Argon LV chipsets for Motorola's new 3G line of cell phones.  These production problems hampered Motorola's ability manufacture new 3G cell phone models in time for the critical 2006 holiday selling season.  Motorola and Freescale collaborated in the design of Argon chipsets that Motorola intended to use in its 3G model phones.  Flaws in the design of the chipsets caused quality issues related to the mounting of the chips, which caused Freescale to experiencing poor manufacturing yields on the Argon chipsets.

81.     The Argon LV chipsets required that two chips be stacked one on top of the other, and in the process of mounting the chips, the chipset warped.  The defects with Freescale's Argon LV chips delayed the release of Motorola's 3G phones until sometime in late November/early December 2006, which negatively impacted Motorola's fourth quarter 2006 operating results because there was not sufficient time to get the cell phones through the distribution channels in time for the critical fourth quarter sales.

82.     On April 27, 2007, the *Wall Street Journal* published a story on Motorola, stating, in relevant part:

> Its [Motorola] work on 3G phones also faced problems.  A semiconductor unit Motorola had spun off was having trouble developing new chips for 3G cellphones.  That slowed work on them because Motorola had pledged to buy all cellphone chips from the spun-off unit through 2006.  The deal also meant the Motorola couldn't shop for cheaper chips elsewhere, squeezing profit margins of existing phones.

---

[3]     Freescale was formerly owned by Motorola and was spun-off from it in 2004.

83.     As a result of these problems, on March 21, 2007, Motorola's then CEO, on a conference call with securities analysts, announced that it was terminating its exclusive 3G chipset supplier relationship with Freescale:

> As you know, we had a silicon supplier for most of our products as part of the separation a couple years ago.  And if you're going to be as big as we are – I think we outlined this in January – that we need to have multiple sources of silicon for different price points across our product line, whether it's 3G at the high end or whether it's some of the products at the low end.  And so we need to diversify real time here and we've got to accelerate that, and I don't think I saw the kind of acceleration and commitment to a silicon strategy.

84.     The difficulties Freescale encountered with manufacturing Motorola's new 3G chipsets had a material adverse affect on Freescale's relationship with its largest customer, Motorola.  As a result, at the time of the IPO, a very material corporate private equity fund controlled by Blackstone was facing significantly reduced growth prospects and bloated levels of semiconductor inventory that was subject to rapid technological obsolesce.

85.     These adverse facts, had a material adverse affect on Freescale's business and, concomitantly, the material corporate private equity fund controlled by Blackstone.

86.     On April 25 2007, the management of Freescale held a conference call with securities analysts.  On that call, Freescale's management represented:

- . . . revenue in our wireless business were negatively impacted by a sales decline due to weak demand in our largest customer Motorola.  To give you a picture for what happened to us, the first quarter [2007] was progressing at a pace that would have resulted in our performance being in line if not slightly better with the industry, much like our Q4 performance.  During the last several weeks of the quarter, our main wireless customer began to reduce their orders, a significant change in activity from the order rate and demand signal provided earlier in the quarter.  We quickly adjusted to the slowdown in wireless revenues by optimizing internal loading, taking cost actions, and reducing our capital expenditures.  Those are the actions that have helped to moderate the impact on our gross margin, EBITDA and cash.

- As Michel discussed, revenues in our wireless business were negatively impacted by the significant sales decline due to reduced demand of our largest customer.

- Our inventory, our days inventory did increase driven by the sharp decline in our wireless revenues late in the quarter.

- So I haven't changed my view on what's happening at Motorola.  And I want to make sure that you understand that I haven't changed.  I mean we have said repeatedly that as 3G becomes more and more of Motorola going forward, they are going to diversify.  We are not expecting, we have never expected, to gradually become 100% of Motorola's silicon.  We have been 50%, 45% to 55% historically over the years of their silicon in 2G, 2.5G.  In 3G, because they started with us, we were at 100%, today have 100% of the opportunity.  And we said repeatedly when they announced one design win with QualComm at one point and when TI came out.  And we said, yeah, we expect that going forward on 3G, they're going to have a multi vendor strategy which, for a company of their size, they had it in 2 and 2.5G and there's no reason that all of a sudden they should change in 3G.  So what you observe is that happening and I think Motorola has also made some comment that they were a little bit behind in diversifying and a lot of people are taking those comments and saying, aha, Motorola is moving away from Freescale.  And of course you can expect all of our competition to claim that they are now getting into Motorola.  But frankly, it has not been a surprise for us.  We know it is going to be a competitive landscape going forward at Motorola like it has been.  I repeat, and I want to make sure everybody understands, that even when Freescale was an internal division of Motorola, it never had 100% of the silicon opportunity.

