UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

LANDMEN PARTNERS INC., Individually and On
Behalf of All Others Similarly Situated, :

                Plaintiff, :

              vs. :

THE BLACKSTONE GROUP L.P, et al., :

             Defendants. :

-------------------------------------------------------------x

Civil Action No. 08-CV-03601-HB

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

I.   Summary of Plaintiffs' Allegations ..................................................................5

II.  Blackstone's Business and Structure ................................................................7

III. The Investments Of The Blackstone-Managed Funds .................................10

IV.  The Registration Statement ............................................................................11

V.   The Proposed Class ..........................................................................................13

APPLICABLE STANDARD ....................................................................................13

ARGUMENT .............................................................................................................15

I.   The Registration Statement Does Not Contain Any Material Misstatements Or
     Omissions .............................................................................................................15

     A.   Plaintiffs' Fundamental Mischaracterization Of The Nature Of
          Blackstone's Business Renders The Very Premise of the Complaint
          Demonstrably False ....................................................................................15

     B.   Blackstone's Alleged Misstatements Or Omissions About Individual
          Portfolio Companies Were Not Material ...............................................16

     C.   Even If Information About Individual Portfolio Companies Could Be
          Material, Plaintiffs Do Not Allege Any Actionable Material Misstatements
          Or Omissions ...............................................................................................19

          1.   Plaintiffs' Allegations Regarding FGIC Are Inadequate And Do
               Not Demonstrate Any Material Misstatement Or Omission ...................20

          2.   Plaintiffs Fail To Allege Adequately Any Material Misstatements
               Or Omissions Regarding Freescale ........................................................24

          3.   Plaintiffs Fail To Allege Adequately Any Material Misstatements
               Or Omissions Regarding The Real Estate Investments ...........................26

          4.   Defendants Cannot Be Held Liable For Failing To Predict Future
               Macroeconomic Conditions .....................................................................27

     D.   Plaintiffs' Allegations Regarding GAAP Are Demonstrably Baseless ...............29

          1.   Financial Accounting Standards Board's Statement of Financial
               Accounting Standards No. 159 .................................................................29

2.      Plaintiffs' GAAP Allegations Rely On Their Allegations Regarding FGIC and Real Estate Investments ......................................................30

3.      Various Additional Alleged Violations ......................................................31

E.      The Registration Statement Fully Disclosed The Risks Involved With Purchasing Blackstone Units ........................................................31

F.      The Alleged Misstatements And Omissions Are Forward-Looking Statements Not Actionable Under "Bespeaks Caution" Doctrine ......................32

G.      The Lack of Loss Causation Is Apparent From The Face Of The Complaint ........................................................33

II.   **Plaintiffs' Section 12 Claims Fail For The Same Reasons As Their Section 11 Claim**........................................................34

III.  **Plaintiffs' Section 15 Claims Fail Because They Depend On The Faulty Section 11 and 12 Claims**........................................................35

**CONCLUSION** ........................................................35

## TABLE OF AUTHORITIES

**Cases**

*Am. High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534
  (S.D.N.Y. 2004) ..............................................................................................4

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007) ...............................14

*Conley v. Gibson,* 355 U.S. 41 (1957) ............................................................................14

*Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ...........................4

*Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501
  (S.D.N.Y. Aug. 22, 2005)..............................................................................32

*De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65 (2d Cir. 1996)...........................14

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................15, 28

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) .........................19, 24

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936
  F.2d 759 (2d Cir. 1991)..................................................................................17

*In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513  (S.D.N.Y. 2005) ................................20

*In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171
  (S.D.N.Y. 2003) ........................................................................................passim

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d
  424 (S.D.N.Y. 2000) ......................................................................................14

*In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580 (S.D.N.Y. 2005) .............................34

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d
  357 (3d Cir. 1993)....................................................................................21, 22

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272
  F. Supp. 2d 243 (S.D.N.Y. 2003)..........................................................21, 25, 33

*In re N. Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466
  (E.D.N.Y. 2006)..............................................................................................20

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y. 2000) ................................20

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247
  (S.D.N.Y. 2008) ..............................................................................................14

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8
  (S.D.N.Y. 2001) ........................................................................................19, 24

*In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992) .................................15

*In re Vivendi, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y.
  2003)........................................................................................................14, 35

*Kapps v. Torch Offshore, Inc.*, 379 F.3d 207  (5th Cir. 2004) .............................21, 25

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994)................................20

*Krim v. Coastal Physician Group, Inc.*, 81 F. Supp. 2d 621
(M.D.N.C. 1998).................................................................................20

*Ladmen Partners, Inc. v. Globalstar, Inc.*, Case No. 07 Civ.
0976(LAP) ........................................................................................14

*Lasker v. N. Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ...........34

*Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408
(S.D.N.Y. 2008) ....................................................................14, 22, 28

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007)......................5

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ..........17

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d
662 (S.D.N.Y. 2008) ............................................14, 18, 24, 28

*Papasan v. Allain*, 478 U.S. 265 (1986)........................................................14

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .......................................15

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip
Morris Cos.*, 75 F.3d 801 (2d Cir. 1996).....................................17

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171
(S.D.N.Y. 1996) ...............................................................................20

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976).....................16, 17

*Zucker v. Quasha*, 891 F. Supp. 1010  (D.N.J. 1995), *aff'd mem*, 82
F.3d 408 (3d Cir. 1996) ..............................................................23, 28

## Statutes

15 U.S.C. § 77k..............................................................................22, 33

## Other Authorities

EITF No. 85-12, *Retention of Specialized Accounting for
Investments in Consolidation*.................................................29

Financial Accounting Standards Board's (FASB) Statement of
Financial Accounting Standards No. 159...............................29, 30

Financial Accounting Standards Board's (FASB) Statement of
Financial Accounting Standards No. 162.......................................31

Regulation S-K ......................................................................15, 27

SEC Guidance on MD&A, Securities Act Release No. 8,350,
Exchange Act Release No. 48,960, Financial Reporting Release
No. 72, Fed. Sec. L. Rep. (CCH) ¶ 87,127 (Dec. 19, 2003).............18

The Blackstone Group L.P. ("Blackstone"), Stephen A. Schwarzman, Peter J. Peterson, Hamilton E. James, and Michael A. Puglisi respectfully submit this memorandum of law, together with the Declaration of Jonathan K. Youngwood, dated December 4, 2008, and the exhibits annexed thereto,[1] in support of their motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint dated October 27, 2008 (the "Complaint"; cited herein as "Compl. ¶ __") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Blackstone, like every other public company, has suffered during the recent severe economic turmoil.  But simply because its stock price has fallen due to unusually adverse and unpredictable conditions in the debt and equity markets over the past 14 months does not mean there were any material misrepresentations or omissions in a Registration Statement issued in June 2007.  The Complaint is replete with errors and unfounded assumptions, fails to meet the pleading standards of a Section 11 or 12 securities case and should be dismissed on the pleadings.

At its core, the Complaint fundamentally mischaracterizes what Blackstone is and what it means to be an investor in Blackstone.  That error, and others, renders the entire theory of Plaintiffs' case completely unfounded.

Blackstone is an alternative asset manager and a provider of financial advisory services.  Among its other businesses, Blackstone manages investment funds that have interests in a wide variety of portfolio companies and real estate assets, and earns performance fees and allocations for doing so successfully.  It does not "own" any of those portfolio companies or real estate assets.  Contrary to the Complaint's repeated assertions, an investment in Blackstone is not

---

[1]     References to "Ex. __" herein refer to the exhibits attached to the Declaration of Jonathan K. Youngwood, dated December 4, 2008.

1

an investment in any of the 43 portfolio companies of the private equity funds that it manages or any of the scores of investments of the real estate funds it manages, but rather is an investment in a multifaceted business which, among other things, earns management fees and agreed upon allocations of the profits from the multitude of investment funds that the firm manages.

A Blackstone unit holder does not own any direct part of FGIC, Freescale, or any real estate assets. The profit or loss made on these and other investments held by the Blackstone-managed investment funds does not therefore flow directly to Blackstone itself or to its unit holders. Blackstone receives a share of the profits, thus benefiting its unit holders, when certain of the funds the firm manages earn an agreed-upon level of profit. These unit holders do not realize losses if a portfolio company loses value. If FGIC or Freescale lost money, the consequence to Blackstone would be that this could reduce the profits of a fund that owns those companies, which, in turn might indirectly reduce the amount of any such profits allocated to Blackstone. The investment of a Blackstone unit holder is in the failure or success of Blackstone and not directly in the underlying investments. Contrary to Plaintiffs' assertions, it is clear that no one portfolio company's performance is material to IPO investors. The investment in FGIC by Blackstone-sponsored funds represented 0.4% of the assets managed by Blackstone at the time of the IPO, and the investment in Freescale by Blackstone-sponsored funds represented a similarly *de minimis* percentage of Blackstone's total assets under management at the time of the IPO.

