**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------x

**LANDMEN PARTNERS INC., Individually and On Behalf of All Others Similarly Situated,**

**Plaintiff,**

**THE BLACKSTONE GROUP, L.P., et al.**

**Defendants.**

---------------------------------------------------------------------------x

**08-CV-3601 (HB)**
**OPINION & ORDER**

**Hon. HAROLD BAER, JR., United States District Judge:**

Plaintiff Landman Partners Inc. ("Plaintiff") brings this putative securities class action on behalf of all purchasers of common "units" (*i.e.* limited partnership interests) in The Blackstone Group L.P. ("Blackstone" or the "Company"), pursuant or traceable to Blackstone's June 25, 2007 initial public offering (the "IPO" or the "Offering"). Consolidated Amended Class Action Complaint ("CAC") ¶¶ 2, 20. Plaintiff alleges that in connection with the IPO, Blackstone and certain of its executives (collectively, "Defendants") caused the Registration Statement and Prospectus issued in connection with the IPO (collectively, the "Offering Documents") to contain materially false and/or misleading statements in violation of Sections 11 and 12(a) of the Securities Act of 1933 (the "Act"), 15 U.S.C. §§ 77k and 77l. Defendants move to dismiss the CAC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Defendants' motion is GRANTED.

## I. FACTUAL BACKGROUND

### A. Blackstone's Business

Blackstone is a self-described "leading global alternative asset manager and provider of financial advisory services"; at root, the Company's business is to profitably invest other peoples' money. CAC ¶2. As of May 1, 2007, Blackstone had $88.4 billion "under management" in a variety of hedge funds, corporate private equity funds, funds of hedge funds, mezzanine funds, closed-end mutual funds.[1] CAC ¶ 27; Decl. of Jonathon K. Youngwood, dated

[1] Blackstone's business is organized into four segments: (1) corporate private equity, which focuses on management of the Company's private equity funds; (2) real estate, which is responsible for management of Blackstone's various real estate investment funds; (3) "marketable alternative asset management,"

December 4, 2008 ("Youngwood Decl."), Ex. A ("Reg. Stmt.") at 2. These various funds are generally structured as limited partnerships that are capitalized by limited-partner investors (such as institutional investors and pension funds) and managed by Blackstone, which, through subsidiary holding partnerships, serves as general partner.

Blackstone thus does not own directly either the various portfolio companies in which its corporate private equity funds invest or the real estate assets owned by its real estate funds.[2] Rather, Blackstone derives revenue from two principal sources: (1) it earns a "management fee" equal to 1.5% of the value of the assets under management; and (2) it earns a "performance fee" or "carried interest" equal to of 20% of the profits generated on the capital it invests for limited partners. CAC ¶33. Blackstone is subject, however, to having its performance fees "clawed-back." That is, the Company is obligated to return performance fees to investors if investments perform poorly. CAC ¶33. In contrast to those who invest in Blackstone's various funds, investors in Blackstone itself acquire a stake in Blackstone's investment management business, hoping that strong performance by the various investment funds will generate performance fees for the Company.

**B. The IPO**

On March 22, 2007, Blackstone filed with the SEC a Form S-1 Registration Statement ("Registration Statement") for the IPO, and thereafter filed certain amendments thereto. CAC ¶34. On June 21, 2007, the Prospectus became effective and 153 million of Blackstone's common units were sold to the public at $31 per unit, thereby raising more than $4.5 billion, much of which was used to purchase the ownership interests from Blackstone's then-existing owners (*i.e.* senior management including the individual named defendants). CAC ¶36; Registration Statement at 20-21. As of the date the initial complaint was filed in this action, on April 15, 2008, Blackstone common units traded between $17.00 and $17.50 per unit. Class Action Complaint ¶ 33. By the time the Consolidated Amended Complaint ("CAC") was filed on October 27, 2008, the units traded for approximately $7.75 per unit. CAC ¶ 8.

---

which involves management of Blackstone's various hedge funds, mezzanine funds, and other "alternative" investment vehicles; and (4) the financial advisory group, which comprises the Company's advisory services business that provides, for example, merger and acquisition analysis and services to other companies. CAC ¶ 31; Reg. Stmt. at 2.

[2] Although Blackstone does invest some of its own funds in the various investments that it manages, as of May 1, 2007, such funds represented a mere 6% of the total assets under management. *See* Registration Statement at 158.

