USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __FEB. 10, 2011__

09-4426-cv
Landmen Partners, Inc. v. The Blackstone Group, L.P.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

FILED
FEB 10 2011
Catherine O'Hagan Wolfe, Clerk
SECOND CIRCUIT
UNITED STATES COURT OF APPEALS

August Term, 2010

(Argued: August 25, 2010     Decided: February 10, 2011)

Docket No. 09-4426-cv

MARTIN LITWIN, MAX POULTER, FRANCIS BRADY, and LANDMEN PARTNERS, INC., Individually
and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

—v.—

THE BLACKSTONE GROUP, L.P., STEPHEN A. SCHWARZMAN, MICHAEL A. PUGLISI, PETER J.
PETERSON, and HAMILTON E. JAMES,

*Defendants-Appellees.*[*]

Before:

MINER, CABRANES, and STRAUB, *Circuit Judges.*

Plaintiffs-Appellants appeal from a judgment of the United States District Court for the

Southern District of New York (Harold Baer, Jr., *Judge*), entered on September 25, 2009, dismissing

plaintiffs' putative securities class action complaint pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim.  We conclude that the District Court erred in dismissing

plaintiffs' complaint because plaintiffs plausibly allege that material information was omitted from,

---

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

1

CERTIFIED COPY ISSUED ON 02/10/2011

1   or misstated in, defendants' initial public offering registration statement and prospectus in violation

2   of Sections 11 and 12(a)(2) of the Securities Act of 1933.  VACATED and REMANDED.

3   _____

4   DAVID A.P. BROWER, Brower Piven, PC, New York, NY (Caitlin M. Moyna,
5   Brower Piven, PC, and Samuel H. Rudman, David A. Rosenfeld, and
6   Mark M. Millkey, Robbins Geller Rudman & Dowd LLP, Melville,
7   NY, *on the brief*), *for Plaintiffs-Appellants*.
8
9   BRUCE D. ANGIOLILLO, Simpson Thacher & Bartlett LLP (Jonathan K.
10   Youngwood, *on the brief*), New York, NY, *for Defendants-Appellees*.
11
12   _____

13   STRAUB, *Circuit Judge*:

14       Plaintiffs-Appellants appeal from a judgment of the United States District Court for the

15   Southern District of New York (Harold Baer, Jr.,  *Judge*), entered on September 25, 2009,

16   dismissing plaintiffs' putative securities class action complaint pursuant to Federal Rule of Civil

17   Procedure 12(b)(6) for failure to state a claim.  *See Landmen Partners Inc. v. Blackstone Group,*

18   *L.P.*, 659 F. Supp. 2d 532 (S.D.N.Y. 2009).  We conclude that the District Court erred in dismissing

19   plaintiffs' complaint because plaintiffs plausibly allege that material information was omitted from,

20   or misstated in, defendants' initial public offering registration statement and prospectus in violation

21   of Sections 11 and 12(a)(2) of the Securities Act of 1933.  Accordingly, we vacate the District

22   Court's judgment and remand for further proceedings.

23

24       **BACKGROUND**

25       Because this is an appeal from a motion to dismiss under Federal Rule of Civil Procedure

26   12(b)(6), the following facts, which we assume to be true, are drawn from plaintiffs' Consolidated

2

1    Amended Class Action Complaint as filed on October 27, 2008.  *See Slayton v. Am. Express Co.*,

2    604 F.3d 758, 766 (2d Cir. 2010).  Where relevant, however, we include information from Securities

3    and Exchange Commission ("SEC") filings by the Blackstone Group, L.P. ("Blackstone") to which

4    plaintiffs refer in their complaint, particularly the Form S-1 Registration Statement ("Registration

5    Statement") and Prospectus filed by Blackstone in connection with its June 21, 2007 initial public

6    offering ("IPO").  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

7    ("[C]ourts must consider the complaint in its entirety, as well as other sources . . . , in particular,

8    documents incorporated into the complaint by reference, and matters of which a court may take

9    judicial notice."); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

10    ("[W]e may consider . . . legally required public disclosure documents filed with the SEC, and

11    documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

12    Lead plaintiffs Martin Litwin, Max Poulter, and Francis Brady, appointed by the District

13    Court on September 15, 2008, bring this putative securities class action on behalf of themselves and

14    all others who purchased the common units of Blackstone at the time of its IPO.  Plaintiffs seek

15    remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15

16    U.S.C. §§ 77k, 77l(a)(2), 77o, for alleged material omissions from, and misstatements in,

17    Blackstone's Registration Statement and Prospectus.[1]  Defendants are Blackstone and Blackstone

---

[1] Defendants correctly point out that plaintiffs did not refer to their control-person liability claims under Section 15 of the Securities Act, which were dismissed by the District Court, in their opening brief on appeal.  Typically, we consider challenges to district court rulings not raised on appeal to be abandoned.  *See, e.g., Major League Baseball Props. Inc. v. Salvino, Inc.*, 542 F.3d 290, 294 (2d Cir. 2008); *Hobbs v. County of Westchester*, 397 F.3d 133, 147 (2d Cir. 2005), *cert. denied*, 546 U.S. 815 (2005); *see also* Fed. R. App. P. 28(a)(9). However, in this case, the District Court did not make a particular ruling on plaintiffs' Section 15

1    executives Stephen A. Schwarzman, Michael A. Puglisi, Peter J. Peterson, and Hamilton E. James

2    (collectively referred to herein as "Blackstone").

3           Blackstone is "a leading global alternative asset manager and provider of financial advisory

4    services" and "one of the largest independent alternative asset managers in the world," with total

5    assets under management of approximately $88.4 billion as of May 1, 2007. Blackstone is divided

6    into four business segments: (1) Corporate Private Equity, which comprises its management of

7    corporate private equity funds; (2) Real Estate, which comprises its management of general real

8    estate funds and internationally focused real estate funds; (3) Marketable Alternative Asset

9    Management, which comprises its management of hedge funds, mezzanine funds, senior debt

10   vehicles, proprietary hedge funds, and publicly traded closed-end mutual funds; and (4) Financial

11   Advisory, which comprises a variety of advisory services.  The Corporate Private Equity segment

12   constitutes approximately 37.4% of Blackstone's total assets under management ($33.1 billion of

13   $88.4 billion), and the Real Estate segment constitutes approximately 22.6% of Blackstone's assets

14   under management ($20 billion of $88.4 billion).   According to Blackstone, "[b]oth the corporate

15   private equity fund and the two real estate opportunity funds (taken together) . . . are among the

16   largest funds ever raised in their respective sectors."  Blackstone further represents to prospective

------

claims.  Rather, the District Court mentioned the Section 15 claims only once, noting that they
were "derivative" of plaintiffs' Section 11 claims. *Landmen Partners*, 659 F. Supp. 2d at 539
n.6.  The District Court then addressed plaintiffs' Section 11 and 12(a)(2) claims on the merits,
and, finding them lacking, dismissed all of plaintiffs' claims. *Id.* at 547.  Because plaintiffs'
Section 15 claims are necessarily dependent on their Section 11 and 12(a)(2) claims, *see* 15
U.S.C. § 77o; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010), and
were treated as such by the District Court, we decline to find that plaintiffs abandoned their
Section 15 claims by failing to specifically refer to the claims in their opening brief.