87.     **Real Estate Investments**: At the time of the IPO, Blackstone had significant investments in real estate.  As noted herein, by the time of the IPO, the market for real estate in several significant markets were starting to deteriorate.  Further, at the time of the IPO, the U.S. real estate market was being adversely affected by a series of negative developments in the credit markets.  Accordingly, by the time of the IPO, it was foreseeable that the Company would have performance fees clawed-back in connection with its real estate investments and would not generate additional performance fees on those investments.

## The Registration Statement Contained Materially Inaccurate Statements

88.     The Registration Statement represented that Blackstone's real estate fund investments accounted for more than one-third of the Company's assets at March 31, 2007.  With respect to the Company's real estate investments, the Registration Statement represented:

**The real estate industry is also experiencing historically high levels of growth and liquidity driven by the strength of the U.S. economy, office employment growth, limited new construction and the availability of financing for acquiring real estate assets.  Concurrently, replacement costs of real property assets have continued to escalate substantially**.  Since 2001, gross domestic product, or "GDP," growth has steadily improved, and GDP is currently predicted to grow at an average annual rate of approximately 3.1% from 2007 through 2009 as indicated by Haver Analytics, World Bank Indicators and Oxford Economic Forecasting.  In addition, recent job growth statistics have indicated higher employment levels during 2005 and 2006, which generally produces greater demand for real estate assets.

**The strong investor demand for real estate assets is due to a number of factors, including persistent, reasonable levels of interest rates, the lack of alternative investments that provide the same levels of expected returns and the ability of lenders to repackage their loans into securitizations, thereby diversifying and limiting their risk.  These factors have combined to significantly increase the capital committed to real estate funds from a variety of institutional investors, including institutional pension funds**.  As a result, the amount of global real estate funds raised has increased dramatically in the past four years, as indicated by the following chart:

Global Real Estate Funds Raised



Amounts include the amount of equity that property funds and real estate debt funds were seeking at the time each annual survey was conducted.  Source: Real Estate Alert

[Emphasis added.]

These statements were materially inaccurate since, as noted in detail above at the time of the IPO,

the U.S. real estate market had passed its zenith and was in a midst of a prolonged decline.

### The Registration Statement Was Required to Disclose the Problems with
### FGIC, Freescale and the Company's Real Estate Investments

89.     Pursuant to Item 11 of Form S-1, registrants are required to provide in a registration statement the information required by Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  The adverse events and uncertainties associated with Blackstone's investments in FGIC, Freescale and real estate were reasonably likely to have a material impact on Blackstone's continuing operations and therefore were required to be disclosed in the Registration Statement, but were not.

90.     In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract . . . .  A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

91.     Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

92.     Here, the problems with FGIC, Freescale and the Company's real estate investments had come to fruition and would have a negative impact on the Company's continuing operations. Accordingly, the Registration Statement was required to disclose these facts but did not.

93.     These known trends, events or uncertainties that were reasonably likely to have a material adverse effect on Blackstone's investment in FGIC, and consequently, on Blackstone's future operating results, were negligently omitted from the Registration Statement.  In fact, the Registration Statement did not mention Blackstone's investment in FGIC and the term "FGIC" or "Financial Guaranty Insurance Company" did  not even appear in the Registration Statement.

### The Financial Statements in the Registration Statement Were Materially Inaccurate and Violated GAAP

94.     The Registration Statement contained Blackstone's audited Combined Statements of Financial Condition as of December 31, 2006, and its audited Combined Statements of Income, Changes in Partners' Capital, and Cash Flows for the years ended December 31, 2006, 2005 and 2004.