Plaintiffs' significant mischaracterization of the structure of Blackstone and the interests of its unit holders renders meaningless Plaintiffs' assumption that the success or failure of individual investments such as FGIC, Freescale or the unspecified real estate investments were material. Were Plaintiffs to correct this error, their allegations would clearly fail. With Blackstone's actual structure and business model in mind, it becomes clear that none of those

2

individual investments were material and there was no need to include any information about any of them in the Prospectus.  The Complaint should be dismissed for this reason alone.

The Complaint is also fatally flawed and should be dismissed for the following additional reasons:

First, the bulk of Plaintiffs' claims regarding FGIC and Freescale is based on information that was openly available to the public at the time of the IPO.  Since a reasonable investor would have known all of the information Plaintiffs claim that Blackstone omitted, it was already part of the "total mix" of information available to the public and its omission is immaterial.

Second, Blackstone's announced write-down of FGIC on March 10, 2008 (almost nine months after the IPO) in no way demonstrates that the value of FGIC should have been written down at the time of the IPO.  Plaintiffs offer no facts to support a contrary conclusion, nor could they because there was no diminution in value of FGIC at the time of the IPO.  Similarly, Plaintiffs do not, and cannot, adequately allege that at the time of the IPO, there was any decline in Freescale's performance or value.

Third, Plaintiffs' Complaint fails to specify any individual real estate assets.  Further, it relies on historical information regarding the *residential* real estate market to support their allegations that investments in real estate by Blackstone-sponsored funds would subsequently fall in value.  However, funds managed by Blackstone own just one minor residential real estate asset; virtually all of the real estate investments by Blackstone-sponsored funds consist of commercial properties.  Moreover, Plaintiffs never allege that any performance fees were actually clawed back, because none were — either at the time of the IPO or subsequently.  Indeed, in contrast to Plaintiffs' allegations, the net value of the underlying

3

portfolio investments owned by the real estate funds managed by Blackstone *increased* by approximately 35% in 2007.

Fourth, the IPO Registration Statement clearly and comprehensively disclosed the risks associated with purchasing Blackstone units in a 36-page "Risk Factors" section.  That section of the Registration Statement included numerous statements about the risk that investments made by Blackstone-sponsored investment funds could decline in value.

Fifth, Plaintiffs' GAAP allegations fail because they are demonstrably based on a misreading of the accounting rules themselves, and also depend entirely on Plaintiffs' inadequate and incorrect non-GAAP allegations.

Finally, the Complaint should be dismissed for failing to adequately plead loss causation.

## STATEMENT OF FACTS

Defendants accept Plaintiffs' allegations as true for purposes of this motion except where those allegations are contradicted by securities filings or by documents incorporated in the Complaint.  Although typically limited to the four corners of the complaint, a court may also on a motion to dismiss consider documents that are incorporated by reference, documents that are "integral to the complaint," and public documents that have been filed with the SEC.  *See Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) (court may consider documents of which plaintiffs have "undisputed notice" or that are "integral" to plaintiffs' claim); *Am. High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534, 538 (S.D.N.Y. 2004) (court may consider "statements or documents incorporated in the complaint by reference, public disclosure documents filed with the SEC, and 'documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit'").  Thus, the Court can properly consider the IPO Registration Statement, as well as the March 10, 2008 Press Release

4

cited in the Complaint.  Courts may also take judicial notice of information such as the trading

price of securities and consider such information on a motion to dismiss.  *Miller v. Lazard, Ltd.*,

473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007).  Thus, the Court may consider the historical trading

price of Blackstone common units.

## I.     Summary of Plaintiffs' Allegations

Plaintiffs allege that on or about June 21, 2007, Blackstone held an initial public

offering (the "IPO"), selling over 153 million of its common units (the "Units") pursuant to a

Form S-1/A Registration Statement (the "Registration Statement") which included a prospectus.

Compl. ¶ 35.  Plaintiffs further allege that the Registration Statement was negligently prepared,

contained untrue statements of material facts, omitted to state other facts necessary to make the

statements made not misleading, and was not prepared in accordance with Generally Accepted

Accounting Principles.  Compl. ¶¶ 39, 96.  Specifically, Plaintiffs claim that Blackstone failed to

disclose that certain of its portfolio companies were "performing poorly" so that there was an

"almost certain" risk that Blackstone would be subject to a clawback of performance fees and

reduced performance fees going forward.  Compl. ¶ 40.  But, Plaintiffs do not allege that such a

clawback took place during the class period or at any other time.

Of the 43 portfolio companies and scores of other assets in which Blackstone-

sponsored private equity and real estate funds had an investment at the time of the IPO, Plaintiffs

cherry pick just two: Financial Guaranty Insurance Company ("FGIC") and Freescale

Semiconductor ("Freescale").  The Complaint also discusses various unnamed and unidentified

"real estate investments."

FGIC: The Complaint's allegations concerning FGIC are thin, conclusory and

incorrect.  Allegedly, "[a]t the time of the IPO, Blackstone's investment in FGIC was performing

poorly," Compl. ¶ 41, and "Blackstone had a duty to disclose the then-known trends, events or

uncertainties associated with FGIC that were reasonably likely to cause the [sic] Blackstone's financial information not to be indicative of future operating results." Compl. ¶ 76. Plaintiffs cite publicly available information regarding the U.S. residential real estate market (available before the IPO) as support for their bald conclusions regarding FGIC. Plaintiffs do not, and cannot, point to any *facts* that at the time of the IPO, there was any decline in FGIC's performance or its value.

> Freescale:  The Complaint offers even fewer details in support of its conclusory allegations regarding Freescale. Plaintiffs allege that Blackstone failed to disclose that "before the IPO, Freescale lost an exclusive agreement to manufacture wireless 3G chipsets for its largest customer, Motorola." Compl. ¶ 77. According to Plaintiffs, this "had a material adverse affect [sic] on Freescale's business and the value of the major corporate private equity fund controlled by Blackstone." *Id.* The information that Blackstone allegedly failed to disclose was widely available to the public before the IPO and was therefore part of the total mix of information available to investors. Moreover, Plaintiffs do not, and cannot, point to any *facts* that at the time of the IPO, there was any decline in Freescale's performance or its value.

> Real Estate Investments: The Complaint's allegations regarding unidentified real estate investments are completely generic. Plaintiffs allege that at the time of the IPO, due to a "deteriorat[ing]" U.S. residential real estate market, it was foreseeable that Blackstone would have performance fees clawed back in connection with its real estate investments and would not generate additional performance fees on those investments. Compl. ¶ 87. Plaintiffs fail to address the fact that at the time of the IPO, Blackstone-sponsored funds owned just one minor residential real estate investment, Ex. E, November 13, 2007 Blackstone 10-Q at 50, and that all of the other investments held by Blackstone-sponsored real estate funds were in non-residential

investments such as office buildings and hotels.  Ex. A, IPO Registration Statement (henceforth "Reg. St.") at 50.

In addition to singling out FGIC, Freescale and unnamed real estate investments, Plaintiffs allege in conclusory fashion that the Registration Statement was presumptively misleading and inaccurate because it contained interim financial statements that were not prepared in accordance with GAAP.  Compl. ¶¶ 96-97.  Plaintiffs argue that the statements failed to comply with GAAP because the interim financial statements overstated the value of "Blackstone's investment in FGIC" and consolidated real estate funds, and because they failed to provide the disclosures required by GAAP about "Blackstone's investment in FGIC."  Compl. ¶ 96.  Plaintiffs also take issue with the method used to value Blackstone's investment in FGIC. Compl. ¶¶ 99-104.  These accounting allegations are based on the Complaint's general and erroneous allegations regarding the value of the FGIC, Freescale and real estate investments.

## II.    Blackstone's Business and Structure

Nearly all Plaintiffs' substantive allegations are premised on a fundamental mischaracterization of Blackstone's business.  Throughout the Complaint, Plaintiffs mischaracterize the nature of Blackstone's business by asserting misleadingly that Blackstone itself owns the portfolio companies held by its investment funds, and that Blackstone has a direct equity interest in those companies' assets.  *See, e.g.*, Compl. ¶ 42 ("Blackstone *owns* a twenty-three (23) percent equity ownership interest in FGIC"); ¶ 102 ("Blackstone *acquired* a 23% interest in FGIC during 2003") (emphasis added).   Plaintiffs suggest erroneously to the Court that any loss in the value of one of these investments equates to a dollar for dollar loss not just to Blackstone but to its public unit holders.