**C. Alleged Misrepresentations and Omissions**

The gravamen of Plaintiff's CAC is that the Registration Statement "misrepresented and failed to disclose that certain of the Company's portfolio companies were not performing well and were of declining value," such that there was a "real, palpable and almost certain risk that the Company would be subject to a claw-back of performance fees and reduced performance fees." CAC ¶¶ 7, 40. More specifically, the CAC alleges that had the Registration Statement not been negligently prepared, it would have disclosed adverse facts about the following three Blackstone investments.

1. FGIC

FGIC is in the business of insuring bonds issued by other entities; it is a monoline financial guarantor. CAC ¶41. According to the CAC, Blackstone "owns" a 23% equity stake in FGIC.[3] According to the CAC, between 2003 and 2007 FGIC moved away from its traditional and generally more conservative business of insuring municipal bonds towards the much riskier business of insuring collateralized debt obligations ("CDOs"), including CDO's backed by subprime mortgages and "synthetic" CDOs backed by credit default swaps, a form of insurance policy designed to protect the holder of a CDO against default. CAC ¶¶ 43-55. According to the CAC, as a consequence of its investment in FGIC, Blackstone had substantial exposure to the subprime mortgage market, which, as of the time of the IPO in March 2007, was clearly and demonstrably on the verge of collapse. CAC¶¶ 62-75. Plaintiff alleges that as a major investor in FGIC, Blackstone had a duty to disclose in the Offering Documents such "then-known trends, events, or uncertainties associated with FGIC" because they were "reasonably likely to cause the [sic] Blackstone's financial information not to be indicative of future operating results." CAC ¶ 77. The Registration Statement, however, did not mention Blackstone's investment in FGIC, and in March 2008, Blackstone wrote down that investment by $122 million. CAC ¶ 40.

2. Freescale Semiconductor

The Registration Statement did disclose to prospective purchasers of Blackstone units that one of the Company's corporate private equity funds had a substantial investment in

[3] Blackstone avers that it does not "own" a 23% equity stake in FGIC, but rather that one of its private equity funds invested approximately $332 million to acquire an a 23% stake in the company in a transaction pursuant to which a consortium of investors acquired a collective 88% interest in FGIC from General Electric Capital Corporation. *See* Youngwood Decl. Ex. C. The PMI Group, Inc. Form 8-K, August 6, 2003.

Freescale, a designer and manufacturer of semiconductors.[4] However, Plaintiff alleges that the Registration Statement failed to mention that "[s]hortly before the IPO, Freescale lost an exclusive agreement to manufacture wireless 3G chipsets for its single largest customer, Motorola" after design defects and quality issues caused delays in the launch of a new cell phone. CAC ¶77-80. The CAC alleges that the loss of Freescale's exclusive arrangement with Motorola was disclosed by, *inter alia*, Motorola's CEO who on a March 21, 2007 conference call with securities analysts announced that it was terminating its relationship with Freescale as the exclusive supplier of its 3G chipset. CAC ¶83. Plaintiff alleges that the loss of the contract had a "material adverse affect on Freescale's business and, concomitantly, . . . [on the] corporate private equity fund controlled by Blackstone." CAC ¶85.

3. Real Estate Investments

Finally, the CAC alleges "that at the time of the IPO Blackstone had significant investments in real estate," and at that time "the market for real estate . . . [was] starting to deteriorate" and "was being adversely affected by a series of negative developments in the credit market." CAC ¶87. Consequently, according to the allegations in the CAC, "by the time of the IPO, it was foreseeable that the Company would have performance fees clawed-back in connection with real estate investments and would not generate additional performance fees on those investments." CAC ¶87. The CAC further alleges that certain statements in the Registration Statement about "high levels of growth" in the real estate industry and "strong investor demand for real estate assets" were materially inaccurate because at the time of the IPO, "the U.S. real estate market had passed its zenith and was in the midst of a prolonged decline." CAC ¶88.

Plaintiff alleges that Blackstone failed to disclose material information about "currently known trends, events and uncertainties" pertaining to the foregoing three investments, which Plaintiff alleges were "reasonably likely to have material effects" on Blackstone's performance. CAC ¶ 89-90 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, SEC Release No. 6835, May 18, 1989 (the "1989 Interpretative Release"). Plaintiff also alleges that the financial statements in the Registration Statement were materially inaccurate and violated GAAP, *see* CAC ¶¶ 94-118, and that the Registration Statement omitted

[4] The CAC acknowledges that the investment capital used by Blackstone's private equity funds "includes equity invested by Blackstone's limited partner co-investors," *i.e.* other people's money. CAC ¶78 n. 2. The Registration Statement confirms that the combined investment in Freescale was approximately $3.1 billion. Reg. Stmt. at 162.

required information about facts and circumstances that made investment in Blackstone units risky. CAC ¶¶ 119-125.