4

1    investors that its "long-term leadership in private equity has imbued the Blackstone brand with value

2    that enhances all of [its] different businesses and facilitates [its] ability to expand into

3    complementary new businesses."

4            In preparation for its 2007 IPO, Blackstone reorganized its corporate structure.  Prior to the

5    IPO, Blackstone's business was operated through a large number of separately owned predecessor

6    entities.  On March 12, 2007, just prior to the launch of the IPO, Blackstone was formed as a

7    Delaware limited partnership and eventually became the sole general partner of five newly formed

8    holding partnerships into which the majority of the operating predecessor entities were contributed.

9    Blackstone receives a substantial portion of its revenues from two sources: (1) a 1.5% management

10   fee on its total assets under management and (2) performance fees of 20% of the profits generated

11   from the capital it invests on behalf of its limited partners.  Under certain circumstances, when

12   investments perform poorly, Blackstone may be subject to a "claw-back" of already paid

13   performance fees, in other words, the required return of fees which it had already collected.

14           On March 22, 2007, Blackstone filed its Form S-1 Registration Statement with the SEC for

15   the IPO.  Blackstone filed several amendments to its Registration Statement, and the Prospectus,

16   which formed part of the Registration Statement, finally became effective on June 21, 2007.  At this

17   time, 153 million common units of Blackstone were sold to the public, raising more than $4.5

18   billion.  The individual defendants and other Blackstone insiders received nearly all of the net

19   proceeds from the IPO.

20           Plaintiffs principally allege that, at the time of the IPO, and unbeknownst to non-insider

21   purchasers of Blackstone common units, two of Blackstone's portfolio companies as well as its real

5

1    estate fund investments were experiencing problems.  Blackstone allegedly knew of, and reasonably

2    expected, these problems to subject it to a claw-back of performance fees and reduced performance

3    fees, thereby materially affecting its future revenues.

4    *FGIC Corporation*

5          In 2003, a consortium of investors that included Blackstone purchased an 88% interest in

6    FGIC Corp. ("FGIC"), a monoline financial guarantor, from General Electric Co. for $1.86 billion.

7    FGIC is the parent company of Financial Guaranty, which primarily provides insurance for bonds.

8    Although municipal bond insurance traditionally constituted the majority of Financial Guaranty's

9    business, in the years leading up to Blackstone's IPO it began writing "insurance" on collateralized

10   debt obligations ("CDOs"),[2] including CDOs backed by sub-prime mortgages to higher-risk

11   borrowers.  Financial Guaranty also began writing "insurance" on residential mortgage-backed

12   securities ("RMBSs")[3] linked to non-prime and sub-prime mortgages.  This "insurance" on RMBSs

13   and CDOs was in the form of credit default swaps ("CDSs").[4]

_____

[2] "CDOs are diversified collections of bonds that are divided into various risk groups and then sold to investors as securities." *Slayton v. Am. Express Co.*, 460 F.3d 215, 219 n.3 (2d Cir. 2006).

[3] RMBSs are "a type of asset-backed security—that is, a security whose value is derived from a specified pool of underlying assets.  Typically, an entity (such as a bank) will buy up a large number of mortgages from other banks, assemble those mortgages into pools, securitize the pools (i.e., split them into shares that can be sold off), and then sell them, usually as bonds, to banks or other investors." *Gearren v. McGraw-Hill Cos.*, 690 F. Supp. 2d 254, 258 n.2 (S.D.N.Y. 2010).

[4] CDSs "are contracts that provide protection against the credit risk of a particular company.  The seller of a CDS agrees to pay the buyer a specific sum of money, called the notional amount, if a credit event, such as bankruptcy, occurs in the referenced company. . . .  In exchange for this risk protection from the CDS-seller, the CDS-buyer agrees to make periodic premium payments during the course of the contract.  The CDS-buyer can use the CDS to

1        By the summer of 2007, FGIC, as a result of Financial Guaranty's underwriting practices,

2    was exposed to billions of dollars in non-prime mortgages, with its total CDS exposure close to $13

3    billion. From mid-2004 through mid-2007, factors including rising interest rates, the adjustment of

4    interest rates on sub-prime mortgages, and a substantial slowing of property-value appreciation (and

5    in some markets, property-value depreciation) caused many borrowers to be unable to refinance their

6    existing loans when they could not meet their payment obligations. As a result, beginning in 2005,

7    there was a significant increase in mortgage-default rates, particularly for sub-prime mortgage loans.

8    By early 2007, before the IPO, some of the top mortgage lenders with sub-prime mortgage exposure

9    began revealing large losses and warned of future market losses. All of these symptoms, plaintiffs

10    allege, provided a strong indication that the problems plaguing sub-prime lenders would generate

11    substantial losses for FGIC on the CDSs it issued to its counterparties. This likelihood was allegedly

12    exacerbated because, in many instances, FGIC's CDS-counterparties were able to demand

13    accelerated payments from FGIC even before a default event occurred on the underlying referenced

14    assets.

15        Blackstone's 23% equity interest in FGIC was worth approximately $331 million at the time

16    of the IPO. Plaintiffs allege that, due to this significant interest, Blackstone was required to disclose

17    the then-known trends, events, or uncertainties related to FGIC's business that were reasonably

18    likely to cause Blackstone's financial information not to be indicative of future operating results.

---

provide protection, like insurance, against the possibility that the debt instruments the buyer
holds will seriously deteriorate in value because of a credit event in the referenced company."
*SEC v. Rorech*, 720 F. Supp. 2d 367, 370–71 (S.D.N.Y. 2010); *see also Aon Fin. Prods., Inc. v.
Societe Generale*, 476 F.3d 90, 92 n.1 (2d Cir. 2007).