95.     The Registration Statement also included Blackstone's unaudited Combined Statements of Financial Condition as of March 31, 2007, and its unaudited Combined Statements of Income, Changes in Partners' Capital, and Cash Flows for the three months ended March 31, 2007 and March 31, 2006 (the "interim financial statements").

96.     The interim financial statements included in the Registration Statement violated GAAP and were each materially inaccurate in that they overstated the value of Blackstone's investment in FGIC at March 31, 2007, and failed to provide the disclosures required by GAAP about Blackstone's investment in FGIC.  In addition, the interim financial statements included in the Registration Statement violated GAAP and were materially inaccurate in that they overstated the value of Blackstone's investments in consolidated real estate funds at March 31, 2007.  Since the values Blackstone attributed to these asset values were inflated, the Company's income for the quarter ended March 31, 2007, as reported the Registration Statement violated GAAP and was materially overstated.

97.     Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Generally Accepted Auditing Standard ("GAAS") AU §411.02.

98.     The interim financial statements in the Registration Statement represented that all of Blackstone's investments at March 31, 2007, were at their fair value.  These investments included Blackstone's: (a) Investments in Consolidated Blackstone Funds; (2) Equity Method Investments, and (3) Other Investments.  Such financial statements in the Registration Statement also state that its equity method investments were reported at their fair value.

99.     Pursuant to GAAP, primarily noted Accounting Principles Board ("APB") Opinion No. 18, investments in corporate entities over which the investor can exert significant influence (but not control) should be accounted for using the "equity method."  The investing entity is presumed to have significant influence if it has 20% or more of the voting rights in a corporate investee.  Under

the equity method, the investment should be recorded initially at cost, with adjustments made to that value to reflect the investor's share of post-acquisition profits and losses, dividends and impairments.

100.    An exception to equity method exists if the investing entity elected to measure the investment at fair value pursuant to an irrevocable "fair value option."

101.    GAAP's guidance associated with the so called "fair value option" is set forth in the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities.*  Pursuant to SFAS No, 159, companies have the option to report selected financial assets or liabilities at fair value, with changes in the fair values of such assets and liabilities between accounting periods reported in earnings as unrealized gains and losses at each subsequent reporting date.

102.    As noted above, Blackstone acquired a 23% interest in FGIC during 2003.  As such, Blackstone was required to account for FGIC utilizing the equity method of accounting.  However, the financial statements in the Registration Statement represented that Blackstone's equity method investments were reported at their fair values, indicating that Blackstone adopted the fair value option for such investments.

103.    Concerning SFAS No. 159, the Registration Statement disclosed:

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*, ("SFAS 159").  SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value, with changes in fair value recognized in earnings.  We are ***currently evaluating*** the potential effect on our combined financial statements of adopting SFAS 159.  [Emphasis added.]

104.    If Blackstone did not elect to utilize fair value option in accounting for its investment

- 30 -

in FGIC, Blackstone was required to account for FGIC under the equity method.[4]  Pursuant to APB Opinion No. 18, Blackstone would have been precluded from reporting its equity method investments, including FGIC, at fair value, thereby rendering the interim financial statements in the Registration Statement materially inaccurate and in violation of GAAP.[5]

105.    If Blackstone did elect to utilize fair value option in accounting for its investment in FGIC, the interim financial statements presented in the Registration Statement was materially inaccurate and violated GAAP because: (a) the fair value Blackstone attributed to its investment in FGIC was negligently inflated at March 31, 2007 which, in turn, materially overstated the Company's reported income during the quarter ended March 31, 2007; and (b) the interim financial statements failed to provide the discloses mandated by SFAS No. 159.

106.    As noted above, by early 2007, the U.S. real estate market was already in the midst of a freefall from its 2005 apex, as property values plummeted and mortgage defaults soared. Declining property values coupled with rising interest rates caused delinquency rates of non-prime loans to rise sharply.

---

[4]     Blackstone was precluded from utilizing the provisions of SFAS No. 115 in accounting for FGIC as it was a privately owned entity without a readily determinable fair value, as defined, at March 31, 2007.