This characterization is grossly incorrect and once it is corrected, it becomes clear that none of the individual investments cited in the Complaint are material.  It is undisputed that

Blackstone does not itself own any of its portfolio companies, nor does it have any direct equity interest in those companies.  Instead, as described in detail throughout the Registration Statement, Blackstone is a holding partnership, which, through equity interests and as general partner in subsidiary holding partnerships, manages a multitude of different investment funds that invest in a large number of portfolio companies and other assets.[2]  Reg. St. at 4.  The focus of Blackstone's business is not to invest for its own account.  *See, e.g.*, Reg. St. at 11.  Rather, Blackstone is an alternative asset manager and a provider of financial advisory services.  Reg. St. at 1.  As an asset manager, Blackstone manages investment funds on behalf of investors in these funds, who are largely institutional investors such as public pension funds.  *See* Reg. St. at 8. Though Blackstone does make small investments in its own funds, the vast majority of the funds' investors are unaffiliated with Blackstone.  Reg. St. at 158.  Under Blackstone's management, the investment funds use the money to purchase assets, such as companies, divisions of companies, or real estate (different funds have different focuses), with the goal of returning a profit to the funds' investors when these assets are sold years later.  Reg. St. at 147-48.  Among its other income streams, Blackstone earns performance fees and allocations for doing so successfully.  Reg. St. at 1.  As the Registration Statement explains, Blackstone "generate[s] [its] income from fees earned pursuant to contractual arrangements with the investment funds that we manage, with the investors in these funds and with these funds' portfolio companies (including management, transaction and monitoring fees) as well as from fees earned for the provision of

---

[2]     At times, the Complaint appears to recognize this structure, only to ignore it in other crucial passages and allegations.  *See* Compl. ¶ 37 ("The Registration Statement represented that Blackstone's investment portfolio, *which consisted almost entirely of investment funds* controlled by Blackstone, made up the lion's share of the Company's assets.  These controlled investment funds are consolidated into operating entities of the Company and are referred to in the Registration Statement as 'consolidated Blackstone funds.'"); ¶ 31 ("Blackstone operates via four business segments: (1) Corporate Private Equity, which comprises its *management of corporate private equity funds . . .*" (emphasis added)).

corporate and mergers and acquisitions advisory services, restructuring and reorganization advisory services and fund placement services for alternative investment funds." Reg. St. at 1.

Since Blackstone does not "own" any of the portfolio companies and other assets owned by the funds that it manages, purchasers of Blackstone's IPO units were not acquiring equity interests in those companies or assets. Instead, investors gain a claim to a portion of Blackstone's diverse and attractive asset management and financial advisory businesses, which include (but are not limited to) earnings from management fees and potential allocations of profits from the various investment funds managed by Blackstone, or in other words, a portion of Blackstone's "ability to generate carried interest." Reg. St. at 180; *see also* Compl. ¶ 33 ("The Company also earns performance fees of twenty (20) percent of the profits generated on a return on the capital it invests for its limited partners."). Blackstone generates a portion of its income from "fees earned pursuant to contractual arrangements with the investment funds that we manage." Reg. St. at 1. "In the case of our carry funds, we are generally entitled to a carried interest equal to 20% of the net realized income and gains generated by these funds . . . . For example, if a carry fund were to sufficiently exceed the preferred return threshold and generate $500 million of profits net of allocable fees and expenses from a given investment, our carried interest would entitle us to receive $100 million of these net profits. Our ability to generate carried interest and incentive fees is an important element of our business and these items have historically accounted for a very significant portion of our income." *Id.* However, Blackstone also derives substantial income from sources other than performance fees and allocations. *See* Ex. B, March 12, 2008 Blackstone 10-K at 45. Performance fees and allocations accounted for 37% of Blackstone's revenues in 2007, and 48% of Blackstone's revenues in 2006. *Id.*

Blackstone IPO investors were not investing in any individual portfolio company or asset held by Blackstone-sponsored funds, but instead were investing in Blackstone's overall

"asset management" and "financial advisory" businesses.  *See* Compl. ¶¶ 26-27; Reg. St. 1-6.

IPO investors were attracted to this type of investment because of Blackstone's "exceptional

record of generating attractive risk-adjusted returns across our asset management businesses."

Reg. St. at 7.  Indeed, Blackstone was able to raise approximately $61.4 billion of committed

capital for its funds over the previous 20 years because of "the strength and breadth of our

franchise, supported by our people, investment approach and track record of success" that

provided "a distinct advantage when raising capital, evaluating opportunities, making

investments, building value and realizing returns."  Reg. St. at 7.  A Blackstone unit holder never

owns any part of FGIC or Freescale or any real estate investments.  The profit or loss made on

these individual investments does not flow directly to Blackstone itself or to its unit holders.

Blackstone unit holders get the benefit of the carried interest when an *entire fund* makes a profit.

They do not realize losses if a portfolio company loses value.  If an entire fund lost money, the

primary consequence to Blackstone would be that it would not earn its portion of the profits on

that fund.

### III.    The Investments Of The Blackstone-Managed Funds

Blackstone-sponsored investment funds have interests in a very large number of

diverse companies and real estate holdings.[3]  From 1987 through May 1, 2007, Blackstone-

sponsored corporate private equity funds invested in approximately 112 different companies in a

variety of industries and geographies.  Reg. St. at 7.  The total enterprise value of all transactions

effected by Blackstone's corporate private equity operations through May 1, 2007 was

---

[3]     Apart from managing private equity and real estate funds, Blackstone manages
investment funds through its Marketable Alternative Asset Management segment.  Reg. St. at 2.
This segment manages funds that make non-private equity and non-real estate investments.
These include hedge funds, mezzanine funds, senior debt vehicles, proprietary hedge funds, and
closed-end mutual funds.  Reg. St. at 2-3.  The Marketable Alternative Asset Management
segment had $35 billion in assets under management as of May 1, 2007, more than either the
Corporate Private Equity or Real Estate segments.  Reg. St. at 2.

approximately $199 billion.  *Id.*  As of May 1, 2007, Blackstone's corporate private equity

operation had over $33 billion of assets under management in 43 different companies.  Reg. St.

at 2, 162.  Blackstone Capital Partners V L.P., or "BCP V," the corporate private equity fund that

Blackstone is currently investing, is one of the largest corporate private equity funds ever raised,

with aggregate capital commitments of over $19.6 billion.  Reg. St. at 161.  Blackstone-

sponsored real estate funds represent some of the largest real estate funds ever raised, with

approximately $20 billion of assets under management as of May 1, 2007.  Reg. St. at 2.

Overall, Blackstone-sponsored funds had approximately $88.4 billion in assets under

management of as of May 1, 2007.  Reg. St. at 1.

In contrast, the private equity funds managed by Blackstone had invested

approximately $332 million in FGIC (0.4% of total assets under management at the time of the

IPO), *see* Ex. C, The PMI Group, Inc., 8-K, August 6, 2003, at 2, and those funds' investment in

Freescale represented a similarly *de minimis* percentage of the assets managed by Blackstone at

the time of the IPO. [4]

## IV.    The Registration Statement

Blackstone filed a Registration Statement in connection with the IPO which not

only exhaustively described its business, but included a 36-page "Risk Factors" section

describing the many risks associated with investing in Blackstone common units.  Reg. St. at 32-

67.  Here are just some of the numerous detailed, plain-language statements in the Registration

Statement of relevance to Plaintiffs' allegations:

- "Our Common Units Are Not an Appropriate Investment for Investors With a Short-
  Term Focus . . . .  While the long-term growth trends in our businesses are favorable, our

---

[4]    Plaintiffs use a $3.1 billion figure as the equity investment in Freescale, but they
acknowledge the fact that that figure includes equity invested by co-investors.  Compl. ¶ 78 n. 2.
The investment in Freescale was made by a consortium of four private equity firms and
numerous other investors.  The amount actually invested by Blackstone-sponsored funds was a
small percentage of the total equity invested of $3.066 billion.

financial results are subject to significant volatility and we are unable to predict them from quarter to quarter or year to year.  Our corporate private equity and real estate businesses have benefited from high levels of activity in the last few years.  These activity levels may continue but they could decline at any time (along with activity levels in any of our other businesses) . . . .  In the past, changing economic and market conditions and our investment actions in response to those changes have led to swings in investment activity from year to year.  We expect these swings to occur in future years as well, which is one of the reasons why there may be significant volatility in our revenue, net income and cash flow."  Reg. St. at 12-13.