## II. LEGAL STANDARD

The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and, more recently, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), articulated the standards that apply to test the sufficiency of Plaintiff's CAC in the face of Blackstone's motion to dismiss pursuant to Rule 12(b)(6).[5] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court must accept all factual allegations as true, but this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of "judicial experience and common sense." *Id.* Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed. *Twombly*, 550 U.S.at 570.

## III. DISCUSSION

### A. Applicable Law

Plaintiffs' primary claims arise under Sections 11 and 12(a) of the Securities Act of 1933, which are "'designed to ensure compliance with the disclosure provisions of the Securities Act by imposing a stringent standard of liability on the parties who play a direct role in a registered [securities] offering.'"[6] *Ladmen Partners v. Globalstar*, 07 Civ. 976 (LAP), 2008 WL 4449280

[5] Because Plaintiff's allegations sound in negligence, not fraud, Plaintiff's complaint is not subject to the more exacting pleading standard of Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Although the "heightened pleading standard of Rule 9(b) applies to Section 11 claims insofar as the claims are premised on allegations of fraud, " *Id*. at 171, and "[i]t is well established that in this context a 'boilerplate disclaimer is not enough to make out a claim for negligence,'" *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 976 (LAP), 2008 WL 4449280, *11 n. 10 (S.D.N.Y. Sep. 30, 2008) (quoting *In re Ultrafem, Inc. Secs. Litig.*, 91 F .Supp.2d 678, 691 (S.D.N.Y. 2000), Plaintiff's allegations in this case clearly sound in negligence and not fraud. Indeed, Blackstone does not argue to the contrary.

[6] Whereas Section 11 applies to misstatements or omissions in a registration statement filed with the SEC, Section 12(a) applies to persons who sell securities pursuant to a prospectus that contains misstatements or omissions. 15 U.S.C. §§77k, 77l(a). However, "claims under Sections 11 and 12 are usually evaluated

(S.D.N.Y. Sept. 30, 2008) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). To state a claim, a plaintiff must allege that, as of its effective date, the offering document contained a material misstatement or omission. 15 U.S.C. §77k(a). "Section 11 places a relatively minimal burden on a plaintiff, requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statement concerning a material fact." *In re Public Offering Secs. Litig.*, 358 F.Supp. 2d 189, 205 (S.D.N.Y. 2004) ("*In re IPO*"). The veracity of a registration statement is determined by assessing the facts as they existed when the statement became effective. *Id.*

In this case, Plaintiff proceeds primarily under a theory of omission:[7] Plaintiff alleges that omissions of material fact (1) made affirmative statements in the Registration Statement false or misleading; and (2) violated Item 303 of SEC Regulation S-K ("Item 303"), which requires an issuer such as Blackstone to "[d]escribe any known trends or uncertainties that have or that [it] reasonably expects will have a material favorable or unfavorable impact on new sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii). Courts have held that Section 11 imposes liability on a registrant who omits to state fact required to be stated under Item 303. *In re IPO.*, 358 F.Supp. 2d at 211 ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under Section 11.") A plaintiff must "'therefore plead facts indicating that the alleged known trends existed at the time of the purported misleading statements or omissions," that the trends were *known* to the registrant who fails to disclose them. *Garber v. Legg Mason, Inc.* 537 F.Supp.2d 597, 611 (S.D.N.Y. 2008) (quoting *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F.Supp.2d 8, 13 (S.D.N.Y. 2001)). Allegations that derive from the requirements of Item 303, however, are still subject to the materiality requirement. That is, under Item 303 a known-trend is only required to be disclosed

---

in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)." *Lin v. Interactive Brokers Group, Inc.*, 574 F.Supp. 2d 408, 416 (S.D.N.Y. 2008) (McMahon, J.). Plaintiff's claims under Section 15(a) against the individual defendants for "control person liability" are derivative of its Section 11 claims.