1    Following the IPO, in a March 10, 2008 press release, Blackstone announced its full-year and

2    fourth-quarter 2007 earnings.  The company's Corporate Private Equity segment reported 2007

3    revenues of $821.3 million, down 18% from 2006 revenues.  "Most significantly, Blackstone

4    reduced the value of its portfolio investment in [FGIC], . . . which accounted for $122.2 million, or

5    69%, of the decline in revenues for the year."  Blackstone reported that its "Corporate Private Equity

6    fourth quarter revenues of ($15.4) million were negative, as compared with revenues of $533.8

7    million for the fourth quarter of 2006," a change "driven primarily by decreases in the value of

8    Blackstone's portfolio investment in [FGIC] . . . and lower net appreciation of portfolio investments

9    in other sectors as compared with the prior year."

10   *Freescale*

11       Freescale Semiconductor, Inc. ("Freescale"), is a semiconductor designer and manufacturer.

12   In 2006, Blackstone invested $3.1 billion in Freescale, the single largest investment by a Blackstone

13   corporate private equity fund since 2004.  The Freescale investment accounted for 9.4% of the

14   Corporate Private Equity segment's assets under management and 3.5% of Blackstone's total assets

15   under management.[5]

---

[5] There is some ambiguity in the record as to exactly how much of the $3.1 billion was invested directly by Blackstone-sponsored funds.  The Registration Statement includes a footnote that states, with respect to all portfolio companies, that the amount of equity invested "includes equity invested by limited partner co-investors and additional equity invested by limited partners of our corporate private equity funds outside of our corporate private equity funds."  However, the Registration Statement's chart indicating the amount of equity invested in various corporate private equity fund portfolio companies does not describe the investment amount in any more detail.  Moreover, although Blackstone states in its brief that plaintiffs "use an erroneous $3.1 billion figure," and further asserts that Blackstone's investment was "*a fraction* of the total [$3.1 billion] equity invest[ment]," nowhere does Blackstone specify the precise amount invested by Blackstone-sponsored funds and the record does not support any

8

1    Shortly before the IPO, in March 2007, Freescale lost an exclusive agreement to manufacture

2    wireless 3G chipsets for its largest customer, Motorola, Inc. ("Motorola"). The loss of this exclusive

3    agreement followed two years of manufacturing and production problems for Freescale. On April

4    25, 2007, Freescale's management held an analysts' call, on which it stated that "revenue[s] in our

5    wireless business were negatively impacted by a sales decline due to weak demand in our largest

6    customer Motorola. . . . During the last several weeks of the quarter, our main wireless customer

7    began to reduce their orders." Plaintiffs allege that "[t]hese adverse facts[] had a material adverse

8    effect on Freescale's business and, concomitantly, the material corporate private equity fund

9    controlled by Blackstone." Plaintiffs argue that Blackstone was required to disclose this material

10   adverse development in its Registration Statement.

11   *Real Estate Investments*

12   As noted above, Blackstone's Real Estate segment constitutes 22.6% of its total assets under

13   management. Although the parties seem to agree that the majority of Blackstone's real estate

14   investments were non-residential in nature, the Registration Statement provides that its "real estate

15   opportunity funds have made a significant number of investments in lodging, major urban office

16   buildings, residential properties, distribution and warehousing centers and a variety of real estate

17   operating companies." Moreover, Blackstone concedes that its real estate funds maintained at least

18   one "modest-sized residential real estate investment." There is no indication in the record, however,

---

amount other than $3.1 billion. Accordingly, because this is a motion to dismiss, we draw the
reasonable inference in favor of plaintiffs that Blackstone's equity investment in Freescale was
the full $3.1 billion. *See Elec. Trading Group, LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133
(2d Cir. 2009), *cert. denied*, 130 S. Ct. 3276 (2010).

1    of the exact dollar amount of Blackstone's residential real estate investment(s), and thus it is not

2    possible to discern the exact percentage of the Real Estate segment's assets under management

3    attributable to residential properties.[6]

4            As detailed above with respect to FGIC, several factors were causing the real estate and

5    mortgage securities markets to deteriorate by the time of the IPO, including the adverse effects of

6    a series of negative developments in the credit markets.  Thus, plaintiffs allege, it was foreseeable

7    that Blackstone would have performance fees clawed back in connection with its real estate

8    investments and that Blackstone would not generate additional performance fees on those

9    investments.

10           In addition to Blackstone's alleged material omission of information related to the downward

11   trend in the real estate market and its likely impact on Blackstone's real estate investments, plaintiffs

12   allege that the Registration Statement included the following affirmative material misstatement:

13           The real estate industry is also experiencing historically high levels of growth
14           and liquidity driven by the strength of the U.S. economy . . . and the availability of
15           financing for acquiring real estate assets. . . .  The strong investor demand for real
16           estate assets is due to a number of factors, including persistent, reasonable levels of
17           interest rates . . . and the ability of lenders to repackage their loans into
18           securitizations, thereby diversifying and limiting their risk.  These factors have
19           combined to significantly increase the capital committed to real estate funds from a
20           variety of institutional investors.
21

―――――――――――――

    [6] The Registration Statement does disclose that "over 85% of the investments of
[Blackstone's] real estate opportunity funds are in office building and hotel assets," *i.e.*,
commercial real estate.  It is unclear, however, whether that means that the remaining 15% of
Blackstone real estate investments are in residential real estate, which would amount to a $3
billion investment.  Such an investment, in addition to being 15% of the assets under
management in the Real Estate segment, would be 3.4% of Blackstone's total assets under
management.

1    *GAAP and Risk Disclosure Allegations*

2         Plaintiffs' complaint includes additional allegations that are related to, and in many ways

3    overlap with, the allegations detailed above. First, they allege that Blackstone's unaudited financial

4    statements for the three-month periods ending March 31, 2007, and March 31, 2006, respectively,

5    which were included in the Registration Statement, violated generally accepted accounting

6    principles ("GAAP") and materially overstated the values of Blackstone's real estate investments

7    and its investment in FGIC. Plaintiffs also allege that Blackstone's disclosure of certain risk factors

8    was too general and failed to inform investors adequately of the then-existing specific risks related

9    to the real estate and credit markets.

10   *Procedural History and District Court Opinion*

11        The initial complaint was filed in the District Court by Landmen Partners, Inc., on April 15,

12   2008. On September 15, 2008, the District Court appointed Martin Litwin, Max Poulter, and Francis

13   Brady as lead plaintiffs, and on October 27, 2008, the lead plaintiffs filed the operative,

14   Consolidated Amended Class Action Complaint. Blackstone filed a motion to dismiss the complaint

15   on December 4, 2008, and, following oral argument, the District Court granted the motion, with

16   prejudice, in an opinion dated September 22, 2009. *See Landmen Partners Inc. v. Blackstone*

17   *Group, L.P.*, 659 F. Supp. 2d 532 (S.D.N.Y. 2009).