[5]     In its Form 10-K for the year ended December 31, 2007, Blackstone reported:

The Partnership evaluates for impairment its equity method investments, including any intangibles and goodwill related to the acquisition of such investments, whenever events or changes in circumstances indicate that the carrying amounts of such investments may not be recoverable in accordance with APB 18. The difference between the carrying value of the equity method investment and its estimated fair value is recognized as an impairment when the loss in value is deemed other than temporary.

107.    As a result, FGIC was exposed to huge losses on the financial guarantees it issued to its counterparties by March 31, 2007.  Indeed, FGIC's exposure to such losses was exacerbated by the fact that, in many instances, FGIC's counterparties had the ability to accelerate payment from FGIC.  These losses dramatically reduced the value of Blackstone's equity investment in FGIC by no later than March 31, 2007.

108.    Moreover, public indices, such as the ABX Index, created via a collaboration among leading investment banks and with Markit Group Limited, a provider of financial data, indicated that by no later than October 2006, subprime mortgage-derived fixed income instruments were being adversely affected by the subprime mortgage crisis.[6]

109.    As set forth in the chart below, during the 4Q06 and the first half of 2007, the value of the ABX Index plummeted, evidencing that the cost of insuring sub-prime RMBS and CDO bonds had increased dramatically due to a higher risk of default:



---

[6]    The ABX Index tracked the performance of 15-20 equally-weighted RMBS tranches backed by sub-prime collateral and was used by market participants as a barometer for assessing how sub-prime loan related assets were performing in the market place.

110.    The collapse of the non-prime series within the ABX Index indicated that FGIC had a very high probability of incurring massive losses on the CDSs it issued, which dramatically reduced the fair value of Blackstone's equity investment in FGIC at March 31, 2007.

111.    In addition to overstating the value of Blackstone's investment in FGIC at March 31, 2007, the interim financial statements included in the Registration Statement violated GAAP and were materially inaccurate in failing to provide the disclosures mandated by SFAS No. 159.

112.    Specifically, the interim financial statements included in the Registration Statement negligently omitted the following disclosures required by SFAS No. 159:

- Information to enable users of its financial statements to understand management's reasons for electing or partially electing the fair value option;

- Information to enable users to understand how changes in fair values affect earnings for the period;

- The same information about certain items (such as equity investments and nonperforming loans) that would have been disclosed if the fair value option had not been elected;

- Information required by paragraph 20 of APB Opinion No. 18 for investments that would have been accounted for under the equity method if the entity had not chosen to apply the fair value option; and

- Information to enable users to understand the differences between fair values and contractual cash flows for certain items.

113.    In addition to the foregoing, the interim financial statements in the Registration Statement violated GAAP and were materially inaccurate in that they overstated the value of Blackstone's investments in consolidated real estate funds at March 31, 2007.

114.    GAAP required that Blackstone's financial statements report the Company's investment fund assets at fair value. Accordingly, the Registration Statement disclosed:

> The Blackstone Funds are, for GAAP purposes, investment companies under the AICPA Audit and Accounting Guide *Investment Companies*. Thus, **such funds reflect their investments**, including Securities Sold, Not Yet Purchased, on the Condensed Combined Statements of Financial Condition **at fair value, with**

**unrealized gains and losses resulting from changes in fair value reflected as a component of Other Income in the Condensed Combined Statements of Income**.

Fair value is the amount that would be received to sell an asset or paid to transfer a liability, in an orderly transaction between market participants at the measurement date (i.e., the exit price). Additionally, these funds do not consolidate their majority-owned and controlled investments (the "Portfolio Companies").

The Company has retained the specialized accounting for the Blackstone Funds pursuant to EITF Issue No. 85-12, *Retention of Specialized Accounting for Investments in Consolidation*.

The fair value of the Company's Investments and Securities Sold, Not Yet Purchased are based on observable market prices when available. Such prices are based on the last sales price on the measurement date, or, if no sales occurred on such date, at the "bid" price at the close of business on such date and if sold short, at the "asked" price at the close of business on such date. Futures and options contracts are valued based on closing market prices. Forward and swap contracts are valued based on market rates or prices obtained from recognized financial data service providers.