- "An investment in our common units involves substantial risks and uncertainties.  Some of the more significant challenges and risks include those associated with our susceptibility to conditions in the global financial markets and global economic conditions, the volatility of our revenue, net income and cash flow . . . ." *Id.* at 13.

- "Difficult market conditions can adversely affect our business in many ways, including by reducing the value or performance of the investments made by our investment funds . . . ." *Id.* at 32.

- "During periods of difficult market conditions or slowdowns in a particular sector, companies in which we invest may experience decreased revenues, financial losses, difficulty in obtaining access to financing and increased funding costs." *Id.*

- "[T]he investment return profiles of most of our investment funds are volatile.  We may . . . experience fluctuations in our results from quarter to quarter due to a number of other factors, including changes in the values of our funds' investments . . . and general economic and market conditions.  Such variability may lead to volatility in the trading price of our common units and cause our results for a particular period not to be indicative of our performance in a future period." *Id.* at 33.

- "The historical returns attributable to our funds should not be considered as indicative of the future results of our funds or of our future results or of any returns expected on an investment in our common units . . . .  [Y]ou should not conclude that continued positive performance of the investment funds that we manage will necessarily result in positive returns on an investment in our common units." *Id.* at 43-44.

- "[O]ur investment funds' returns have benefited from investment opportunities and general market conditions that may not repeat themselves, including favorable borrowing conditions in the debt markets, and there can be no assurance that our current or future investment funds will be able to avail themselves of comparable investment opportunities or market conditions . . . ." *Id.* at 44.

- "The market price of our common units may be volatile, which could cause the value of your investment to decline . . . .  Securities markets worldwide experience significant price and volume fluctuations.  This market volatility, as well as general economic, market or political conditions, could reduce the market price of common units in spite of our operating performance.  In addition, our operating results could be below the expectations of public market analysts and investors, and in response the market price of

our common units could decrease significantly.  You may be unable to resell your common units at or above the initial public offering price."  *Id.* at 63.

The Risk Factors section also included specific disclosures about possible risks related to the broader real estate market:

- "The market conditions surrounding each of our businesses, and in particular our . . . real estate segment[] have been quite favorable for a number of years.  Future market conditions may not continue to be as favorable."  *Id.* at 32.

- "[I]n the past few years, the rates of returns of our . . . real estate opportunity funds have been positively influenced by a number of investments that experienced rapid and substantial increases in value following the dates on which those investments were made, which may not occur with respect to future investments."  *Id.* at 44.

- "Our real estate opportunity funds are subject to the risks inherent in the ownership and operation of real estate and the construction and development of real estate."  *Id.* at 50.

- "Investments in our real estate opportunity funds will be subject to . . . risks includ[ing] . . . general and local economic conditions, changes in supply and demand for competing properties . . . changes in interest rates, the reduced availability of mortgage funds . . . ."  *Id.*

In sum, all of Plaintiffs' allegations about declines in value of investments at the time of the IPO should be dismissed on their face.  But even if there had been a decline in value at that time of a few of the numerous investments in Blackstone's investment funds, IPO purchasers would have been fully warned about that possibility in the Risk Factors section of the Registration Statement.

## V.   The Proposed Class

Plaintiffs assert their claims generally on behalf of a purported class consisting of "all those who purchased the common units of Blackstone pursuant and/or traceable to the IPO" other than Defendants.  Compl. ¶ 20.

## APPLICABLE STANDARD

As the Supreme Court recently explained, the standard for pleading claims under Rule 8 of the Federal Rules of Civil Procedure is no longer the "no set of facts" phraseology

employed in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007); *see also id.* 127 S.Ct. at 1965, ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Rather, in order to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1965. "[T]he touchstone for adequate pleading is plausibility. . . . Thus, materials properly before the court must provide grounds for more than mere speculation or suspicion that a plaintiff is entitled to the requested relief." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 667 (S.D.N.Y. 2008); *Ladmen Partners, Inc. v. Globalstar, Inc.*, Case No. 07 Civ. 0976(LAP), 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008); *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 414 (S.D.N.Y. 2008).

While a court must accept as true well-pleaded allegations, "conclusory statements unsupported by factual allegations or legal conclusions and characterizations presented as fact allegations" are insufficient to state a claim. *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 434 (S.D.N.Y. 2000) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."). Moreover, it is "improper . . . to assume that the [plaintiff] can prove facts that it has not alleged." *In re Vivendi, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 165 (S.D.N.Y. 2003) (internal quotation omitted).

To successfully plead a Section 11 claim, a plaintiff must allege an untrue statement of material fact in a Registration Statement, or an omission of a material fact that either renders an affirmative statement in the Registration Statement misleading or that is

14

otherwise required by law to be disclosed. *Rombach v. Chang*, 355 F.3d 164, 168 n.2 (2d Cir. 2004). Plaintiffs here allege that omissions of material fact (1) made affirmative statements misleading and (2) violated Item 303 of SEC Regulation S-K. To prevail on the former theory, a Section 11 claim must allege a genuine link between an alleged omission and an affirmative statement in the Registration Statement. *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993). To make out a claim under Item 303, a plaintiff must allege that a registrant failed to disclose known trends, events or uncertainties that are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. A plaintiff must allege that a registrant actually knew this information. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) ("[Plaintiff] argues that pleading a trend's *existence* is enough to support a claim, and whether defendants were actually aware of the trend is not legally operative. [Plaintiff] misreads Item 303, which requires that the trend actually be *known*.")

## ARGUMENT

### I.    The Registration Statement Does Not Contain Any Material Misstatements Or Omissions

   A.    *Plaintiffs' Fundamental Mischaracterization Of The Nature Of Blackstone's Business Renders The Very Premise of the Complaint Demonstrably False*

Plaintiffs' Complaint is premised on a fundamental mischaracterization of Blackstone's business. By incorrectly and repeatedly stating that Blackstone itself "owns" portfolio companies such as FGIC, *see, e.g.*, Compl. ¶ 42, Plaintiffs misrepresent that purchasers of Blackstone IPO units themselves were acquiring an equity interest in those companies, and therefore had an interest in knowing the details surrounding those companies' businesses. This characterization is demonstrably and unquestionably false. Blackstone does not own any of its

portfolio companies, nor does it have direct equity interests the portfolio companies, including FGIC and Freescale.  Similarly, it has no direct ownership in any real estate assets.

B.   *Blackstone's Alleged Misstatements Or Omissions About Individual Portfolio Companies Were Not Material*

Only material omissions are actionable under Section 11.  To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  What is relevant for investors in Blackstone units is the total mix of information regarding *Blackstone* as an asset management and financial advisory firm, not information about each of the 43 different portfolio companies and scores of real estate assets in which a few of the investment funds sponsored by Blackstone hold an interest.

The Complaint focuses on the performance of only two portfolio companies.  However, as of May 1, 2007, Blackstone's corporate private equity operation, which itself is only one of Blackstone's four business segments, had over $33 billion of assets under management in 43 different companies, Reg. St. at 2, 162, and Blackstone-sponsored funds collectively had approximately $88.4 billion in assets under management.  Reg. St. at 1.  In contrast, Blackstone-sponsored funds had invested approximately $332 million in FGIC (0.4% of total assets under management at the time of the IPO), Ex. C, August 6, 2003 The PMI Group, Inc. 8-K, at 2, and their investment in Freescale represented a similarly *de minimis* percentage of the assets managed by Blackstone at the time of the IPO.  It is self-evident and a matter of common sense that a decrease in value — even a significant decrease in value — of FGIC or Freescale does not and cannot have a material impact on the overall success of Blackstone's business.

16

If Plaintiffs' materiality standard were the law, Blackstone would be required to issue compilations of prospectuses for all of the 43 portfolio companies and scores of real estate assets in which its private equity and real estate funds have any interest.  This would bury an investor in an avalanche of unnecessary information.  The securities laws do not encourage, much less require, such incomprehensible disclosure. "The federal securities laws require that disclosure in a prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (internal quotation omitted); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir. 1996) ("Companies conduct many experiments and tests in connection with their products, and to require the public announcement of each one would risk 'burying the shareholders in an avalanche of trivial information.'") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("A prospectus will violate federal securities laws if it . . . buries [material objective factual matters] beneath other information . . . .").  Notably, Plaintiffs do not allege that the SEC rules require disclosure about individual portfolio companies.