[7] Plaintiff maintains that certain allegations in the CAC concerning the Registration Statement's discussion of the then-current state of the real estate market constitute affirmative misrepresentations. *See* CAC ¶125; Tr. of Oral Arg. at 27. The CAC's allegations pertaining to the Company's real estate investments are discussed *infra*.

if the company reasonably expects that it will have a material impact on continuing operations. 17 C.F.R. 229.303(a).[8]

"The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*JP Morgan Chase*") (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 240 (1988)) (internal quotation marks and alteration omitted). That is, for a misstatement or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

To determine whether an allegedly misleading statement is material, a court must engage "in a fact-specific inquiry"—there is no bright line rule. *JP Morgan Chase*, 553 F.3d at 197. "Because materiality is a mixed question of law and fact, in the context of a Fed.R.Civ.P. 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). This is not to say that a complaint can never be dismissed on materiality grounds at the motion to dismiss stage: indeed several courts have found relatively small misstatements or omissions to be immaterial as a matter of law. *See, e.g., JP Morgan Chase*, 553 F.3d at 204 (accounting treatment of 0.3% of bank's assets immaterial as a matter of law); *Garber*, 537 F.Supp. 2d at 613-14 (omission of .4% of annual revenue immaterial and citing similar cases); *In re: Duke Energy Corp. Secs. Litig*.,

[8] Although the Second Circuit has not squarely addressed the issue, in *Oran v. Stafford*, the Third Circuit stated that "[b]ecause the materiality standards for Rule 10b-5 and SK-303 differ significantly, the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. Such a duty to disclose must be separately shown." 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.) (quoting *Alfus v. Pyramid Tech. Corp.*, 764 F.Supp. 598, 608 (N.D.Cal.1991)). Consequently, the Third Circuit held that a violation of Item 303's "reporting requirements does not automatically give rise to a material omission under Rule 10b-5." The same holds true here because, as discussed below, "[t]he standard for assessing materiality under Section 10(b) and Rule 10b-5 is the same as under Sections 11 and 12(a)(2)." *Garber v. Legg Mason, Inc.*, 537 F.Supp. 2d 597, 615 (S.D.N.Y. 2008) (citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). Consequently, the general requirement of materiality overlays the Plaintiff's allegations that Blackstone violated the disclosure requirements of Item 303.

282 F.Supp. 2d 158, 161 (S.D.N.Y. 2003) (inflation of company's revenue by 0.3% immaterial as a matter of law); *In re Turkcell Iletisim*, 202 F.Supp.2d at 13 (failure to disclose 9% difference in operating income insufficient to establish liability under Section 11); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546-47 (8th Cir. 1997) (overstatement of assets by 2% immaterial as matter of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 n. 26 (1st Cir. 1996) (omission of information regarding 3% to 9% of actual revenues immaterial as a matter of law).

In *JP Morgan Chase*, the Second Circuit reaffirmed that the inquiry entails both quantitative and qualitative inquiries, although there the Circuit considered the two inquiries *sequentially*. *JP Morgan Chase*, 553 F.3d at 204. *First*, the Circuit considered quantitative factors: that is, on a relative scale, how large are the alleged misstatements? *Id.* The Circuit cited the SEC's Staff Accounting Bulletin No. 99 ("SAB 99"), which provides that "[t]he use of a percentage as a numerical threshold, such as 5% may provide the basis for a preliminary assumption that … a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." *Id.* (quoting SAB 99, 64 Fed.Reg. 45150, 45151 (1999)). The Circuit agreed with SAB 99 that "the five percent numerical threshold is a good starting point for assessing the materiality of the alleged misstatement."[9] *Id.* *Second*, the Circuit considered the qualitative factors which are "intended to allow for a finding of materiality if the quantitative size of the misstatement is small but the effect of the misstatement is large." *Id.* at 205.

**B. Alleged Omissions Concerning the Portfolio Companies**

Applying the foregoing analysis to the alleged misstatements and omissions concerning the portfolio companies FGIC and Freescale, it is apparent that the allegations satisfy neither the quantitative nor qualitative prongs of the test. It is important not to interpret my conclusion here as some sort of approval of the conduct by those responsible for the IPO, nor any indication as to how much, if any, knowledge (as alleged in the CAC) those who drafted the Offering Documents possessed. First, Blackstone's $331 million investment in FGIC represented a mere 0.4% of the Blackstone's assets under management at the time of the IPO, on par with the 0.3% of JP Morgan Chase's assets that the Circuit found "does not even come close" to the 5% threshold that serves as an appropriate "starting place." *JP Morgan Chase*, 553 F.3d at 204. When the