18        The District Court's opinion primarily focused on the materiality of the alleged omissions

19   and misstatements concerning FGIC, Freescale, and Blackstone's real estate investments. First, the

20   District Court analyzed the relative scale or quantitative materiality of the alleged FGIC and

21   Freescale omissions.  After noting our (and the SEC's) acceptance of a 5% threshold as an

11

1    appropriate "starting place" or "preliminary assumption" of immateriality, the District Court noted

2    that "Blackstone's $331 million investment in FGIC represented a mere 0.4% of Blackstone's [total]

3    assets under management at the time of the IPO."[7] *Id.* at 541 (citing *ECA & Local 134 IBEW Joint*

4    *Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009)).  The District Court then

5    addressed plaintiffs' argument that the materiality of the omissions is best illustrated by the effect

6    the eventual $122.2 million drop in value of Blackstone's FGIC investment had on Blackstone's

7    2007 annual revenues.  *Id.*  The District Court found that while the decline in FGIC's investment

8    value may have been significant relative to the Corporate Private Equity segment's annual revenues,

9    it was quantitatively immaterial as compared with Blackstone's $3.12 billion in total revenues for

10   2007.[8]  *Id.*

11          The District Court next looked at the quantitative materiality of the Freescale omissions,

12   again comparing Blackstone's investment to its total assets under management.  The court stated that

13   "the $3.1 billion investment in Freescale represented 3.6% of the total $88.4 billion the Company

14   had under management at the time of the IPO."  *Id.*  The District Court did not mention that the

15   investment in Freescale accounted for 9.4% of the Corporate Private Equity segment's $33.1 billion

16   of assets under management.  The District Court found it significant that the complaint did not (and

17   likely could not) allege that Freescale's loss of its exclusive supplier relationship with Motorola

_____

     [7] The investment accounted for approximately 1% of the Corporate Private Equity
segment's assets under management.

     [8] The District Court incorrectly stated that the "$122 million write down for FGIC was a
mere 0.4% of Blackstone's $3.12 billion in annual revenue." *Landmen Partners*, 659 F. Supp.
2d at 541.  In fact, $122 million is nearly 4% of $3.12 billion.

1    would cause Blackstone's investment in Freescale to lose 100% of its value. *Id.* at 542.

2          The District Court then pointed to the structure of the Blackstone enterprise as further

3    support for the immateriality of the alleged omissions. According to the District Court, because the

4    performance of individual portfolio companies only affects Blackstone's revenues after investment

5    gains or losses are aggregated at the fund level, the poor performance of one investment may be

6    offset by the strong performance of another. *Id.* Accordingly, "there is no way to make a principled

7    distinction between the negative information that Plaintiff[s] claim[] was wrongfully omitted from

8    the Registration Statement and information . . . about every other portfolio company." *Id.* The

9    District Court found that requiring disclosure of information about particular portfolio companies

10    or investments would risk "obfuscat[ing] truly material information in a flood of unnecessary detail,

11    a result that the securities laws forbid." *Id.*

12          Next, recognizing that a quantitative analysis is not dispositive of materiality, the District

13    Court found that only one of the qualitative factors that we, or the SEC, often consider were present

14    in this case. Specifically, the court found that: (1) none of the omissions concealed unlawful

15    transactions or conduct; (2) the alleged omissions did not relate to a significant aspect of

16    Blackstone's operations; (3) there was no significant market reaction to the public disclosure of the

17    alleged omissions; (4) the alleged omissions did not hide a failure to meet analysts' expectations;

18    (5) the alleged omissions did not change a loss into income or vice versa; and (6) the alleged

19    omissions did not affect Blackstone's compliance with loan covenants or other contractual

20    requirements. The District Court noted that the one qualitative factor it found present in this

21    case—that the alleged omissions had the effect of increasing Blackstone's management's

1    compensation—was not enough, by itself, to make the omissions material.  *Id.* at 543–44.

2    Accordingly, the District Court held that the alleged omissions concerning FGIC and Freescale were

3    immaterial as a matter of law.  *Id.* at 544.

4            The District Court then separately analyzed the alleged omissions and misstatements

5    regarding Blackstone's real estate investments.  The District Court first noted that the complaint

6    failed to "identify a single real estate investment or allege a single fact capable of linking the

7    problems in the subprime residential mortgage market in late 2006 and early 2007 and the roughly

8    contemporaneous decline in home prices (which are well-documented by the [complaint]) to

9    Blackstone's real estate investments, 85% of which were in commercial and hotel properties." *Id.*

10   According to the District Court, without further factual enhancement as to how the troubles in the

11   residential mortgage markets could have a foreseeable material effect on Blackstone's real estate

12   investments, plaintiffs' allegations fell short of the plausibility standard set forth in *Bell Atlantic*

13   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In addition, the District Court found that plaintiffs had

14   failed to allege any facts that, if true, would render false those statements alleged to be affirmative

15   misrepresentations. The District Court further found that insofar as plaintiffs alleged that Blackstone

16   was required to disclose general market conditions, such omissions are not actionable because

17   Sections 11 and 12(a)(2) do not require disclosure of publicly available information: "The omission

18   of generally known macro-economic conditions is not material because such matters are already part

19   of the 'total mix' of information available to investors." *Landmen Partners*, 659 F. Supp. 2d at 545.

20   Finally, the District Court noted that the complaint contained no allegations that Blackstone knew

21   that market conditions "were reasonably likely to have a material effect on *its* portfolio of real estate

1   investments," *id.* at 545, and stated that "generalized allegations that problems brewing in the market

2   at large made it 'foreseeable' that a particular set of unidentified investments would sour are

3   insufficient to 'nudge[] [the] claims across the line from conceivable to plausible,'" *id.* at 546

4   (alterations in original) (quoting *Twombly*, 550 U.S. at 570). The District Court's opinion concluded

5   with a brief analysis of the GAAP allegations.  The District Court found that because those

6   allegations were largely derivative of plaintiffs' other allegations, they were insufficient to state a

7   claim for essentially the same reasons that the primary allegations failed.  Accordingly, the District

8   Court granted Blackstone's motion to dismiss and dismissed plaintiffs' claims with prejudice.

9   Judgment was entered in favor of Blackstone on September 25, 2009.  Plaintiffs filed a timely notice

10  of appeal on October 23, 2009.