A significant number of the investments have been valued by the Company, in the absence of observable market prices, using the valuation methodologies described below. Additional information regarding these investments is provided in Note 3 to the condensed combined financial statements. For some investments, little market activity may exist; management's determination of fair value is then based on the best information available in the circumstances and may incorporate management's own assumptions. The Company estimates the fair value of investments when market prices are not observable as follows.

*Corporate private equity, real estate and mezzanine investments* - For investments for which observable market prices do not exist, such investments are reported at fair value as determined by the Company. Fair value is determined using valuation methodologies after giving consideration to a range of factors, including but not limited to the price at which the investment was acquired, the nature of the investment, local market conditions, trading values on public exchanges for comparable securities, current and projected operating performance and financing transactions subsequent to the acquisition of the investment. These valuation methodologies involve a significant degree of management judgment. [Emphasis added.]

115.    During the quarter ended March 31, 2007, Blackstone reported a gain of $540 million on real estate investment activities. This gain, which accounted for almost one-half of Blackstone's net income during the quarter ended March 31, 2007, was predominately an unrealized gain – that is,

it was the result of an increase in the values Blackstone ascribed to the real estate funds it controlled during the quarter ended March 31, 2007.

116.    As noted in detail above, by early 2007, the U.S. real estate market was well in the midst of a freefall from its 2005 apex as property values plummeted.  Had Blackstone recorded the real estate funds it controlled during the quarter ended March 31, 2007, at their true fair value, Blackstone would have recorded a loss during the quarter March 31, 2007, instead of $1.1 billion in income.

117.    In addition to the violations of GAAP noted above, Blackstone's interim financial statements contained in the Registration Statement were presented in violation of at least the following provisions of GAAP:

(a)    The principle that financial statements recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*e.g.*, likely) that an asset has been impaired or a liability has been incurred, and the amount of such loss can be reasonably estimated.  (SFAS No. 5);

(b)    The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred.  (SFAS No. 5);

(c)    The principle that financial statements disclose certain significant risks and uncertainties.  (Statement of Position No. 94-6);

(d)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions.  (Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, ¶34);

(e)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources.  (Concepts Statement No. 1, ¶40);

(f)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (Concepts Statement No. 1, ¶50);

(g)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

(h)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (Concepts Statement No. 2, ¶79); and

(i)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (Concepts Statement No. 2, ¶¶95, 97).

118.   In failing to prepare financial statements that conformed to the requirements of GAAP, the Registration Statement disseminated by Blackstone was materially inaccurate.

## The Registration Statement Omitted to Include
## Significant Factors that Made the IPO Risky

119.   Pursuant to Item 3 of Form S-11, the Registration Statement was required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

120.   The Registration Statement represented:

*Valuation methodologies for certain assets in our funds can be subject to significant subjectivity and the fair value of assets established pursuant to such methodologies may never be realized, which could result in significant losses for our funds.*

There are no readily ascertainable market prices for a very large number of illiquid investments of our corporate private equity, real estate opportunity and mezzanine funds. We determine the value of the investments of each of our corporate private equity, real estate opportunity and mezzanine funds on a periodic basis based on the fair value of such investments. The fair value of investments of a corporate private equity, real estate opportunity or mezzanine fund is determined using a number of methodologies described in the investment funds' valuation policies. We have made valuation determinations historically without the assistance of an independent valuation firm, although an independent valuation firm will participate in valuation determinations following this offering.

Investments for which market prices are not observable are generally either private investments in the equity of operating companies or real estate properties or investments in funds managed by others. Fair values of private investments are determined by reference to public market or private transactions or valuations for comparable companies or assets in the relevant asset class when such amounts are available. Generally these valuations are derived by multiplying a key performance metric of the investee company or asset (e.g., EBITDA) by the relevant valuation multiple (e.g., price/equity ratio) observed for comparable companies or transactions, adjusted by management for differences between the investment and the comparable referenced. Private investments may also be valued at cost for a period of time after an acquisition as the best indicator of fair value. If the fair value of private investments held cannot be valued by reference to observable valuation measures for comparable companies, then the primary analytical method used to estimate the fair value of such private investments is the discounted cash flow method. A sensitivity analysis is applied to the estimated future cash flows using various factors depending

on the investment, including assumed growth rates (in cash flows), capitalization rates (for determining terminal values) and appropriate discount rates to determine a range of reasonable values. The valuation based on the inputs determined to be the most probable is used as the fair value of the investment.