Here, Blackstone had $88.4 billion in assets under management as of May 1, 2007.  Compl. ¶ 2.  A total of $33 billion of those assets were held in its private equity funds, which had investments in 43 different portfolio companies, each regularly fluctuating in value up and down.  Similarly, approximately $20 billion of those assets were in real estate funds, also regularly fluctuating in value.  Reg. St. at 2.  Separate disclosure on every factor that could affect the performance of each of the individual investments made by the private equity and real estate funds (together with similar information about Blackstone's numerous other investment funds) would flood unit holders with "an avalanche of trivial information."  The SEC discourages such

an approach to disclosure.  "[C]ompanies should avoid the unnecessary information overload for investors that can result from disclosure of information that is not required, is immaterial, and does not promote understanding."  SEC Guidance on MD&A, Securities Act Release No. 8,350, Exchange Act Release No. 48,960, Financial Reporting Release No. 72, Fed. Sec. L. Rep. (CCH) ¶ 87,127 (Dec. 19, 2003) ("2003 Interpretive Release").  "Companies must determine, based on their own particular facts and circumstances, whether a disclosure of a particular matter is required . . . [as] the effectiveness of MD&A decreases with the accumulation of unnecessary detail or duplicative or uninformative disclosure that obscures material information."  *Id*.  The SEC also counsels reporting companies to focus on *consolidated* financial information.  *See id.* ("Companies also should focus on an analysis of the consolidated financial condition and operating performance, with segment data provided where material to an understanding of consolidated information.").  Plaintiffs do not allege, and they cannot, that Blackstone is required to consolidate the financial information of the portfolio companies owned by the funds it manages.

In any event, the individual performance of two isolated portfolio companies was plainly immaterial to IPO investors.  Blackstone-sponsored funds themselves only held a minority interest (23%) in FGIC, for which they had invested approximately $332 *million*.  Ex. C, The PMI Group, Inc., 8-K, August 6, 2003, at 2.  In contrast, the assets managed by Blackstone's private equity segment alone totaled $33 *billion*.  Thus, the investment in FGIC by Blackstone-sponsored funds represented only 1% of the total investments of Blackstone-managed private equity funds, and only 0.4% of Blackstone's total assets under management at the time of the IPO.

Courts have dismissed securities law claims for lack of materiality where the allegedly omitted statements impacted a small portion of a company's value.  *See Panther*

18

*Partners*, 538 F. Supp. 2d at 674 ("[A] $700,000 write-off within a $30 million dollar acquisition[] is immaterial. The absence of materiality is further demonstrated when [plaintiff] suggests that the potential $700,000 write-off be disclosed in the context of a $125 million dollar offering."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (9% drop in operating income insufficient to establish liability under a Section 11 claim); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 n. 26 (1st Cir. 1996) (failure to disclose a 9% difference in quarterly operating results not materially misleading).

Plaintiffs do not even attempt to allege materiality with respect to Freescale, as they have not alleged any amount of loss suffered by Freescale or any amount of impairment to any fund's investment in Freescale. In any event, Blackstone's interest in Freescale represented a *de minimis* percentage of the firm's total assets under management at the time of the IPO.

Plaintiffs single out two of the 43 investments by Blackstone's private equity funds which they baldly allege to have declined in value at the time of the IPO. But Blackstone also did not disclose in its IPO prospectus any information about the numerous portfolio companies whose value at the time of the IPO had increased from that which was reflected in the IPO prospectus by amounts that were many multiples of the amounts by which Plaintiffs have incorrectly assumed FGIC or Freescale had declined in value at the time of the IPO. Not surprisingly, Plaintiffs do not complain about these omissions.

C.    *Even If Information About Individual Portfolio Companies Could Be Material, Plaintiffs Do Not Allege Any Actionable Material Misstatements Or Omissions*

Even if the details surrounding particular individual portfolio investments by Blackstone's funds were material to IPO investors, Plaintiffs have not alleged any material omissions or misstatements in the IPO Registration Statement. The bulk of Plaintiffs' complaint deals with alleged omissions, but Plaintiffs have failed to allege that Blackstone had a duty to disclose any of the allegedly omitted information. "A threshold requirement for a Section 11 . . .

19

claim based on a failure to disclose information is the presence of an affirmative statement that is made misleading by the material omission." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003); *see also In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 532 (S.D.N.Y. 2005) (same). A defendant is not required to disclose all known information, but has a duty to disclose any information that is "necessary to make other statements not misleading." *Alliance Pharm.*, 279 F. Supp. 2d at 182; *see also  In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000) (same).

1.      *Plaintiffs' Allegations Regarding FGIC Are Inadequate And Do Not Demonstrate Any Material Misstatement Or Omission*

Plaintiffs have not alleged *any* affirmative statement made regarding FGIC that was made misleading by any alleged omission. Instead, Plaintiffs baldly conclude that Blackstone failed to disclose that "[a]t the time of the IPO, Blackstone's investment in FGIC was performing poorly"[5] (Compl. ¶ 41) and "Blackstone had a duty to disclose the then-known trends, events or uncertainties associated with FGIC that were reasonably likely to cause the [sic] Blackstone's financial information not to be indicative of future operating results" (Compl. ¶ 76).

---

[5]      These allegations are largely based on the assertion that Blackstone did not characterize FGIC or Freescale as "not performing well" or "impaired." *See, e.g.*, Compl. ¶ 121. But, the lack of pejorative terms to describe the investments made by Blackstone-sponsored funds is not actionable. *See Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) ("Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested"); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (upholding dismissal of complaint that included allegations that the company failed to disclose that its competitive position was "deteriorating" and that "[s]ince the use of a particular pejorative adjective will not alter the total mix of information available to the investing public . . . such statements are immaterial as a matter of law…"); *Krim v. Coastal Physician Group, Inc.*, 81 F. Supp. 2d 621, 628-29 (M.D.N.C. 1998), *aff'd*, 201 F.3d 436 (4th Cir. 1999). "Moreover, '[a] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock.'" *In re N. Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006).

20

*First*, Plaintiffs rely on contemporaneously available public information relating to FGIC's business strategy, including references to news articles (Compl. ¶¶ 43-46, 57); publicly available information on the U.S. residential mortgage market, including references to news articles and public announcements (Compl. ¶¶ 47-56, 59, 62-74); and publicly available macroeconomic data (Compl. ¶¶ 60-61).  Contrary to Plaintiffs' claim that this information was "unbeknownst to the investing public" (Compl. ¶ 40), any such information that might have been relevant to the condition of FGIC's business as of June 21, 2007 was publicly available at the time of the IPO.  *See, e.g.*, Compl. ¶ 44 (August 2003 *Standard & Poor's* article); ¶ 45 (February 24, 2004 *Bond Buyer* article); ¶ 56 (2004 FGIC announcement); ¶ 60 (June 2004 Federal Reserve announcement); ¶ 61 (historical OFHEO house price index); ¶ 63 (August 2005 HSBC memo); ¶ 64 (August 2003 story on CBS' *Marketwatch*); ¶ 65 (August 23, 2006 *Dow Jones Newswires* article); ¶ 66 (September 15, 2006 *CNNMoney.com* article); ¶ 67 (November 13, 2006 *American Banker* article); ¶ 68 (November 30, 2006 *National Mortgage News* article); ¶ 69 (December 13, 2006 *Associated Press* article); ¶ 72 (April 2, 2007 announcement by New Century Financial Corporation).

A Section 11 claim may be properly dismissed on the pleadings for a lack of materiality where the allegedly omitted information was already available to the public, because "[t]he 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information.").  For example, the Third Circuit has dismissed a Section 11 claim for a failure to disclose the effect weakened economic conditions would have on the business.  *In re Donald J. Trump Casino Sec. Litig.-Taj*

21

*Mahal Litig.*, 7 F.3d 357, 377 (3d Cir. 1993) ("[W]e hold that the defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast."). The court held that this omission was immaterial. *Id.* ("As the reasonable investor should have known of the economic downturn in the Northeast at that time, the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors."). Here, Plaintiffs' own allegations make clear that a reasonable investor would have known all of the information Plaintiffs claim that Blackstone omitted, because this information was openly available to the public. As this information was already part of the "total mix" of information available to the public, its omission is immaterial.