[9] Under the facts of *JP Morgan Chase*, where the alleged misstatement concerned 0.3% of JP Morgan Chase's total assets, the Circuit found the misstatement "does not even come close" to the threshold. *JP Morgan Chase*, 553 F.3d at 204.

amount of the write-down on the FGIC investment is considered—$122 million—the relative size of the alleged omission drops further. Plaintiffs rejoin that the drop in value of Blackstone's investment in FGIC accounted for 69% of the decline in revenue of Blackstone's corporate private equity group for the year 2007, which, at $881 million was down 18% over the prior year. But the corporate private equity group's $881 million in revenue constituted only 28% of Blackstone's $3.12 billion in total revenue for 2007. In *this* context, the quantitative immateriality of the $122 million write down is plain: the $122 million write down for FGIC was a mere 0.4% of Blackstone's $3.12 billion in annual revenue.

Second, the $3.1 billion investment in Freescale represented a 3.6% of the total $88.4 billion the Company had under management at the time of the IPO, which falls below the 5% benchmark that the Second Circuit has stated is a good "starting point" for the quantitative inquiry into materiality. *JP Morgan Chase*, 553 F.3d at 204. Furthermore, the CAC does not allege that loss of the exclusive supplier relationship with Motorola would cause the Blackstone fund's investment in Freescale to lose 100% of its value.[10] Were this lawsuit about a registration statement issued in connection with the sale of shares in Freescale, loss of the exclusive supplier relationship with Motorola would almost certainly be material. *See e.g. In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70-74 (2d Cir. 2001) (omission of sharp decline in sales and increase in returns of companies' best-selling product was material). But this case is not about sale of shares in Freescale, which was one of 43 companies in which Blackstone's corporate private equity segment had investments.

The immateriality of the alleged omissions concerning FGIC and Freescale derives not only from the relative size of Blackstone's investments in these companies, but also the *structure* of the Blackstone enterprise. The performance of the individual companies only affects Blackstone's revenues after investment gains or losses are aggregated at the fund level. *See* Reg. Stmt. at 1 ("[W]e receive a preferred allocation of income (a 'carried interest') or an incentive

[10] Indeed, the CAC does not allege *any* drop in the value of the Blackstone corporate equity fund's investment in Freescale. Allegations of actual loss are not required because the veracity and materiality of the statements at issue here must be judged as of the effective date of the Registration Statement. *See Feiner v. SS&C Techs.*, 11 F.Supp. 2d 204, 209 (D. Conn. 1998); 15 U.S.C. §77k(a). Nevertheless, it cannot be reasonably inferred from the facts alleged in the CAC that the value of Freescale could possibly have dropped to zero as a consequence of the loss of the exclusive relationship with Motorola. Indeed, the statements made by Freescale's management in an April 2007 conference call and quoted in the CAC confirm that Freescale "never expected" to provide 100% of Motorola's 3G chipsets. CAC ¶86 ("[w]e expect that going forward on 3G, they're going to have a multi vendor strategy which, for a company of their size, they had [] in 2 and 2.5G and there's no reason to think that all of a sudden they should change for 3G.")

fee from an investment fund in the event that specified investment returns are achieved by the funds.") At the fund level, the poor performance of one investment may be offset by the strong performance of another: the fact that Blackstone's corporate private equity fund wrote down its investment in FGIC by $122 million but still saw revenues of $821 million proves this point. Purchasers of units in Blackstone at the IPO (the putative class here) get the benefit of performance fees or the "carried interest" when an *entire fund* makes a profit and are potentially subject to the adverse consequences of claw-backs if the *entire fund* loses money). In this respect, there is no way to make a principled distinction between the negative information that Plaintiff claims was wrongfully omitted from the Registration Statement and information—whether positive or negative—about every other portfolio company, let alone every investment made by Blackstone's many subsidiary funds. Including all such information would have obfuscated truly material information in a flood of unnecessary detail, a result that the securities laws forbid. *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) ("The federal securities laws require that disclosure in a prospectus must steer a middle course, [and not] submerg[e] a material fact in a flood of collateral data."); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). In sum, the alleged omissions concerning FGIC and Freescale fall short of the quantitative threshold for materiality by virtue of both the size of the investments relative to Blackstone's total assets under management and the structure of Blackstone's investment management business.