11  **DISCUSSION**

12  *Standard of Review*

13        "We review de novo the dismissal of a complaint under Rule 12(b)(6), accepting all factual

14  allegations as true and drawing all reasonable inferences in favor of the plaintiff." *ECA & Local*

15  *134*, 553 F.3d at 196. "To survive a motion to dismiss, a complaint must plead enough facts to state

16  a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has

17  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

18  reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

19  U.S. ___, 129 S. Ct. 1937, 1949 (2009).

20        Notably, plaintiffs' complaint explicitly does not allege fraud; rather, it alleges that

21  Blackstone acted negligently in preparing its Registration Statement and Prospectus. *See Rombach*

15

1    *v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("Fraud is not an element or a requisite to a claim under

2    Section 11 or Section 12(a)(2) . . . . [A] plaintiff need allege no more than negligence to proceed

3    under Section 11 and Section 12(a)(2) . . . ."). Moreover, Blackstone does not argue on appeal that

4    plaintiffs' claims are premised on allegations of fraud. Accordingly, as pleaded, plaintiffs' claims

5    are not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See id.*

6    (holding that Rule 9(b)'s heightened pleading standard applies to claims under Section 11 and

7    Section 12(a)(2) only "insofar as the claims are premised on allegations of fraud"). Stated

8    differently, this is an ordinary notice pleading case, subject only to the "short and plain statement"

9    requirements of Federal Rule of Civil Procedure 8(a).

10   *Sections 11 and 12(a)(2) of the Securities Act*

11   Section 11 of the Securities Act imposes liability on issuers and other signatories of a

12   registration statement that, upon becoming effective, "contain[s] an untrue statement of a material

13   fact or omit[s] to state a material fact required to be stated therein or necessary to make the

14   statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability under

15   similar circumstances on issuers or sellers of securities by means of a prospectus. *See id.* §

16   77l(a)(2). So long as a plaintiff establishes one of the three bases for liability under these

17   provisions—(1) a material misrepresentation; (2) a material omission in contravention of an

18   affirmative legal disclosure obligation; or (3) a material omission of information that is necessary

19   to prevent existing disclosures from being misleading, *see In re Morgan Stanley Info. Fund Sec.*

20   *Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)—then, in a Section 11 case, "the general rule [is] that an

21   issuer's liability . . . is absolute." *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir.

1    2007); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) ("[Section 11] was

2    designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing

3    a stringent standard of liability on the parties who play a direct role in a registered offering. . . .

4    Although limited in scope, Section 11 places a relatively minimal burden on a plaintiff." (footnote

5    omitted)).  The primary issue before us is the second basis for liability; that is, whether Blackstone's

6    Registration Statement and Prospectus omitted material information that Blackstone was legally

7    required to disclose.[9]

8    *Required Disclosures Under Item 303 of Regulation S-K*

9            Plaintiffs principally contend that Item 303 of SEC Regulation S-K, 17 C.F.R. §

10   229.303(a)(3)(ii), provides the basis for Blackstone's disclosure obligation. Pursuant to Subsection

11   (a)(3)(ii) of Item 303, a registrant must "[d]escribe any known trends or uncertainties . . . that the

12   registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income

13   from continuing operations."  Instruction 3 to paragraph 303(a) provides that "[t]he discussion and

14   analysis shall focus specifically on material events and uncertainties known to management that

15   would cause reported financial information not to be necessarily indicative of future operating

16   results or of future financial condition."   17 C.F.R. § 229.303(a) instruction 3.    The SEC's

17   interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty

18   "where a trend, demand, commitment, event or uncertainty is both [1] presently known to

19   management and [2] reasonably likely to have material effects on the registrant's financial condition

---

[9] There is, of course, the additional issue of the alleged material misstatements related to Blackstone's affirmative disclosures about the strength of the real estate market at the time of the IPO.  We will address those alleged misstatements below.

1    or results of operations."   Management's Discussion and Analysis of Financial Condition and

2    Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831,

3    Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989) [hereinafter

4    MD&A].

5          Although the District Court opinion and the parties on appeal primarily focus on the

6    materiality of Blackstone's alleged omissions, Blackstone does urge that plaintiffs' complaint fails

7    to adequately allege that Blackstone was required by Item 303 to disclose trends in the real estate

8    market for the purpose of Sections 11 and 12(a)(2).   We disagree.   Plaintiffs allege that the

9    downward trend in the real estate market was already known and existing at the time of the IPO, and

10   that the trend or uncertainty in the market was reasonably likely to have a material impact on

11   Blackstone's financial condition.   Therefore, plaintiffs have adequately pleaded a presently existing

12   trend, event, or uncertainty, and the sole remaining issue is whether the effect of the "known"

13   information was "reasonably likely" to be material for the purpose of Item 303 and, in turn, for the

14   purpose of Sections 11 and 12(a)(2).

15   _Legal Standard of Materiality_

16         Materiality is an "inherently fact-specific finding," *Basic Inc. v. Levinson*, 485 U.S. 224, 236

17   (1988), that is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor

18   would have considered significant in making investment decisions," *Ganino v. Citizens Utils. Co.*,

19   228 F.3d 154, 161–62 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231).[10]   "[T]here must be a

---

[10] Although *Ganino* addresses materiality in the context of claims brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, the test for materiality is the same when claims are brought pursuant to Sections 11 and 12(a)(2) of the Securities Act. *See Rombach*, 355

1     substantial likelihood that the disclosure of the omitted fact would have been viewed by the

2     reasonable investor as having significantly altered the 'total mix' of information made available."

3     *Id.* at 162 (alteration in original) (internal quotation marks omitted).  However, "it is not necessary

4     to assert that the investor would have acted differently if an accurate disclosure was made." *Id.*

5     Rather, when a district court is presented with a Rule 12(b)(6) motion, "'a complaint may not

6     properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material

7     unless they are so obviously unimportant to a reasonable investor that reasonable minds could not

8     differ on the question of their importance.'" *Id.* (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067

9     (2d Cir. 1985)); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (noting that

10    even at the summary judgment stage, the "determination [of materiality] requires delicate

11    assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and

12    the significance of those inferences to him, and these assessments are peculiarly ones for the trier

13    of fact").

14         "[W]e have consistently rejected a formulaic approach to assessing the materiality of an

15    alleged misrepresentation."  *Ganino*, 228 F.3d at 162; *see also ECA & Local 134 IBEW Joint*

16    *Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("While *Ganino* held that

17    bright-line numerical tests for materiality are inappropriate, it did not exclude analysis based on, or

18    even emphasis of, quantitative considerations.").  In both *Ganino* and *ECA & Local 134*, we cited

19    with approval SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) [hereinafter SAB

20    No. 99], which provides relevant guidance regarding the proper assessment of materiality. *See ECA*

---

F.3d at 178 n.11.