The determination of fair value using these methodologies takes into consideration a range of factors, including but not limited to the price at which the investment was acquired, the nature of the investment, local market conditions, trading values on public exchanges for comparable securities, current and projected operating performance and financing transactions subsequent to the acquisition of the investment. These valuation methodologies involve a significant degree of management judgment.

Because there is significant uncertainty in the valuation of, or in the stability of the value of illiquid investments, the fair values of such investments as reflected in an investment fund's net asset value do not necessarily reflect the prices that would actually be obtained by us on behalf of the investment fund when such investments are realized. Realizations at values significantly lower than the values at which investments have been reflected in prior fund net asset values would result in losses for the applicable fund, a decline in asset management fees and the loss of potential carried interest and incentive fees. Changes in values attributed to investments from quarter to quarter may result in volatility in the net asset values and results of operations that we report from period to period. Also, a situation where asset values turn out to be materially different than values reflected in prior fund net asset values could cause investors to lose confidence in us, which would in turn result in difficulty in raising additional funds or redemptions from our hedge funds.

121.    This disclosure was not sufficient or meaningful to advise investors of the actual risks associated with the values attributed to certain of Blackstone's investments, including the fact that certain of the Company's investments were not performing well and were of declining value and, as a result, Blackstone's equity investment was impaired and the Company would not generate anticipated performance fees on those investments. As alleged herein, certain of Blackstone's investments were subject to specific undisclosed risks that adversely affected the value of such investments and such investments were already being overvalued on the Company's financial statements.

122.    The Registration Statement also represented:

*Our use of leverage to finance our business will expose us to substantial risks, which are exacerbated by our funds' use of leverage to finance investments.*

It is our intention to eventually use a significant amount of borrowings to finance our business operations as a public company. See "Summary – Blackstone - We Intend to be a Different Kind of Public Company - Use of Leverage to Enhance Returns". That will expose us to the typical risks associated with the use of substantial leverage, including those discussed below under " - Dependence on significant leverage in investments by our funds could adversely affect our ability to achieve attractive rates of return on those investments". These risks are exacerbated by our funds' use of leverage to finance investments. Our use of substantial leverage as a public company, coupled with the leverage used by many of our investment funds to finance investments, could also cause us to suffer a decline in the credit ratings assigned to our debt by rating agencies, which might well result in an increase in our borrowing costs and could otherwise adversely affect our business in a material way, particularly if our credit ratings were to fall below investment grade.

123.    This disclosure was not sufficient or meaningful to advise investors of the actual, existing risks and current circumstances at the time of the IPO associated with the tightening of the credit markets and credit lending at the time of the IPO, including but not limited to Blackstone's exposure, through FGIC, to CDO's and RMBS. In addition, these undisclosed factors also adversely affect values of Blackstone's investments, including its consolidated real estate fund investments and such investments were already being overvalued on the Company's financial statements.

124.    In addition, the Registration Statement also represented:

*Our real estate opportunity funds are subject to the risks inherent in the ownership and operation of real estate and the construction and development of real estate.*