*Second*, Plaintiffs rely on Blackstone's press release on March 10, 2008 announcing a write-down in the value of FGIC. According to Plaintiffs, "at the time of the IPO, the Company was required to write-down the value of its investment by $122 million, but which [sic] it failed to do until after the IPO." Compl. ¶ 40. Plaintiffs cannot seriously claim that Blackstone's announced write-down on March 10, 2008 (almost nine months after the IPO) demonstrates ipso facto that Blackstone should have written down the value of FGIC at the time of the IPO. Plaintiffs plead no non-conclusory fact that supports their bald assertion that *at the time of the IPO* FGIC was already experiencing the problems leading to the write down nine months later.

The accuracy and completeness of documents challenged under Section 11 is tested at the time the documents became effective. *Alliance Pharm.*, 279 F. Supp. 2d at 183 ("Section 11 plainly states that it provides a civil remedy against certain individuals based on false statements or misleading omissions of material fact in any part of a registration statement 'when such part became effective.'" (quoting 15 U.S.C. § 77k(a))); *see also Lin v. Interactive*

22

*Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("A cognizable claim under Section 11 or 12 of the 1933 Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.") (internal quotation omitted).  Events occurring after the documents became effective cannot establish Section 11 liability.  *Alliance Pharm.* 279 F. Supp. 2d at 183 ("Plaintiffs provide no authority to support their assertion that liability can attach-under Section 11 when events that occur after the effective date of the registration statement render statements therein misleading.").  The Registration Statement and Prospectus became effective on June 21, 2007. Plaintiffs must allege that "the omitted information in fact existed at the time that the allegedly misleading statement was made." *Zucker v. Quasha*, 891 F. Supp. 1010, 1017 (D.N.J. 1995), *aff'd mem*, 82 F.3d 408 (3d Cir. 1996).  Plaintiffs have not done so.  Neither Blackstone's press release on March 10, 2008 nor any other statement by Blackstone after June 21, 2007 nor any other developments after that date suggest that the IPO Prospectus was incomplete or inaccurate in any way, and Plaintiffs have not alleged any *facts* that were required to be disclosed but were omitted at the time of the IPO.

In any event, the write down in the value of FGIC was $122.9 million, compared to a total quarterly decrease in Total Pro Forma Adjusted Reportable Segment Revenues of $843.1 million.  Compl. ¶ 127.  This represents less than 4% of Blackstone's annual Total Pro Forma Adjusted Reportable Segment Revenues (which is exclusive of net gains from fund investment activities), according to the March 10, 2008 Press Release.[6]  As noted above, courts have dismissed securities law claims for lack of materiality where the allegedly omitted statements impacted, at most, only three to nine percent of a company's actual revenues.  *See*

---

[6]    Ex. D, March 10, 2008 Blackstone Press Release (setting forth Total Pro Forma Adjusted Reportable Segment Revenues of $3.12 billion.).  *See* Compl. ¶ 127.

*Panther Partners*, 538 F. Supp. 2d at 674; *In re Turkcell*, 202 F. Supp. 2d at 13; *Glassman*, 90 F.3d at 633 n. 26.  Indeed, despite the write down of FGIC in 2007, Blackstone had "Record Pro Forma Adjusted Revenues and Pro Forma Adjusted Economic Net Income for the full year 2007."  Ex. D, March 10, 2008 Blackstone Press Release.

It is also notable that Plaintiffs premise their entire complaint on the possibility that reduced performance of portfolio companies would "almost certain[ly]" lead to "claw-back[s]" of performance fees from Blackstone.  *See, e.g.*, Compl. ¶ 40.  Yet nowhere do Plaintiffs allege that such a clawback occurred.  In fact, Blackstone's 2007 revenues actually *increased by $432.7 million or 17%* relative to 2006.  Ex. B, March 12, 2008 Blackstone 10-K at 60.  Plaintiffs have failed to link any reduction in the performance of FGIC or any other investments to the revenues of Blackstone.

### 2. Plaintiffs Fail To Allege Adequately Any Material Misstatements Or Omissions Regarding Freescale

Plaintiffs have not alleged *any* affirmative statements made regarding Freescale that were made misleading by any alleged omissions.  Instead, Plaintiffs allege that Blackstone failed to disclose that "before the IPO, Freescale lost an exclusive agreement to manufacture wireless 3G chipsets for its largest customer, Motorola."  According to Plaintiffs, this "had a material adverse affect [sic] on Freescale's business and the value of the major corporate private equity fund controlled by Blackstone."  Compl. ¶ 77.

Plaintiffs' sources of factual support for these allegations were all publicly available *prior* to the IPO: (1) an April 27, 2007 Wall Street Journal article (Compl. ¶ 82), (2) a March 21, 2007 Motorola investor conference call (Compl. ¶ 83), and (3) an April 25, 2007 Freescale investor conference call (Compl. ¶ 86).  This information was publicly available at the time of the IPO, contrary to Plaintiffs' claim that it was "unbeknownst to the investing public" (Compl. ¶ 40).  Moreover, Plaintiffs' own allegations reveal that it was *publicly known* that

24

Freescale management *had never expected* that Motorola would continue to contract 3G chipsets exclusively from Freescale after the IPO.  The Wall Street Journal reported that after spinning off Freescale (its semiconductor unit), Motorola was under contractual obligation "to buy all cellphone chips from the spun-off unit through 2006."  Compl. ¶ 82.  This "meant the [sic] Motorola couldn't shop for cheaper chips elsewhere" until after its contractual obligation expired in 2007.  *Id.*  Freescale management announced in the company's April 25, 2007 investor conference call:

> "So I haven't changed my view on what's happening at Motorola.  And I want to make sure that you understand that I haven't changed.  I mean we have said repeatedly that as 3G becomes more and more of Motorola going forward, *they are going to diversify.  We are not expecting, we have never expected, to gradually become 100% of Motorola's silicon*.  We have been 50%, 45% to 55% historically over the years of their silicon in 2G, 2.5G.  In 3G, because they started with us, we were at 100%, today have 100% of the opportunity.  And we said repeatedly when they announced one design win with QualComm at one point and when TI came out.  And we said, yeah, *we expect that going forward on 3G, they're going to have a multi vendor strategy* which, for a company of their size, they had it in 2 and 2.5G and there's no reason that all of a sudden they should change in 3G.  So what you observe is that happening and I think Motorola has also made some comment that they were a little bit behind in diversifying and a lot of people are taking those comments and saying, aha, Motorola is moving away from Freescale.  And of course you can expect all of our competition to claim that they are now getting into Motorola.  But frankly, *it has not been a surprise for us* . . . .  I repeat, and I want to make sure everybody understands, that *even when Freescale was an internal division of Motorola, it never had 100% of the silicon opportunity*."

Compl. ¶ 86 (emphasis added).

As the loss of Motorola's exclusive 3G contract was both *public* and *expected* before the IPO, it was information that was already part of the "total mix" of information available to the public, and not actionable.  *Kapps*, 379 F.3d at 216; *see also In re Merrill Lynch & Co.*, 272 F. Supp. 2d at 249-50.

3.  *Plaintiffs Fail To Allege Adequately Any Material Misstatements Or Omissions Regarding The Real Estate Investments*

Plaintiffs' allegations relating to unidentified real estate investments are wholly conclusory.  According to Plaintiffs, "by the time of the IPO, the market for real estate in several significant markets were [sic] starting to deteriorate [and] the U.S. real estate market was being adversely affected by a series of negative developments in the credit markets."  Compl. ¶ 87. Accordingly, "it was foreseeable that the Company would have performance fees clawed-back in connection with its real estate investments and would not generate additional performance fees on those investments."  *Id.*

Plaintiffs fail to allege that any performance fees were actually clawed back during the class period or at any other time.  In fact, the net value of the underlying portfolio investments owned by the real estate funds managed by Blackstone actually *increased* by approximately 35% in 2007.  Compl. ¶ 128, quoting Ex. B, March 12, 2008 Blackstone 10-K.

Moreover, Plaintiffs do not identify specific real estate investments, nor do they provide facts to support their conclusion that it was "foreseeable" that a "deteriorating" domestic residential real estate market would negatively affect the value of Blackstone-sponsored real estate funds.  Plaintiffs essentially attempt to piggyback their real estate allegations on their FGIC allegations.  The FGIC allegations, however, are limited to the U.S. *residential* real estate market.  *See* Compl. ¶¶ 43-62.  Plaintiffs have not alleged that Blackstone-sponsored funds held any significant amount of residential real estate holdings, nor could they because those funds held a single minor residential real estate asset.  Ex. E, November 13, 2007 Blackstone 10-Q at 50.  To the contrary, all but one of the investments of the real estate funds managed by Blackstone at the time of the IPO were in commercial properties, including 85% in office buildings and hotels.  Reg. St. at 50.  Thus, Plaintiffs' extended discourse on the U.S. residential

real estate market has no relevance whatsoever to the real estate assets held by the funds managed by Blackstone.