This is not to the say that the size or structure of a company immunizes it from liability under the Securities Act. To the contrary, in this Court's view, preventing such a result is a critical purpose of the qualitative considerations that are "intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." *JP Morgan Chase,* 553 F.3d at 205. But the alleged omissions concerning the portfolio companies fall short here as well. None of the qualitative considerations discussed by the Circuit in *JP Morgan Chase* or any of the others set forth in SAB 99 are implicated here. *Id.* at 204-05. First, the CAC contains no allegation that any of the alleged misstatements or omissions concealed unlawful transactions or conduct. Plaintiff contends that the Registration Statement should have included a fuller exposition of the risks attendant to an investment in Blackstone and then-current trends and events, but not that any omission concealed something illegal.

Second, although the investment Freescale by Blackstone's corporate private equity group was substantial and the write down of its investment FGIC large as an absolute value,

these entities were but two of 43 portfolio companies invested in by one of four business segments. For this reason, and as discussed above, the alleged omissions about FGIC and Freescale did not relate to a "significant aspect of [Blackstone's] operations" as a whole. *JP Morgan Chase*, 553 F.3d at 204.[11] The third qualitative factor considered by the Circuit is also absent, namely the market's reaction to the public disclosure of the alleged omission. *Id.* at 205. Here, Blackstone units traded at approximately $14.50 before disclosure of the alleged omission concerning FGIC in the March 10, 2008 press release, but traded at approximately $17.50 when the initial complaint in this action was filed approximately one month later.[12]

Furthermore, the other "considerations that may well render material a qualitatively small misstatement" identified in SAB No. 99 are not implicated here. The CAC does not allege that the misstatements or omissions about the portfolio companies "hide[] a failure to meet analysts' consensus expectations for the enterprise," "change[d] a loss into income or vice versa," or affected Blacksone's "compliance with loan covenants or other contractual requirements." SAB No. 99, 64 Fed.Reg 45150, 45152. Although Blackstone executives were some of the chief beneficiaries of the IPO so that alleged omissions in the Offering Documents doubtless had "the effect of increasing management's compensation," the alleged omissions pertaining to the portfolio companies are so quantitatively small that this qualitative concern identified in SAB No. 99 is not enough to, alone, make the omissions material. Accordingly, I conclude the alleged misstatements and omissions concerning FGIC and Freescale are immaterial as a matter of law.

---

[11] *JP Morgan Chase* concerned the defendant bank's ("JPMC") characterization of certain transactions with Enron. There, the Circuit stated, "[w]hile Plaintiffs allege that Enron is a "key client" of JPMC, it appears clear that JPMC's transactions were not a significant aspect of JPMC's operations, considering the fact that JPMC earned less than .1% of its revenues from Enron related transactions each year." *JP Morgan Chase*, 553 F.3d at 204-205. Put into the context of the allegations of this complaint, even if Blackstone's investment in FGIC dropped to zero, the $331 million investment loss would be approximately .1% of Blackstone's $3.12 billion in revenues for 2007.

[12] The Court "'may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.'" *Miller v. Lazard, Ltd.*, 473 F.Supp.2d 571, 578 (S.D.N.Y. 2007) (quoting *Ganino* 228 F.3d at 167 n. 8). Blackstone argues that the absence of a price decline makes clear that the lack of loss causation is apparent from the face of the CAC. Because I conclude that the CAC fails to state a claim for reasons other than the adequacy of its allegations of loss causation, I need not and expressly decline to address Blackstone's loss causation argument.

**C. Alleged Misstatements and Omissions Concerning Real Estate Investments**

The core of the Plaintiff's allegations with respect to the real estate investments is the following single paragraph of the CAC:

> At the time of the IPO, Blackstone had significant investments in real estate. As noted herein, by the time of the IPO, the market for real estate in several significant markets were [sic] starting to deteriorate. Further, at the time of the time of the IPO the real estate market was being adversely affected by a series of negative developments in the credit markets. Accordingly, by the time of the IPO, it was foreseeable that the Company would have performance fees clawed-back in connection with those real estate investments and would not generate additional performance fees on those investments.

CAC ¶87. On the basis of this factual allegation, Plaintiff contends that Blackstone's failure to specifically address the deteriorating real estate market constituted a material omission. The CAC also alleges that the Registration Statement affirmatively misrepresented that the "[t]he real estate industry is . . . experiencing historically high levels of growth and liquidity," when in fact the "real estate market had passed its zenith and was in the midst of a prolonged decline." CAC ¶¶ 87-8. Finally, Plaintiff alleges that the Registration Statement's risk disclosures pertaining to real estate investments were materially inaccurate because the disclosed risks had already materialized. CAC ¶125.