1    *& Local 134*, 553 F.3d at 197–98; *Ganino*, 228 F.3d at 163–64.

2    As the SEC stated,

3    [t]he use of a percentage as a numerical threshold, such as 5%, may provide
4    the basis for a preliminary assumption that . . . a deviation of less than the specified
5    percentage with respect to a particular item . . . is unlikely to be material. . . . But
6    quantifying, in percentage terms, the magnitude of a misstatement . . . cannot
7    appropriately be used as a substitute for a full analysis of all relevant considerations.
8
9
10   SAB No. 99, 64 Fed. Reg. at 45,151; *see also ECA & Local 134*, 553 F.3d at 204 (noting that a "five

11   percent numerical threshold is a good *starting place* for assessing . . . materiality" (emphasis

12   added)).   Accordingly, a court must consider "both 'quantitative' and 'qualitative' factors in

13   assessing an item's materiality," SAB No. 99, 64 Fed. Reg. at 45,151, and that consideration should

14   be undertaken in an integrative manner. *See Ganino*, 228 F.3d at 163; *see also In re Kidder Peabody*

15   *Sec. Litig.*, 10 F. Supp. 2d 398, 410–11 (S.D.N.Y. 1998); SAB No. 99, 64 Fed. Reg. at 45,152

16   ("Qualitative factors may cause misstatements of quantitatively small amounts to be material . . . .").

17   In this case, the District Court confronted a Rule 12(b)(6) motion, a motion for which

18   plaintiffs need only satisfy the basic notice pleading requirements of Rule 8. So long as plaintiffs

19   plausibly allege that Blackstone omitted material information that it was required to disclose or

20   made material misstatements in its offering documents, they meet the relatively minimal burden of

21   stating a claim pursuant to Sections 11 and 12(a)(2), under which, should plaintiffs' claims be

22   substantiated, Blackstone's liability as an issuer is absolute. Where the principal issue is materiality,

23   an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower.

24   Accordingly, we cannot agree with the District Court at this preliminary stage of litigation that the

25   alleged omissions and misstatements "are so obviously unimportant to a reasonable investor that

20

1     reasonable minds could not differ on the question of their importance."  *Ganino*, 228 F.3d at 162

2     (internal quotation marks omitted).

3     *Materiality of Omissions Related to FGIC and Freescale*

4            As to the materiality of the omissions related to FGIC and Freescale, Blackstone first argues

5     that the relevant information was public knowledge, and thus could not be material because it was

6     already part of the "total mix" of information available to investors.  Specifically, Blackstone

7     contends that, as the complaint itself alleges based on citations to news articles and analysts' calls,

8     the shift in FGIC's strategy toward a less conservative approach to bond insurance and Freescale's

9     loss of its exclusive contract with Motorola were facts publicly known at the time of the IPO.

10           It is true that, as a general matter, the "'total mix' of information may . . . include information

11    already in the public domain and facts known or reasonably available to [potential investors]."

12    *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (internal

13    quotation marks omitted); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y.

14    2008) (holding that defendants had no duty under the securities laws to disclose the publicly

15    reported departure of an asset manager), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) (summary order).

16    But case law does not support the sweeping proposition that an issuer of securities is never required

17    to disclose publicly available information.  *See, e.g., Kapps v. Torch Offshore, Inc.*, 379 F.3d 207,

18    213, 215 (5th Cir. 2004) (holding that the "definition of 'material' under Section 11 is not strictly

19    limited to information that is firm-specific and non-public" and noting that "the SEC requires an

20    issuer to disclose certain 'trends' that could affect its business, and in appropriate circumstances this

21    requirement may extend to certain trends that are not firm-specific or are publicly available");

21

1    *United Paperworkers*, 985 F.2d at 1199 (stating that "the mere presence in the media of sporadic

2    news reports . . . should not be considered to be part of the total mix of information that would

3    clarify or place in proper context the company's representations in its proxy materials"); *see also*

4    *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious

5    limitations on a corporation's ability to charge its stockholders with knowledge of information

6    omitted from a document such as a . . . prospectus on the basis that the information is public

7    knowledge and otherwise available to them."), *cert. denied*, 485 U.S. 1007 (1988).

8            In this case, the key information that plaintiffs assert should have been disclosed is whether,

9    and to what extent, the particular known trend, event, or uncertainty might have been reasonably

10   expected to materially affect Blackstone's investments.  And this potential future *impact* was

11   certainly not public knowledge, particularly in the case of FGIC, which was not even mentioned in

12   Blackstone's Registration Statement and thus cannot be considered part of the "total mix" of

13   information already available to investors.  Again, the focus of plaintiffs' claims is the required

14   disclosures under Item 303—plaintiffs are not seeking the disclosure of the mere fact of

15   Blackstone's investment in FGIC, of the downward trend in the real estate market, or of Freescale's

16   loss of its exclusive contract with Motorola.  Rather, plaintiffs claim that Blackstone was required

17   to disclose the manner in which those then-known trends, events, or uncertainties might reasonably

18   be expected to materially impact Blackstone's future revenues.

19           While it is true that Blackstone's investments in FGIC and Freescale fall below the

20   presumptive 5% threshold of materiality, we find that the District Court erred in its analysis of

21   certain qualitative factors related to materiality.  First, the District Court and Blackstone place too

22

1    much emphasis on Blackstone's structure and on the fact that a loss in one portfolio company might

2    be offset by a gain in another portfolio company.   Blackstone is not permitted, in assessing

3    materiality, to aggregate negative and positive effects on its performance fees in order to avoid

4    disclosure of a particular material negative event. *Cf.* SAB No. 99, Fed. Reg. at 45,153 (noting in

5    the context of aggregating and netting multiple misstatements that "[r]egistrants and their auditors

6    first should consider whether each misstatement is material, irrespective of its effect when combined

7    with other misstatements").    Were we to hold otherwise, we would effectively sanction

8    misstatements in a registration statement or prospectus related to particular portfolio companies so

9    long as the net effect on the revenues of a public private equity firm like Blackstone was immaterial.

10   The question, of course, is not whether a loss in a particular investment's value will merely affect

11   revenues, because even after aggregation of gains and losses at the fund level, it will almost certainly

12   have some effect.   The relevant question under Item 303 is whether Blackstone reasonably expects

13   the impact to be material.   We see no principled basis for holding that an historically "private"

14   equity company that has chosen to go public is somehow subject to a different standard under the

15   securities disclosure laws and regulations than a traditional public company with numerous

16   subsidiaries. *See* Mohsen Manesh, *Legal Asymmetry and the End of Corporate Law*, 34 Del. J.