Investments in our real estate opportunity funds will be subject to the risks inherent in the ownership and operation of real estate and real estate-related businesses and assets. These risks include those associated with the burdens of ownership of real property, general and local economic conditions, changes in supply of and demand for competing properties in an area (as a result for instance of overbuilding), fluctuations in the average occupancy and room rates for hotel properties, the financial resources of tenants, changes in building, environmental and other laws, energy and supply shortages, various uninsured or uninsurable risks, natural disasters, changes in government regulations (such as rent control), changes in real property tax rates, changes in interest rates, the reduced availability of mortgage funds which may render the sale or refinancing of properties difficult or impracticable, negative developments in the economy that depress travel activity, environmental liabilities, contingent liabilities on disposition of assets, terrorist attacks, war and other factors that are beyond our control. In addition, if our real estate opportunity funds acquire direct or indirect interests in undeveloped land or underdeveloped real property, which may often be non-income producing, they will

be subject to the risks normally associated with such assets and development activities, including risks relating to the availability and timely receipt of zoning and other regulatory or environmental approvals, the cost and timely completion of construction (including risks beyond the control of our fund, such as weather or labor conditions or material shortages) and the availability of both construction and permanent financing on favorable terms.

125.    This disclosure was not sufficient or meaningful to advise investors of the actual, existing risks and current circumstances at the time of the IPO associated Blackstone's consolidated real estate fund investments.  As alleged herein, at the time of the IPO the U.S. real estate market was well in the midst of a freefall from its 2005 apex as property values plummeted and mortgage defaults soared.  Nonetheless, the Registration Statement negligently disclosed:

> ***The real estate industry is also experiencing historically high levels of growth and liquidity driven by the strength of the U.S. economy, office employment growth, limited new construction and the availability of financing for acquiring real estate assets***.  Concurrently, replacement costs of real property assets have continued to escalate substantially.  Since 2001, gross domestic product, or "GDP," growth has steadily improved, and GDP is currently predicted to grow at an average annual rate of approximately 3.1% from 2007 through 2009 as indicated by Haver Analytics, World Bank Indicators and Oxford Economic Forecasting.  In addition, recent job growth statistics have indicated higher employment levels during 2005 and 2006, which generally produces greater demand for real estate assets.  ***The strong investor demand for real estate assets is due to a number of factors, including persistent, reasonable levels of interest rates, the lack of alternative investments that provide the same levels of expected returns and the ability of lenders to repackage their loans into securitizations, thereby diversifying and limiting their risk.  These factors have combined to significantly increase the capital committed to real estate funds from a variety of institutional investors, including institutional pension funds***.  [Emphasis added.]

### Post-IPO Disclosures

126.    After the IPO, information slowly leaked into the market about certain of the Company's portfolio companies and investment and the price of Blackstone units declined substantially.

127.    On March 10, 2008, Blackstone issued a press release announcing its financial results for the full year of 2007 and the fourth quarter of 2007, the periods ending December 31, 2007.  The

Company reported that it had written down its investment in FGIC by $122.9 million stating in

pertinent part as follows:

> Total Reportable Segment Revenues declined to $366.9 million from Total Pro
> Forma Adjusted Reportable Segment Revenues of $1.21 billion in the quarter ended
> December 31, 2006, primarily due to decreased revenues in the Corporate Private
> Equity and Real Estate segments.  The revenue declines in the Corporate Private
> Equity and Real Estate segments in the fourth quarter of 2007 were mostly due to
> lower net appreciation of the investment portfolio as compared to the prior year, as
> well as a significant decrease in the value of Blackstone's portfolio investment in
> Financial Guaranty Insurance Company, a monoline financial guarantor.

128.    On or about March 12, 2008, Blackstone filed its December 31, 2007 Form 10-K with

the SEC, which disclosed the following about the Company's FGIC investment:

> Most significantly, due to the adverse conditions affecting monoline financial
> guarantors resulting from the turmoil in the credit markets, Blackstone reduced the
> carrying value of its portfolio investment in Financial Guaranty Insurance Company,
> which accounted for $110.2 million or 51% of the decline in our Corporate Private
> Equity segment's Performance Fees and Allocations.  For 2007, the net value of our
> Real Estate segment's underlying portfolio investments increased by approximately
> 35% as compared to an increase in net value of approximately 85% in 2006.

129.    At present, Blackstone units trade for approximately $7.75 per unit – 75% below the

IPO price of $31 per unit.

### COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

130.    Plaintiffs incorporate ¶¶1-129 by reference herein.  This Count is brought pursuant to

Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

Plaintiffs do not claim that Defendants committed intentional or reckless misconduct or that

Defendants acted with scienter or fraudulent intent.