        4.        *Defendants Cannot Be Held Liable For Failing To Predict Future Macroeconomic Conditions*

With respect to the allegations involving FGIC and real estate investments, Plaintiffs allege that Blackstone had a duty to disclose the "known trends, events or uncertainties" associated with these investments.  Compl. ¶ 89.[7]  Plaintiffs point to a number of "indicators" about the U.S. economy, widely available to the public and the market before and at the time of the IPO, that they contend made obvious that the U.S. real estate market was in "freefall" and was "in the midst" of a *prolonged* decline, and that FGIC and unnamed Blackstone real estate investments would be harmed as a result.  Compl. ¶¶ 88, 106.

Plaintiffs allege in effect that Blackstone failed to accurately predict, at the time of the IPO, the future length and severity of a weakened real estate market.  *See, e.g.*, Compl. ¶ 59 ("Three main indicators are used by industry experts to assess the current state of, *and future prospects for*, the U.S. mortgage market . . .").  In essence, Plaintiffs argue, with the benefit of hindsight, that the risks of the real estate market were so obvious as to require disclosure at the time of the IPO.

There are several fatal flaws in this claim.  First, Item 303 of Regulation S-K only requires disclosure of currently existing trends, not projections about future macroeconomic market conditions.  Defendants cannot be held liable for purportedly failing to fulfill the requirements of Item 303 or anything else simply by failing to predict future economic factors that could affect portfolio companies or real estate investments.  The "[f]ederal securities law[s]

---

[7]      Plaintiffs allege that Item 11 of Form S-1 requires registrants to provide the information required by Item 303 of Regulation S-K and then rely on a SEC interpretive release from 1989 interpreting Item 303 to require disclosure of "currently known trends, events and uncertainties that are reasonably expected to have material effects . . . ."  Compl. ¶¶ 89-90.

do[] not require disclosure of facts that are purely hypothetical or not reasonably discoverable by the defendant." *Zucker*, 891 F. Supp. at 1018.  Plaintiffs couch their allegations in terms of Blackstone's failure at the time of the IPO to reveal an adverse trend in the macroeconomic climate.  However, Plaintiffs fail to allege that the alleged "trends or uncertainties" were actually known to Blackstone's management and without such knowledge, there can be no violation of Item 303.  *See Garber*, 537 F. Supp. 2d at 614 ("[Plaintiff] argues that pleading a trend's *existence* is enough to support a claim, and whether defendants were actually aware of the trend is not legally operative. [Plaintiff] misreads Item 303, which requires that the trend actually be *known*.").  "The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock market itself." *Panther Partners*, 538 F. Supp. 2d at 664; *see also Lin*, 574 F. Supp. 2d at 421 ("The securities laws do not require clairvoyance in the preparation of offering documents.") (internal quotation omitted).  Even if there were signals of problems in the sub-prime mortgage-backed securities market at the time of the IPO, Plaintiffs do not allege adequately that Blackstone knew something the public did not know about the scope or magnitude of the problems that were to come.  *See Panther Partners*, 538 F. Supp. 2d at 673 ("No plausibly pleaded fact suggests that [the Defendant] knew or should have known of the scope or magnitude of the defect problem at the time of the Secondary Offering.  Plaintiff asks the Court to assume that Defendants *must* have known because something did in fact occur later; this is simply inadequate pleading.").

        The second problem with Plaintiffs' allegations about trends in the residential real estate market is that they had nothing to do with the commercial real estate market, in which all

but one of the real estate assets of Blackstone-sponsored funds are held.  Ex. E, November 13, 2007 Blackstone 10-Q at 50.

Moreover, Blackstone extensively disclosed the risks involved in purchasing IPO units, including risks relating to Blackstone's susceptibility to market and economic conditions and changes in the values of investments made by sponsored funds.  *See Statement of Facts, Section IV, supra.*

D.    *Plaintiffs' Allegations Regarding GAAP Are Demonstrably Baseless*

Plaintiffs make a series of technical objections to Blackstone's interim financial statements, but these claims misstate GAAP requirements and largely arise from Plaintiffs' demonstrated misrepresentation and mischaracterization of the structure of Blackstone and its unsubstantiated allegations about declines in value of specified investments by Blackstone-sponsored funds.

1.    *Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 159*

Plaintiffs repeatedly take issue with Blackstone's accounting method, citing the requirements of the Financial Accounting Standards Board's (FASB) Statement of Financial Accounting Standards ("SFAS") No. 159.  Compl. ¶ 98-105.  Plaintiffs ignore that SFAS No. 159 was not in effect on March 31, 2007, the date of the interim financial statements included in the IPO Registration Statement (*see* Compl. ¶ 95).  SFAS No. 159 ("This Statement is effective as of the beginning of an entity's first fiscal year that begins after November 15, 2007.").  SFAS No. 159 was therefore not applicable to Blackstone's financial statements included in the IPO Registration Statement and Blackstone was under no obligation to utilize SFAS No. 159.  As made clear in the Registration Statement (and cited but ignored by Plaintiffs), Blackstone "retained the specialized accounting for the Blackstone Funds pursuant to EITF No. 85-12, *Retention of Specialized Accounting for Investments in Consolidation*."  *See* Compl. ¶ 114.

29

2.    *Plaintiffs' GAAP Allegations Rely On Their Allegations Regarding FGIC and Real Estate Investments*

Placing aside Plaintiffs' misreading of the applicability of SFAS No. 159, Plaintiffs' GAAP-related allegations boil down to an allegation that Blackstone overvalued its funds' investment in FGIC and unnamed real estate investments on March 31, 2007.  *See* Compl. ¶ 114 ("GAAP required that Blackstone's financial statements report the Company's investment fund assets at fair value."), ¶ 105 ("[T]he fair value Blackstone attributed to its investment in FGIC was negligently inflated at March 31, 2007.").  Plaintiffs rely on the following two allegations: (1) by an unspecified date in early 2007, the U.S. residential real estate market was in "freefall" (Compl. ¶ 106); and (2) FGIC was exposed to losses on the financial guarantees it issued to its counterparties (Compl. ¶ 107).  For the numerous reasons discussed above, these allegations fail, and therefore Plaintiffs' GAAP allegations fail.

Plaintiffs also claim that the ABX Index declined during the fourth quarter of 2006 and the first half of 2007.  Compl. ¶ 109.  In contrast however, the Complaint provides a chart of three ABX indices all of which show a rising or flat index at March 31, 2007.[8]  Compl. ¶ 109.  Plaintiffs seem to assume that all RMBSs and CDOs structured from non-prime underlying mortgages are themselves sub-prime instruments.  Compl. ¶ 110 ("The collapse of the non-prime series within the ABX Index indicated that FGIC had a very high probability of incurring massive losses on the CDSs it issued").  Following this flawed assumption, Plaintiffs look only to the ABX BBB Index for evidence that FGIC was exposed to "huge losses."  However, Plaintiffs never allege that FGIC offered CDSs on BBB-rated RMBSs and CDOs.  Plaintiffs earlier allege that non-prime mortgages are structured into RMBSs and CDOs with a range of

---

[8]    Plaintiffs unhelpfully provide a chart with dates that are not clearly marked, but it is clear that all three indices were rising or flat on March 31, 2007 — the date of the challenged financial statements.

ratings, including AAA.  Compl. ¶ 52.  Plaintiffs' own allegations demonstrate that the ABX

AAA Index remained at or near 100% until approximately June 29.  This allegation on its face

does not support Plaintiffs' conclusion that on March 31, 2007, FGIC was exposed to huge

losses on CDSs, and thus that FGIC was overvalued.

     *3.*     *Various Additional Alleged Violations*

     Plaintiffs cite to Statements of Financial Accounting Concepts, though these are

not authoritative sources of GAAP.  *Compare* Compl. ¶¶ 117(d)-(i) *with* SFAS No. 162 ¶¶ 3, 5

(FASB Concept Statements are not in any of the four categories of "sources of accounting

principles that are generally accepted" but merely "other accounting literature.").