These allegations fall short for several reasons. First, the CAC does not identify a single real estate investment or allege a single fact capable of linking the problems in the subprime residential mortgage market in late 2006 and early 2007 and the roughly contemporaneous decline in home prices (which are well-documented by the CAC) to Blackstone's real estate investments, 85% of which were in commercial and hotel properties. Reg. Stmt. at 50. Plaintiff alleges that Blackstone invested in real estate and the real estate market was starting to deteriorate. CAC ¶87. But "without further factual enhancement" as to *how* the troubles in the residential mortgage and housing markets could possibly (let alone plausibly) have a foreseeable material affect on Blackstone's real estate investments, such allegations "stop[] short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 546; *see also Hutchinson v. CBRE Realty Finance, Inc.*, No. 07 Civ. 1599 (SRU), 2009 WL 2342768, *9-10 (D. Conn. Jul. 29, 2009) ("It is not enough for the plaintiffs to allege that, at the time CBRE issued its offering statements, CBRE's financial health possibly could have been worsened by a Triton default.") Furthermore, Plaintiff fails to allege any *facts*, as distinct from conclusory statements such as that the "U.S. real estate market had passed its zenith," that if true, would render false the few

statements alleged to be affirmative misrepresentations: namely, that "the real estate *industry* is [] experiencing historically high levels of growth," "that replacement costs of real property assets have *continued* to escalate." CAC ¶ 88 (emphasis added).

Second, to the extent that Plaintiff alleges Blackstone should have disclosed the conditions of the market generally, such omissions are not actionable. "Sections 11 and 12(a)(2) do not require the disclosure of publicly available information." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F.Supp.2d 243, 250 (S.D.N.Y. 2003) (citing, *inter alia*, *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it.") The omission of generally known macro-economic conditions is not material because such matters are already part of the "total mix" of information available to investors. For example, in *In re: Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 377(3d Cir. 1993), the Third Circuit held that an issuer's failure to alert investors to the implications of the "weakened economic conditions in the Northeast" was not actionable because "the reasonable investor should have known of the economic downturn in the Northeast at that time, [and thus] the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors." Thus when the CAC alleges the omission of "adverse events and uncertainties associated with Blackstone's investments in . . . real estate" but points only to a real estate market "in the midst of a prolonged decline" the CAC points to nothing that the reasonable investor would not already know.

Third and finally, Plaintiff's allegations fall short to the extent they allege that Blackstone knew things that others did not and that Item 303's requirement of disclosure of "known trends" renders the alleged omissions material.[13] The CAC contains no allegations that Blackstone knew that the conditions in the real estate and credit markets were reasonably likely to have a material effect on *its* portfolio of real estate investments.[14] It may well be that as sophisticated real estate

---

[13] One of the principal deficiencies with the CAC's allegations pertaining to Blackstone's real estate investments is that one is forced to speculate as to what it is that Plaintiff contends should have been disclosed.

[14] The parties dispute whether Item 303 requires the pleader to allege that the undisclosed trends were in fact known by the registrant. At oral argument, Plaintiff argued that because the trends were "knowable" and Section 11 and 12(a) claims impose a negligence standard of liability, Plaintiff is only required to allege that "the information was knowable or that the defendants were negligent in not knowing it." Tr. 37-38. As it pertains to the general standard of *liability* under Sections 11 and 12(a), Plaintiff's argument finds support in the case law. Indeed, as was recently noted by the district court in *Hutchinson v. CBRE*

investors Blackstone *should have known* that the problems in the real estate and credit markets were not limited to subprime residential mortgages, but this is not enough. *See e.g. Garber*, 537 F.Supp.2d at 611; n. 14, *supra*. Plaintiff does not allege that Blackstone knew of any trends that would materially affect *its* real estate investments and generalized allegations that problems brewing in the market at large made it "foreseeable" that a particular set of unidentified investments would sour are insufficient to "nudge[] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S.at 570.