17   Corp. L. 465, 482 (2009) (noting that Blackstone, as a publicly listed entity, is "substantively

18   indistinguishable from [its] publicly traded corporate counterparts").   In a case of pure omissions,

19   to the extent that the securities laws require information to be disclosed and the information in

20   question is material in the eyes of a reasonable investor, Blackstone must disclose the information.

1    Blackstone's structure is no defense on a motion to dismiss.[11]

2    Second, the District Court erred in finding that the alleged omissions did not relate to a

3    significant aspect of Blackstone's operations.  In discussing "considerations that may well render

4    material a quantitatively small misstatement," SAB No. 99 provides that "materiality . . . may turn

5    on where [the misstatement] appears in the financial statements:" "[S]ituations may arise . . . where

6    the auditor will conclude that a matter relating to segment information is qualitatively material even

7    though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a

8    whole."  SAB No. 99, 64 Fed. Reg. at 45,152.  SAB No. 99 also provides that one factor affecting

9    qualitative materiality is whether the misstatement or omission relates to a segment that plays a

10   "significant role" in the registrant's business.  *Id.*  In this case, Blackstone makes clear in its offering

11   documents that Corporate Private Equity is its flagship segment, playing a significant role in the

12   company's history, operations, and value.  Blackstone states that its Corporate Private Equity fund

13   is "among the largest . . . ever raised," and that its "long-term leadership in private equity has

14   imbued the Blackstone brand with value that enhances all of [its] different businesses and facilitates

15   [its] ability to expand into complementary new businesses."  Because Blackstone's Corporate

16   Private Equity segment plays such an important role in Blackstone's business and provides value

17   to all of its other asset management and financial advisory services, a reasonable investor would

18   almost certainly want to know information related to that segment that Blackstone reasonably

19   expects will have a material adverse effect on its future revenues.   Therefore, the alleged

_____

[11] Blackstone would certainly be free to argue before a jury that its structure renders the omissions related to FGIC and Freescale immaterial.  We simply hold that Blackstone's structure does not permit a finding of immateriality as a matter of law.

1    misstatements and omissions relating to FGIC and Freescale were plausibly material.

2           Furthermore, with respect to Freescale in particular, Blackstone's investment in the company

3    accounted for 9.4% of the Corporate Private Equity segment's assets under management, and the

4    investment was nearly three times larger than the next largest investment in that segment as reported

5    in Blackstone's Prospectus.  Even where a misstatement or omission may be quantitatively small

6    compared to a registrant's firm-wide financial results, its significance to a particularly important

7    segment of a registrant's business tends to show its materiality.  *See In re Kidder Peabody*, 10 F.

8    Supp. 2d at 410–11 (noting that while amount of "false profits may have been minor compared to

9    GE's earnings as a whole, they were quite significant to" a subsidiary's profits, which, "in turn,

10   represented a significant portion of GE's balance sheet").  Viewed in that light, we cannot hold that

11   the alleged loss of Freescale's exclusive contract with its largest customer and the concomitant

12   potential negative impact on one of the largest investments in Blackstone's Corporate Private Equity

13   segment was immaterial.

14          Finally, the District Court failed to consider another relevant qualitative factor—that the

15   omissions "mask[] a change in earnings or other trends." SAB No. 99, 64 Fed. Reg. at 45,152. Such

16   a possibility is precisely what the required disclosures under Item 303 aim to avoid.  Here,

17   Blackstone omitted information related to FGIC and Freescale that plaintiffs allege was reasonably

18   likely to have a material effect on the revenues of Blackstone's Corporate Private Equity segment

19   and, in turn, on Blackstone as a whole.  Blackstone's failure to disclose that information masked a

20   reasonably likely change in earnings, as well as the trend, event, or uncertainty that was likely to

21   cause such a change.

1          All of these qualitative factors, together with the District Court's correct observation that the

2   alleged omissions "doubtless had 'the effect of increasing management's compensation,'" *see* SAB

3   No. 99, 64 Fed. Reg. at 45,152, show that the alleged omissions were material. Accordingly, we hold

4   that plaintiffs have adequately pleaded that Blackstone omitted material information related to FGIC

5   and Freescale that it was required to disclose under Item 303 of Regulation S-K.

6   *Materiality of Omissions and Misstatements Related to Real Estate Investments*

7          We also find that the District Court erred in its analysis of the alleged omissions and

8   misstatements related to Blackstone's real estate investments. First, the District Court's opinion

9   implies that to state a plausible claim, plaintiffs' complaint had to identify specific real estate

10  investments made or assets held by Blackstone funds that might have been at risk as a result of the

11  then-known trends in the real estate industry. *See Landmen Partners Inc. v. Blackstone Group, L.P.*,

12  659 F. Supp. 2d 532, 545–46 (S.D.N.Y. 2009). This expectation, however, misses the very core of

13  plaintiffs' allegations, namely, that Blackstone omitted material information that it had a duty to

14  report. In other words, plaintiffs' precise, actionable allegation is that Blackstone failed to disclose

15  material details of its real estate investments, and specifically that it failed to disclose the manner

16  in which those unidentified, particular investments might be materially affected by the then-existing

17  downward trend in housing prices, the increasing default rates for sub-prime mortgage loans, and

18  the pending problems for complex mortgage securities. That is all Item 303 requires in order to

19  trigger a disclosure obligation: a known trend that Blackstone reasonably expected would materially

20  affect its investments and revenues. Plaintiffs allege that they were unaware of, but legally entitled

21  to disclosure of, the very information that the District Court held had to be specified in plaintiffs'

1    complaint.

2        Moreover, there are two problems with the District Court's finding that plaintiffs' claims fail

3    because they cannot establish any "link[]" between the declining residential real estate market and

4    Blackstone's heavy investments in commercial real estate. *See id.* at 544. First, the offering

5    documents indicate, and Blackstone admits, that Blackstone has at least one modest-sized residential

6    real estate investment, and, drawing all reasonable inferences in plaintiffs' favor, its residential real

7    estate holdings might constitute as much as $3 billion and 15% of the Real Estate segment's assets

8    under management. *See supra* n.6. This alone is enough on a Rule 12(b)(6) motion to establish a

9    plausible link between the alleged trend in the residential real estate market and Blackstone's real

10   estate investments.   Second, even if the overwhelming majority of Blackstone's real estate

11   investments are commercial in nature, it is certainly plausible for plaintiffs to allege that a collapse

12   in the residential real estate market, and, more importantly, in the market for complex securitizations

13   of residential mortgages, might reasonably be expected to adversely affect commercial real estate

14   investments. Blackstone's own disclosures in its Registration Statement make this link clear, given

15   that it admits that "the ability of lenders to repackage their [residential] loans into securitizations"

16   is one factor contributing to the "significant[] increase [in] the capital committed to [predominantly

17   commercial] real estate funds."