131.    The Registration Statement for the IPO was inaccurate and misleading, contained

untrue statements of material facts, omitted to state other facts necessary to make the statements

made not misleading, and omitted to state material facts required to be stated therein.

- 41 -

132.    Defendant Blackstone is the registrant for the IPO.  As such, Blackstone is strictly liable for the materially inaccurate statements contained in the Registration Statement and Prospectus and the failure of the Registration Statement and the Prospectus to be complete and accurate.  By virtue of the Registration Statement containing material misrepresentations and omissions of material facts necessary to make the statements therein not false and misleading, Blackstone is liable under Section 11 of the Securities Act.

133.    The Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentation of material facts and omissions of material fact necessary to make the statements made therein not misleading.  As such, the Individual Defendants are liable to Plaintiffs and the Class.

134.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

135.    Plaintiffs acquired Blackstone units traceable to, and in reliance on, the Registration Statement and without knowledge of the untruths and/or admissions alleged herein.  Plaintiffs sustained damages when the price of Blackstone units declined substantially due to material inaccuracies in the Registration Statement.

136.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the IPO.

- 42 -

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

137.    Plaintiffs incorporate ¶¶1-136 by reference herein.  This Count is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all purchasers of Blackstone's common units in the IPO.  For purposes of this Count, Plaintiffs affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

138.    Defendants were sellers, offerors and/or solicitors of purchasers of the Blackstone common unit offered pursuant to the Prospectus.  Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the IPO.  The Registration Statement and Prospectus were used to induce investors, such as Plaintiffs and the other members of the Class, to purchase Blackstone common units.

139.    The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

140.    The Individual Defendants' actions of solicitation included participating in the preparation of the Prospectus which contained untrue statements of material fact and/or omitted to state in form necessary to make the statements made, not false and misleading.

141.    Blackstone, acting through its employees, agents and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the Prospectus.

142.    As set forth more specifically above, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

143. Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

144. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

145. This claim was brought within one year after discovery of the untrue statements and omissions in the Prospectus and within three years after Blackstone common units as sold to the Class in connection with the IPO.

146. By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiffs and Class members who purchased or acquired Blackstone's common units pursuant to the Prospectus, each of whom has been damaged as a result of such violation. Accordingly, Plaintiffs and/or the other members of the Class who hold units issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their units, and hereby tender their units to the Defendants sued herein. Class members who have sold their units seek damages to the extent permitted by law.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

147. Plaintiffs incorporate ¶¶1-146 by reference herein. This Count is asserted by Plaintiffs against all Individual Defendants. For purposes of this Count, Plaintiffs affirmatively state

that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

148.    Throughout the Class Period, the Individual Defendants acted as controlling persons of Blackstone within the meaning of Section 15 of the Securities Act.  By reason of their ownership interest, senior management positions and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Blackstone to engage in the conduct complained of herein and were therefore, control persons of Blackstone.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

149.    WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.    awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements;

D.    awarding rescission or a rescissory measure of damages as to Count II; and

E.    awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

- 45 -

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 27, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
SRudman@csgrr.com
DRosenfeld@csgrr.com

BROWER PIVEN, P.C.
A Professional Corporation
DAVID A.P. BROWER

DAVID A.P. BROWER

488 Madison Avenue, Eighth Floor
New York, NY  10022
Telephone:  212/501-9000
212/501-0300 (fax)
Brower@Browerpiven.com

*Lead Counsel for the Class*

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

*Additional Counsel*

- 46 -

CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2008, a copy of the foregoing Consolidated Amended

Class Action Complaint for Violations of Federal Securities Laws was sent, via U.S. Mail,

postage prepaid to the following parties:

**Counsel for Defendants**
Bruce D. Angiolillo
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
212/455-2000
212/455-2502 (Fax)


**Counsel for Plaintiffs**
David A.P. Brower
Brower Piven, P.C.
A Professional Corporation
488 Madison Avenue, Eighth Floor
New York, NY  10022
212/501-9000
212/501-0300 (Fax)

Anne Martin
Paralegal