     E.     *The Registration Statement Fully Disclosed The Risks Involved With Purchasing*
          *Blackstone Units*

     Contrary to Plaintiffs' allegation that Blackstone violated Item 503 of Regulation

S-K by failing to provide a "discussion of the most significant factors that make the offering

risky or speculative," Compl. ¶ 119, the Registration Statement included a 36-page "Risk

Factors" section describing the risks associated with investing in Blackstone common units.

Reg. St. at 32-67.[9]  In fact, the very first risk disclosure warned that "[d]ifficult market

conditions can adversely affect our business in many ways, including by reducing the value of

performance of the investments made by our investment funds."  Reg. St. at 32.  Eleven pages of

risk factors specifically described the risks involved with Blackstone's asset management

business (which include, among other things, the firm's management of private equity funds and

---

[9]     Plaintiffs' Item 503 allegations are nothing more than repetitions of their earlier
allegations.  *See* Compl. ¶ 121 ("This disclosure was not sufficient or meaningful to advise
investors of the actual risks . . .  that certain of the Company's investments were not performing
well and were of declining value"), ¶ 123 ("This disclosure was not sufficient or meaningful to
advise investors of the actual, existing risks . . . including . . . Blackstone's exposure, through
FGIC, to CDO's and RMBS"), ¶ 125 ("This disclosure was not sufficient or meaningful . . .  As
alleged herein, at the time of the IPO the U.S. real estate market was well in the midst of a
freefall")

real estate funds). Among these risks was that Blackstone's asset management business involves investments in "relatively high-risk, illiquid assets" which may return no profits or even "lose some or all of [Blackstone's] principal investments." Reg. St. at 46.

> F. *The Alleged Misstatements And Omissions Are Forward-Looking Statements Not Actionable Under "Bespeaks Caution" Doctrine*

Forward-looking statements in IPO registration statements are protected by the "bespeaks caution" doctrine. *See Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501 at *9 (S.D.N.Y. Aug. 22, 2005) (analyzing initial public offering statements under "bespeaks caution" doctrine). "Under the bespeaks caution doctrine, a misstatement or omission [related to a forward-looking statement] will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." *Alliance Pharm.*, 279 F. Supp. 2d at 192 (internal quotation omitted).

Plaintiffs' allegations that Blackstone was required to disclose (1) allegedly adverse "trends, events, or uncertainties" in the U.S. real estate market (Compl. ¶ 76), and (2) that there was an "almost certain risk that the Company would be subject to a claw-back of performance fees and reduced performance fees" (Compl. ¶ 40) allege omissions related to forward-looking statements. As noted in *Statement of Facts*, *Section IV, supra*, the Registration Statement clearly disclosed the risks involved in purchasing Blackstone units. *See, e.g.,* Reg. St. at 32 ("A general market downturn, or a specific market dislocation, may result in lower investment returns for our investment funds, which would adversely affect our revenues."); *id.* ("Difficult market conditions can adversely affect our business in many ways, including by reducing the value or performance of the investments made by our investment funds . . . ."); *id.* (detailing results of reduced performance of investment funds). The specific cautionary language found in the many risk disclosures in the Registration Statement thus renders Plaintiffs' alleged misstatements or omissions immaterial.

32

G.    *The Lack of Loss Causation Is Apparent From The Face Of The Complaint*

"Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper."  *In re Merrill Lynch & Co.*, 272 F. Supp. 2d at 253.  In *Merrill Lynch*, the Court dismissed the plaintiff's Section 11 and 12 claims where the entirety of the alleged drop in the defendant's stock price occurred *before* the allegedly omitted information was disclosed.  *Id.* at 255 ("Plaintiff here alleges that she has sustained a loss by pointing to declines in the price of her Fund's shares which occurred *before* public disclosure of the allegedly concealed information. Such price declines may not be charged to Defendants under Section 11 or Section 12(a)(2).").  Such is the situation here.

Plaintiffs allege that the price of Blackstone units declined from $31.00 to approximately $7.75 per unit.  Compl. ¶ 8.  But Blackstone's units were trading at $14.58 before the alleged omission regarding FGIC was disclosed in the March 10 press release[10] and traded between $17.15 and $17.52 ($3 higher than at the pre-FGIC disclosure date) on April 15, 2008, the date of the first filed complaint in this case, which is the relevant price for damages under Section 11(e).  15 U.S.C. § 77k(e) ("The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought . . . .").  Thus, none of the decline in the price

---

[10]    Plaintiffs' conclusory allegation that "information slowly leaked into the market about certain of the Company's portfolio companies and investment and the price of Blackstone units declined substantially" before the press release is entitled to no weight.  Compl. ¶ 126.  Plaintiffs do not allege any specific pieces of information about FGIC or Freescale that became available between the IPO and the March 10, 2008 press release.  To the contrary, Plaintiffs allege that the information that Motorola was terminating its exclusive supplier relationship with Freescale was announced on March 21, 2007, *before* the IPO.  Compl. ¶ 83.  Nor do Plaintiffs allege any specific information reaching the market about any real estate investments during this period.

of the Units can be attributable to this alleged omission.  The complaint is thus properly dismissed because of the obvious lack of loss causation.

Moreover, the Court should consider the trading price of the Units in the days surrounding March 10, 2008, the date of the press release announcing the write down of FGIC.[11] On Friday, March 7, the Units closed at $14.58.  The press release was issued before the market opened on March 10, and a conference call was held at 11:00 am.  The Units opened on Monday, March 10, at $14.39, and closed at $15.00, an increase over the previous close of 2.8%.  The Units opened the next morning at $15.90, up over 9% from the last trade before the announcement of the FGIC write down.[12]

## II.    Plaintiffs' Section 12 Claims Fail For The Same Reasons As Their Section 11 Claim

As the Registration Statement attacked in the Section 11 claim incorporates the Prospectus attacked in the Section 12 claim, Plaintiffs' failure to adequately allege a material misstatement or omission in the Registration Statement is fatal to the Section 12 claim as well. *See Lasker v. N. Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57-58 (2d Cir. 1996) (Section 11 and Section 12 claims both "require[] that [plaintiffs] identify a materially misleading statement made by the defendants."); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) ("Materiality is . . . a required element for claims under both § 11 and § 12(a)(2).")

---

[11]    Plaintiffs do not allege any "corrective disclosures" related to Freescale or real estate fund investments, so it is impossible for Plaintiffs to attribute any decline in the price of the Units to alleged omissions regarding these investments.

[12]    In any event, the write down in the value of FGIC was $122.9 million, compared to a total quarterly decrease in Total Pro Forma Adjusted Reportable Segment Revenues of $843.1 million.  Compl. ¶ 127.  This represents less than 4% of Blackstone's annual Total Pro Forma Adjusted Reportable Segment Revenues (which is exclusive of net gains from fund investment activities), according to the March 10, 2008 Press Release.  Indeed, despite the write down of FGIC in 2007, Blackstone had "Record Pro Forma Adjusted Revenues and Pro Forma Adjusted Economic Net Income for the full year 2007."  Ex. D, March 10, 2008 Blackstone Press Release.

**III.     Plaintiffs' Section 15 Claims Fail Because They Depend On The Faulty Section 11 and 12 Claims**

To plead a *prima facie* case of control person liability under Section 15, Plaintiffs must allege: (i) an underlying primary violation of the securities laws and (ii) control over the controlled person.  *See In re Vivendi*, 381 F. Supp. 2d at 187.  Plaintiffs' Section 15 claim fails because they have not established an underlying Section 11 or 12 claim for the reasons above. *See Alliance Pharm.*, 279 F. Supp. 2d at 182 ("Liability under Section 15 requires an underlying violation of Section 11 or Section 12(a)(2).").  Moreover, Plaintiffs have failed to plead control by the Individual Defendants other than in the most conclusory fashion.  *See* Compl. ¶ 148.

CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the claims against them.  Because no efforts at repleading will cause Plaintiffs' legally invalid claims to be cured, the Court need not provide leave for Plaintiffs to amend.

Dated: New York, New York
      December 4, 2008

SIMPSON THACHER & BARTLETT LLP


By    /s/ Bruce D. Angiolillo
     Bruce D. Angiolillo (BA-9271)
       angiolillo@stblaw.com
     Jonathan K. Youngwood (JY-2234)
       jyoungwood@stblaw.com
     Paul Sirkis (PS-7516)
       psirkis@stblaw.com
     425 Lexington Avenue
     New York, New York  10017-3954
     Telephone: (212) 455-2000
     Facsimile:  (212) 455-2502

     Attorneys for Defendants