**D. Alleged Inaccuracies in Financial Statements**

Finally, the CAC alleges that the financial statements contained in the Registration Statement overstated the value of Blackstone's investment in FGIC and in the Company's various real estate funds.[15] These allegations are essentially derivative of those discussed above

---

*Realty Finance, Inc.*, if a plaintiff adequately alleges material omissions from a securities offering statement, under Sections 11 and 12(a), "those claims are subject to a strict liability standard and issuers are held liable despite any otherwise available due diligence defense or lack of knowledge." *Hutchinson v. CBRE Realty Finance, Inc.* 2009 WL 2342768, *8 (D. Conn. Jul. 29, 2009). But Section 11 only imposes strict liability on an issuer who fails to include information "required to be stated" in the registration statement. 15 U.S.C. § 77k(a). Here Plaintiff relies on the disclosure requirements of Item 303 to make a case for the *materiality* of the alleged omissions (*i.e.* that they were "required to be stated"), but Plaintiff cannot bootstrap its way into a lower standard for materiality under Item 303 simply because it pursues claims under Sections 11 and 12(a). Both the language of Item 303 itself and the SEC releases and case law interpreting it are clear that Item 303 requires disclosure of "*known* trends." 17 C.F.R. § 229.303(a)(3)(ii) (imposing requirement for issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on . . . revenues or income from continuing operations.") The 1989 Interpretive Release upon which Plaintiff relies states, that "[a] disclosure duty exists where a trend, demand, commitment, event or uncertainty is both *presently known to management* and reasonably likely to have material effects on the registrant's financial condition or results of operation." 1989 Interpretive Release, Fed. Sec. L. Rep. (CCH) ¶ 72,436, at 62,143, reprinted at ¶ 73,193, at 62,842 (emphasis added). The case law confirms this point. *See e.g.*, *Garber*, 537 F.Supp.2d at 611; *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F.Supp.2d 8, 13 (S.D.N.Y. 2001) ("The complaint fails to allege that there [were] 'trends' or that they were 'known' as of the date the Prospectus became effective."); *J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 387 (6th Cir. 2008) ("We find that the named plaintiffs' [Section 11 and 12(a)] claims are without merit because the offering materials did not have material omissions because . . . Item 303 only imposes a duty to make forward-looking projections regarding known information, and plaintiffs pleaded only that the information was "knowable").

[15] The CAC also alleges a more technical violation of generally accepted accounting principles ("GAAP"), "the standard metric by which courts determine whether accounting statements are false or misleading." *In re Countrywide Financial Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1175 (C.D. Cal. 2008). Of course to be actionable, misleading statements must also be material. In addition to the fact that any overvaluing of Blackstone's investment in FGIC would not be material, Plaintiffs fail to adequately allege that Blackstone accounting treatment of FGIC violated GAAP. Plaintiff alleges that Blackstone was required to either account for FGIC under the "equity method" or make an "irrevocable" election to use the so-called "fair value option" pursuant to Statement of Financial Accounting Standards No. 159

and are insufficient to state a claim for largely the same reasons. As discussed above, the alleged omissions about FGIC's exposure to the subprime mortgage market are immaterial as a matter of law. So too, then, are Plaintiff's allegations that Blackstone overvalued its investment in FGIC at the time of the Registration Statement. Similarly, Plaintiff's allegations that the financial statements overvalued Blackstone's real estate investments are premised on the conclusory allegation that the real estate market was in the "midst of the freefall" but they lack any factual connection to the real estate investments actually in the Company's portfolio.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the CAC for failure to state a claim is GRANTED. Because Plaintiff elected to stand on it pleading rather than to amend it in the face of Defendant's motion to dismiss as allowed by my Individual Practices, Plaintiff's claims are dismissed with prejudice. *Nwakocha v. Sadowski,* 369 F.Supp.2d 362, 372 (E.D.N.Y. 2005) ("A court . . . has discretion to dismiss with prejudice if it believes that amendment would be futile or would unnecessarily expend judicial resources."). The Clerk of the Court is instructed to close this case and any open motions and remove it from my docket.

**SO ORDERED**
**September 22, 2009**
**New York, New York**

**U.S.D.J.**

---

("SFAS No. 159"), but in fact Blackstone accounted for its investments under the "fair value method" without making the election. Plaintiff's allegation, thus, assumes that the *only* way Blackstone was permitted to account for its "equity method investments at their fair values" was pursuant to SFAS No. 159. However, the AICPA Audit and Accounting Guide, *Audits of Investment Companies* and EITF Issue No. 85-12, *Retention of Specialized Accounting for Investments in Consolidation*, each of which were relied upon by Blackstone (and disclosed in the financial statements) permit accounting for subsidiary investments under the fair value method. Moreover, SFAS No. 159 was not in effect as of the date of the financial statements, and Blackstone affirmatively disclosed that it elected not to early adopt it but rather was "considering its effect." Reg. Stmt. at 87, F-42.