18        Finally, the District Court erred when it stated that "Plaintiff[s] fail[] to allege any

19   *facts* . . . that if true, would render false the few statements alleged to be affirmative

20   misrepresentations." *Landmen Partners*, 659 F. Supp. 2d at 544. To the contrary, plaintiffs provide

21   significant factual detail about the general deterioration of the real estate market and specific facts

27

1    that, drawing all reasonable inferences in plaintiffs' favor, directly contradict statements made by

2    Blackstone in its Registration Statement.  First, the chart in plaintiffs' complaint illustrating the

3    seasonally adjusted price change in the U.S. housing market contradicts Blackstone's representation

4    that the "real estate industry [was]. . . experiencing historically high levels of growth," because the

5    chart shows that the rate of price appreciation began to decline significantly beginning in late 2005.

6    In addition, Blackstone's representation that "strong investor demand for real estate assets is due [in

7    part] to . . . persistent, reasonable levels of interest rates" is refuted by plaintiffs' allegations that "[a]s

8    key short-term and the prime rates rose [beginning in June 2004], other interest rates rose as well,

9    including those for most residential mortgage loans" and that "[t]his rise in interest rates made it more

10    difficult for borrowers to meet their payment obligations."  Also, Blackstone's statement that "lenders

11    [were able] to repackage their loans into securitizations, thereby diversifying and limiting their risk,"

12    is at least impliedly refuted by plaintiffs' detailed allegations as to how the increasing sub-prime

13    mortgage loan defaults were going to impact negatively the existing and future uses of, and value

14    associated with, CDOs, RMBSs, and CDSs.

15        Absent these errors, the materiality of the alleged omitted and misstated information related

16    to Blackstone's real estate investments becomes clear.  First, Blackstone's real estate segment played

17    a "significant role," SAB No. 99, 64 Fed. Reg. at 45,152, in Blackstone's business.  While

18    Blackstone's real estate segment may not be as prominent to the company's traditional identity as its

19    Corporate Private Equity segment, Blackstone's real estate segment nevertheless constituted 22.6%

20    of Blackstone's total assets under management.  A reasonable Blackstone investor may well have

21    wanted to know of any potentially adverse trends concerning a segment that constituted nearly a

1    quarter of Blackstone's total assets under management.  Second, the alleged misstatements and

2    omissions regarding real estate were qualitatively material because they masked a potential change

3    in earnings or other trends.  Finally, the alleged misstatements and omissions, if proven, had "the

4    effect of increasing management's compensation," *id.*  For all these reasons, we conclude that the

5    District Court erred in dismissing plaintiffs' allegations relating to Blackstone's real estate

6    investments.  Plaintiffs plausibly allege that Blackstone omitted material information that it was

7    required to disclose and that it made material misstatements in its IPO offering documents.

8        With regard to all of the alleged omissions and misrepresentations, the District Court and

9    Blackstone raise the legitimate concern that plaintiffs' view of materiality would require companies

10   like Blackstone to "issue compilations of prospectuses for the scores of portfolio companies and real

11   estate assets in which its private equity and real estate funds have any interest."  Although, as the

12   District Court correctly noted, "[i]ncluding all such information would . . . obfuscate[] truly material

13   information in a flood of unnecessary detail, a result that the securities laws forbid," *id.* at 542 (citing

14   *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)), we are not

15   persuaded that such a concern is warranted in this case because of two protections from that result.

16   First, as in all bases for liability under Sections 11 and 12(a)(2), the omitted information must be

17   material.  Although materiality is undoubtedly a flexible concept due to its fact-specific nature, it is

18   still capable of some defined boundaries.  And needless to say, not every portfolio company or real

19   estate asset in which Blackstone invests will be deemed material.  Moreover, in the area of pure

20   omissions, disclosure of the information must be required.  Here, plaintiffs adequately plead that Item

21   303 of Regulation S-K requires Blackstone to disclose the omitted information, but without that

1    regulatory requirement Blackstone would be under no obligation to disclose even material

2    information.  Thus, it is only when there is both materiality and a duty to disclose that a company

3    may be held liable for omitting information from a registration statement or prospectus.  These

4    requirements provide sufficient protection against the opening-of-the-floodgates argument advanced

5    by Blackstone and accepted by the District Court.

6    *Additional Allegations and Denial of Leave to Amend*

7           We conclude by briefly addressing two remaining issues presented by this appeal.  First, as

8    to plaintiffs' remaining allegations, we find, as did the District Court, that plaintiffs' GAAP

9    allegations "are essentially derivative of those discussed above," *id.* at 546, although we, in turn,

10    conclude that these allegations are sufficient to state a claim for largely the same reasons.  In

11    addition, although the District Court did not specifically address plaintiffs' risk disclosure allegations,

12    we similarly conclude that these allegations are derivative of those already discussed and,

13    accordingly, those claims are also reinstated upon remand.

14           Second, we do not reach the issue whether the District Court exceeded its allowable discretion

15    by dismissing plaintiffs' complaint without providing leave to amend.  However, we note that where,

16    as here, leave to amend is requested informally in a brief in opposition to a motion to dismiss, we

17    have held that it is within the district "court's discretion to deny leave to amend implicitly by not

18    addressing the request." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006).

19

20

21

1    **CONCLUSION**

2          In sum, we hold that the District Court erred in dismissing for failure to state a claim

3    plaintiffs' complaint brought pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act because

4    (1) plaintiffs plausibly allege that Blackstone omitted from its Registration Statement and Prospectus

5    material information related to its investments in FGIC and Freescale that Blackstone was required

6    to disclose under Item 303 of Regulation S-K; (2) plaintiffs plausibly allege that Blackstone both

7    omitted material information that it was required to disclose under Item 303 and made material

8    misstatements in its offering documents related to its real estate investments; and (3) plaintiffs'

9    remaining GAAP and risk disclosure allegations are derivative of their primary allegations, and

10   therefore these secondary allegations are sufficient to state a claim.  Accordingly, we vacate the

11   District Court's judgment and remand for further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit