UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

LANDMEN PARTNERS INC., Individually :     Civil Action No. 08-cv-03601-HB-FM
and On Behalf of All Others Similarly Situated, :

                            :     <u>CLASS ACTION</u>

             Plaintiff, :

                            :     LEAD PLAINTIFFS' MEMORANDUM OF

    vs.                   :     LAW IN SUPPORT OF UNOPPOSED

                            :     MOTION FOR PRELIMINARY APPROVAL

THE BLACKSTONE GROUP L.P., et al.,   :     OF SETTLEMENT

                            :

            Defendants. :

———————————————————————— x

## TABLE OF CONTENTS

Page

I.    INTRODUCTION AND BACKGROUND ........................................................1

II.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED ..................4

    A.    The Standards for Reviewing a Proposed Settlement for Preliminary
        Approval ........................................................................................................4

    B.    Preliminary Approval of the Settlement Should Be Granted.................................6

        1.    The Complexity, Expense, and Likely Duration of the Litigation
            Supports Approval of the Settlement..................................................6

        2.    The Reaction of the Class to the Settlement .................................................8

        3.    The Stage of the Proceedings........................................................................9

        4.    The Risk of Establishing Liability and Damages .....................................10

        5.    The Risks of Maintaining This Action as a Class Action Through
            Trial..............................................................................................11

        6.    The Ability of Defendants to Withstand a Greater Judgment...................12

        7.    The Reasonableness of the Settlement in Light of the Best Possible
            Recovery and the Attendant Risks of Litigation.......................................12

III.  THE PROPOSED FORM AND METHOD OF CLASS NOTICE AND THE
    FORM OF THE PROOF OF CLAIM AND RELEASE ARE APPROPRIATE .............15

    A.    The Scope of the Notice Program Is Adequate.......................................................15

    B.    The Proposed Form of Notice Comports with the Requirements of Due
        Process, the Private Securities Litigation Reform Act of 1995, and Rule 23
        and Is the Same or Similar to Notices Approved by Other Courts........................16

IV.   PROPOSED SCHEDULE ........................................................................17

V.    CONCLUSION........................................................................................18

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. Dairy Farmers of Am., Inc.*,
No. 5:09-cv-230, 2011 U.S. Dist. LEXIS 48479
(D. Vt. May 4, 2011)........................................................................................5

*Chatelain v. Prudential-Bache Sec.*,
805 F. Supp. 209 (S.D.N.Y. 1992) .................................................................5

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)............................................................................12

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).................................................................4, 6, 10

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174 (W.D.N.Y. 2005)..................................................................12

*Hicks v. Stanley*,
No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890
(S.D.N.Y. Oct. 24, 2005) .................................................................................7

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984),
*aff'd*, 818 F.2d 145 (2d Cir. 1987) ...............................................................13

*In re Alloy, Inc., Sec. Litig.*,
No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129
(S.D.N.Y. Dec. 2, 2004)............................................................................7, 11

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
No. MDL 1500, 2006 U.S. Dist. LEXIS 17588
(S.D.N.Y. Apr. 6, 2006)....................................................................7, 11, 15

*In re Currency Conversion Fee Antitrust Litig.*,
No. 01 MDL 1409, 2006 U.S. Dist. LEXIS 81440
(S.D.N.Y. Nov. 8, 2006) ..............................................................................4, 6

*In re Enron Corp. Sec.*,
228 F.R.D. 541 (S.D. Tex. 2005)...................................................................15

*In re Gilat Satellite Networks, Ltd.*,
No. CV-02-1510, 2007 U.S. Dist. LEXIS 29062
(E.D.N.Y. Apr. 19, 2007)...............................................................................16

**Page**

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................10, 13

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090
  (S.D.N.Y. Sept. 29, 2003) .........................................................................13

*In re Initial Pub. Offering Sec. Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) ......................................................................7

*In re Luxottica Group S.p.A., Sec. Litig.*,
  No. CV-01-3285 (JBW)(MDG), 2005 U.S. Dist. LEXIS 27765
  (E.D.N.Y. Nov. 15, 2005) ..........................................................................16

*In re Med. X-Ray Film Antitrust Litig.*,
  No. CV-93-5904, 1997 U.S. Dist. LEXIS 21936
  (E.D.N.Y. Dec. 10, 1997) ............................................................................6

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450
  (S.D.N.Y. Feb. 1, 2007) ............................................................................15

*In re Michael Milken & Assocs. Sec. Litig.*,
  150 F.R.D. 57 (S.D.N.Y. 1993) ......................................................................5

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ...............................................................4, 5, 6

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ....................................................................6

*In re Prudential Sec. Ltd. P'ships Litig.*,
  164 F.R.D. 362 (S.D.N.Y.),
  *aff'd*, 107 F.3d 3 (2d Cir. 1996) ...................................................................16

*In re Stock Exchs. Options Trading Antitrust Litig.*,
  No. 99 Civ. 0962 (RCC), 2006 U.S. Dist. LEXIS 87825
  (S.D.N.Y. Dec. 4, 2006).............................................................................17

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004).........................................................................12

**Page**

*In re Warner Chilcott Ltd. Sec. Litig.*,
   No. 06 Civ. 11515 (WHP), 2008 U.S. Dist. LEXIS 99840
   (S.D.N.Y. Nov. 20, 2008) ..................................................................................4

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972) .............................................................................13

*Strougo v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...............................................................8

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) .................................................................................4

*Weigner v. New York*,
   852 F.2d 646 (2d Cir. 1988) .............................................................................16

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982) ...............................................................................17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k ...............................................................................................................2, 10
   §77o ...............................................................................................................2, 10
   §77z-1(a)(7)(A)-(F) ..........................................................................................18

Federal Rules of Civil Procedure
   Rule 23 ........................................................................................................16, 17

**SECONDARY AUTHORITIES**

*Manual for Complex Litigation* (4th ed. 2004)
   §21.632 .............................................................................................................5

*Manual for Complex Litigation* (3d ed. 1995)
   §30.41 ...............................................................................................................5

Lead Plaintiffs Martin Litwin and Francis Brady ("Lead Plaintiffs") respectfully submit this memorandum of law in support of their unopposed motion for preliminary approval of the settlement reached in this litigation (the "Settlement"). The proposed Settlement provides the Class (defined below) with a recovery of $85 million in cash to resolve this securities class action against The Blackstone Group L.P. ("Blackstone"), Stephen A. Schwarzman, Peter G. Peterson, Hamilton E. James, and Michael A. Puglisi ("Individual Defendants") (Blackstone and the Individual Defendants, the "Defendants"). The Settlement is memorialized in a Settlement Agreement entered into by the parties dated August 28, 2013 (the "Stipulation").[1]

By this motion, Lead Plaintiffs seek entry of an order: (1) granting preliminary approval of the proposed Settlement; (2) approving the form and manner of giving notice of the proposed Settlement to the Class (defined below); and (3) setting a hearing date for final approval thereof (the "Settlement Hearing") and a schedule for various deadlines relevant thereto ("Notice Order"). As shown below, the proposed Settlement represents an exceptional result for the Class, is fair, reasonable and adequate under the governing standards in this Circuit, and warrants approval of this Court.

## I.     INTRODUCTION AND BACKGROUND

This Settlement, which provides the Class with $85 million in cash (before deduction for attorneys' fees, expenses and the costs of notice and administration), represents the culmination of over five years of hard-fought litigation in a case that the Court had dismissed entirely. Trial was less than three weeks away, and the parties had exchanged witness and exhibit lists and were in the process of negotiating the pretrial order. Extensive discovery had also taken place, consisting of 21

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation.

depositions (of 19 witnesses) and the review of nearly five million pages of documents produced by Defendants and nearly 25 subpoenaed third parties.

Additionally, the Settlement follows the completion of expert discovery, three unsuccessful attempts at mediation (the last time in May 2013), and the briefing and argument of Defendants' motion for summary judgment. In short, Lead Plaintiffs and Lead Counsel thoroughly evaluated the strengths and weaknesses of the claims asserted in this case, and left no stone unturned in leveraging those strengths to secure the greatest cash consideration they believe is reasonably achievable under the circumstances. In fact, according to calculations by Lead Plaintiffs' rebuttal damages expert, the $85 million common fund represents approximately 12% of a conservative estimate of $691.5 million in damages achievable at trial (assuming complete victory on all of Lead Plaintiffs' asserted omissions and misrepresentations and the jury's acceptance of Lead Plaintiffs' causation and damages models for the entire Class Period), and approximately 23% of $369.5 million of damages under Defendants' damages analysis. Under these circumstances, this is truly an exceptional result, and the Settlement readily satisfies the standards applicable to preliminary approval and the standards applicable to the forthcoming request for final approval of the Settlement, should the Court grant preliminary approval.

No less exceptional, however, were the potential hurdles that Lead Plaintiffs would have had to overcome at the summary judgment stage and at trial. Although the claims alleged in this Action arise under Sections 11 and 15 of the Securities Act of 1933, the principal basis on which Lead Plaintiffs sought to establish Defendants' duty of disclosure was Item 303 of SEC Regulation S-K ("Item 303"). Item 303, in turn, requires disclosure when a registrant's management reasonably expects known trends or uncertainties to cause a material adverse effect on revenues or results of operation. Thus, at trial, Lead Plaintiffs would not only have to prove (i) that trends or uncertainties

were facing Blackstone's fund investments in FGIC, Freescale and Blackstone's real estate segment at the time of the IPO, but also (ii) that these trends or uncertainties were known to management and (iii) that management reasonably should have expected them to materially and adversely affect Blackstone's revenues and results of operation. Alleging these matters is one thing, but proving them at a hotly disputed trial by a preponderance of the evidence is a different matter entirely – as demonstrated by the parties' sharply conflicting submissions on the pending summary judgment motion.

Moreover, even assuming that Lead Plaintiffs could establish actionable omissions and misrepresentations, rebutting Defendants' negative causation defense posed a meaningful risk. Although Lead Plaintiffs would contend that Defendants shouldered the burden of demonstrating that the unit price declines during the relevant period after the IPO – from June 21, 2007 through March 12, 2008 –were the result of events or circumstances other than the revelation of information regarding the Registration Statement's alleged misstatements or omissions, it would have been difficult for Lead Plaintiffs to prove, in response to an adequate showing by Defendants, that public information regarding FGIC, Freescale and the real estate market generally had a sufficiently direct and adverse impact on Blackstone's unit price. In fact, Defendants contend, *inter alia*, that Blackstone never disclosed any negative information during the relevant period concerning Freescale or its funds' real estate investments, and that the unit price increased when Blackstone formally announced the FGIC write-down.

When viewed in light of the risks that Lead Plaintiffs faced in obtaining a determination from the Court in connection with summary judgment and securing a jury verdict at trial, and the prospect that Defendants would undoubtedly appeal any adverse determination, the Settlement represents an excellent result for the Class and saves Class Members the considerable expense and delay presented

by continued litigation and the possibility that they might not receive a distribution for several years even if they prevailed at trial, and, of course, eliminates the risk that Lead Plaintiffs would have lost and the Class would have recovered nothing. Accordingly, as further explained below, preliminary approval of the Settlement is warranted here.

## II.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED

As discussed herein, the proposed Settlement is a very good result for Lead Plaintiffs and the Class. The Settlement provides a recovery in a case that the Court had dismissed and where Lead Plaintiffs faced numerous hurdles to proving liability and damages, and is certainly within the range of what is fair, reasonable, and adequate. Accordingly, Lead Plaintiffs respectfully submit that an analysis of the *Grinnell* factors (*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)), set forth below, which apply to a court's determination of final approval of a settlement, also support preliminary approval of this Settlement. *See also In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 U.S. Dist. LEXIS 99840, at *4 (S.D.N.Y. Nov. 20, 2008) ("Although a complete analysis of [the *Grinnell*] factors is required for final approval, at the preliminary approval stage, 'the Court need only find that the proposed settlement fits "within the range of possible approval"' to proceed.") (citation omitted).

### A.   The Standards for Reviewing a Proposed Settlement for Preliminary Approval

Once a proposed settlement is reached, "a court must determine whether the terms of the proposed settlement warrant preliminary approval. In other words, the court must make 'a preliminary evaluation' as to whether the settlement is fair, reasonable and adequate." *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006) (citation omitted); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102

(S.D.N.Y. 1997) ("*NASDAQ*") ("Preliminary approval of a proposed settlement is the first in a two-step process required before a class action may be settled. . . . In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice."). "In determining whether to grant preliminary approval, the court starts with the proposition that 'there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.'" *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2011 U.S. Dist. LEXIS 48479, at *9 (D. Vt. May 4, 2011) (citation omitted). Courts are afforded wide discretion in determining which information to consider at this preliminary stage, and this initial assessment can be made on the basis of information already known to the court. *Manual for Complex Litigation* §21.632 (4th ed. 2004).

"Preliminary approval is merely the first step in a multi-step process in which the . . . Settlement will be scrutinized by both the court and class members." *Allen*, 2011 U.S. Dist. LEXIS 48479, at *10. "It deprives no party or non-party of any procedural or substantive rights, and provides a mechanism through which class members who object to the . . . Settlement can voice those objections." *Id.* A strong initial presumption of fairness attaches to the proposed settlement if, as here, the settlement is reached by experienced counsel after arm's-length negotiations, and courts should accord great weight to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993); *Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992).

Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, and falls within the range of approval, preliminary approval is generally granted. *See NASDAQ*, 176 F.R.D. at 102 (citing *Manual for Complex Litigation* §30.41 (3d ed. 1995)); *Currency Conversion*, 2006 U.S. Dist. LEXIS 81440, at *13; *In re*

*Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1997 U.S. Dist. LEXIS 21936, at *19 (E.D.N.Y. Dec. 10, 1997) ("preliminary approval should be granted and notice of the proposed settlement given to the class if there are no obvious deficiencies in the proposed settlement[]"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("At this stage of the proceeding, the Court need only find that the proposed settlement fits 'within the range of possible approval.'") (citation omitted). "Once preliminary approval is bestowed, the second step of the process ensues; notice is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval." *NASDAQ*, 176 F.R.D. at 102.

### B.    Preliminary Approval of the Settlement Should Be Granted

The Second Circuit has identified nine factors that courts should consider in deciding whether to grant final approval of a class action settlement:

> (1) [T]he complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted). While a more detailed discussion and analysis of the applicability of the *Grinnell* factors to this Action and the proposed Settlement will be presented at the time of final approval, as demonstrated below, those factors easily satisfy and support preliminary approval of the Settlement.

### 1.    The Complexity, Expense, and Likely Duration of the Litigation Supports Approval of the Settlement

Courts have consistently recognized that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement, especially where the settlement under evaluation involves a securities class action. *See, e.g., Hicks v. Stanley*, No. 01 Civ.

- 6 -

10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *16 (S.D.N.Y. Oct. 24, 2005); *In re Alloy, Inc., Sec. Litig.*, No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129, at *6 (S.D.N.Y. Dec. 2, 2004) (approving settlement, noting action involved complex securities fraud issues "that were likely to be litigated aggressively, at substantial expense to all parties"); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2006 U.S. Dist. LEXIS 17588, at *31 (S.D.N.Y. Apr. 6, 2006) (due to their "notorious complexity," securities class actions often settle to "circumvent[] the difficulty and uncertainty inherent in long, costly trials").

This case is no exception. Lead Plaintiffs advanced complex legal and factual issues under the federal securities laws and SEC regulations, each of which would require extensive testimony by fact and possibly expert witnesses. When the Settlement was brokered, fact and expert discovery had been completed; summary judgment was fully briefed, argued and pending decision; motions *in limine* were nearly fully briefed; the parties had exchanged trial and witness exhibit lists and objections; and the Action was on the eve of trial. *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 117 (S.D.N.Y. 2009) (citation omitted) ("'[A] vast amount of additional factual and expert discovery remains to prepare for trials, and motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable.'") (citation omitted).

Moreover, as the summary judgment briefing and argument demonstrate, the issues that the parties would present at trial regarding Blackstone's structure, its method for accounting for revenues, its obligations under Section 11 and SEC regulations, and the trading history of its common units were multifaceted, extremely complex, and could have been difficult for jurors to follow at trial. The Settlement also eliminates the uncertainty of post-trial motion practice, including any attempts by Defendants to prevail on their statutory defense to individual Class Member's claims based on the purported knowledge of the facts allegedly misrepresented or omitted, and the

possibility that other impediments to recovery for the Class could arise with the passage of time. *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery").

Any result at trial would ultimately have been the subject of appellate proceedings. This Action had already proceeded through an appeal to the Second Circuit Court of Appeals and a certiorari petition to the Supreme Court. Even if Lead Plaintiffs fully prevailed at trial, there is no reason to believe that Defendants would not have exhausted their appellate remedies before the judgment in this Action became final, which could have delayed recovery to the Class for many more years.

Clearly, the prosecution of the Action was expensive, and the trial, with the costs of experts, trial consultants, and modern trial materials and technologies commonly used in complex financial cases would have multiplied those costs. Further, Defendants' insurance coverage was a wasting asset, and defense costs incurred through further litigation would have reduced the availability of those funds to compensate Class Members.

### 2.    The Reaction of the Class to the Settlement

Lead Plaintiffs have extensively participated in the prosecution of this Action and were actively involved in the decision to enter into the Settlement. Notice regarding the Settlement has not yet been mailed or otherwise distributed. In the event any objections are received after notice is disseminated, however, they will be addressed by Lead Counsel in connection with the forthcoming motion for final approval of the Settlement.

Nevertheless, Lead Plaintiffs would be surprised to receive any level of significant or cognizable opposition to the Settlement, in view of the fact that the Court had initially dismissed this

Action, Lead Plaintiffs obtained a reversal from the Second Circuit, and Lead Plaintiffs vigorously litigated this Action for more than five years, securing this Settlement only after arguing summary judgment, and three weeks before trial. Moreover, as explained below, the Settlement represents a comparably very high percentage of potentially recoverable damages at trial based on the most conservative estimates of Lead Plaintiffs' rebuttal damages expert.

### 3. The Stage of the Proceedings

This case was settled virtually on the eve of trial. The volume and substance of Lead Plaintiffs' and Lead Counsel's knowledge of the merits and potential weaknesses of the claims alleged in this Action are unquestionably adequate to support the proposed Settlement.

This knowledge is based, first and foremost, on Lead Plaintiffs' and Lead Counsel's extensive investigation and aggressive prosecution of this Action, including, *inter alia*:

(1)    review and analysis of the Registration Statement in connection with the IPO, as well as press releases, public statements, SEC filings, regulatory filings and reports, and securities analysts' reports and advisories about Blackstone;

(2)    research and evaluation of the applicable law with respect to the claims asserted in the Action and the potential defenses thereto, as well as researching and drafting the initial and amended complaints;

(3)    researching and briefing opposition to the motion to dismiss and closely analyzing the Court's decision to grant that motion;

(4)    briefing a successful appeal of the Court's dismissal and closely analyzing the Court's decision to grant that motion;

(5)    conducting extensive document discovery, consisting of the review and analysis of nearly 5 million pages of documents produced by Defendants and nearly 25 third-parties that Lead Plaintiffs had subpoenaed;

(6)    conducting and defending 21 depositions of fact and expert witnesses collectively, which generated hundreds (if not thousands) of exhibits, with Lead Plaintiffs having conducted 16 depositions;

(7)    evaluating Lead Plaintiffs' purchases of Blackstone common units and the facts they found important in deciding to invest in Blackstone, as well as their understanding of the Registration Statement's disclosures;

(8)     consulting extensively with Lead Plaintiffs' real estate/securitization and damages experts, in connection with preparing such experts for their depositions, opposing summary judgment, seeking the exclusion of Defendants' experts, and otherwise preparing for trial;

(9)     preparing for and attending an all-day mediation session in May 2013, and discussing the strengths and weaknesses of the claims asserted in this Action in that context; and

(10)    discussing the merits of this Action during the course of prosecuting this Action and engaging in negotiations with Defendants' counsel concerning this Settlement.

These efforts, and the accumulation of information resulting from them, allowed Lead Plaintiffs and Lead Counsel to adequately inform themselves of the strengths and weaknesses of the claims asserted in this Action and armed them to engage in effective settlement discussions. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("the question is whether the parties had adequate information about their claims"). Thus, this factor also supports the Settlement.

### 4.      The Risk of Establishing Liability and Damages

In assessing the Settlement, the Court should balance the benefits afforded the Class, including the immediacy and certainty of a recovery, against the risks of continued litigation. *See Grinnell*, 495 F.2d at 463. As this Action amply demonstrates, securities class actions – even those brought under Sections 11 and 15 – naturally present hurdles to proving liability that are difficult for plaintiffs to meet. *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *39 (noting that "[t]he difficulty of establishing liability is a common risk of securities litigation"); *Alloy*, 2004 U.S. Dist. LEXIS 24129, at *6 (finding that issues present in securities action presented significant hurdles to proving liability).

While Lead Plaintiffs believe that their claims would be borne out by the evidence and that a jury could find in their favor at trial, they also recognize that they face risks to proving liability and

damages, and that, no matter how confident a litigant may be of his or her ultimate success on the merits, no one can predict how a jury will decide a case. Moreover, Defendants challenged virtually every factual and legal element of Lead Plaintiffs' claims and had articulated numerous defenses to Lead Plaintiffs' allegations that the Court could have accepted at the summary judgment stage or the jury could have accepted at trial.

Defendants also asserted that none of the alleged omissions or misrepresentations caused damages and aggressively disputed Lead Plaintiffs' loss causation rebuttal expert's analysis and his calculation of damages. Indeed, Defendants' position was that Class Members suffered no compensable damages as a result of Defendants' alleged conduct, and that all of the loss in value of Blackstone units was the result of unanticipated, "unprecedented" post-IPO macroeconomic market-wide conditions. If Defendants were wholly or partially successful in convincing the trier of fact that their version of events or legal defenses had merit, Lead Plaintiffs could have lost the case or seen the potential recovery dramatically reduced.

Accordingly, the risks of continued litigation weigh in favor of preliminary approval of the proposed Settlement.

### 5. The Risks of Maintaining This Action as a Class Action Through Trial

Although the Court has already certified the Class, certification can be reviewed or modified at any time before trial. Thus, there is always a risk that the Court might not maintain this Action, or particular claims, on a class-wide basis through trial. *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (noting that "[w]hile plaintiffs might indeed prevail [on a motion for class certification], the risk that the case might be not certified is not illusory"). This risk is exacerbated by the fact that adverse factual developments that might frustrate the continued maintenance of a class action, or intervening changes in the law that could have the same consequence, are sometimes

by their very nature unpredictable – and thus possible at any time during the pendency of a case. Thus, this factor also weighs in favor of the Settlement.

### 6.    The Ability of Defendants to Withstand a Greater Judgment

A court may also consider a defendant's ability to withstand a judgment greater than that secured by settlement, although it is not generally one of the determinative factors in warranting approval of a settlement. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (affirming court's finding that defendant's ability to pay more was irrelevant to assessment of settlement). In fact, courts generally do not regard the ability of a defendant to withstand a greater judgment as an impediment to the approval of a settlement when other factors favor approval and, in any event, the ability of a defendant to cover a larger monetary settlement does not automatically render a proposed settlement unreasonable. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001).

### 7.    The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). The Court need only determine whether the Settlement falls within a "range of reasonableness" – a range that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also Global Crossing*, 225 F.R.D. at 461 (noting that "the certainty of [a] settlement amount has to be judged in [the] context of the legal and practical obstacles to obtaining a large recovery"); *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090, at *12-*13

(S.D.N.Y. Sept. 29, 2003) (noting few cases tried before a jury result in full amount of damages claimed).

Here, the $85 million common fund associated with the Settlement represents approximately 12% of Lead Plaintiffs' expert's conservative estimate of $691.5 million in damages achievable at trial (assuming 100% victory on all issues of liability and damages for the entire Class);[2] and approximately 23% of $369.5 million under Defendants' damages analysis – after giving effect to the claims, advanced by Defendants, that damages associated with Freescale would not be recoverable due to an inability to link the disclosure of information about Freescale to the post-IPO decline in Blackstone's unit price,[3] and that Lead Plaintiffs' expert utilized an incorrect peer group in assessing damages caused by Blackstone's alleged false statements and omissions.

---

[2] As will be discussed in greater length in Lead Plaintiffs' papers in support of final approval of the Settlement, success at trial is only the first step on the road to recovery for absent class members in a securities class action. Following trial, and establishment of a per unit formula for calculating class member claims based on their purchase and/or sale dates, a claims process must be performed to determine any amounts that individual class members may recovery. Defendants would then only be liable to pay those class members who file and prove out their claims. It is a fact of class actions that all class members who can make a claim do not. Further, as a case grows older, the likelihood that members of the class will file claims decreases. Thus, the aggregate damages figures calculated by Lead Plaintiffs' expert would likely have been significantly reduced before a final judgment could be entered by virtue of fewer-than-all eligible Class Members filing claims. And, because this is a Section 11 action, and damages are capped by the offering price of the security at issue, the risk that the price of Blackstone units could rise above the offering price before a final judgment was entered posed a risk that the ultimate amount of damages that Class Members could recover would be further reduced.

[3] Lead Plaintiffs' expert, Professor Steven Feinstein, presented a conservative estimate of $691.5 million in damages. Professor Feinstein attributed $1.15 of the decline in the unit price on July 19, 2007 to news about Freescale, and none of the decline on July 20, 2007 to such news. Accordingly, removing $1.15 per unit from the 153,333,333 units issued in connection with the IPO results in an aggregate reduction of $176.33 million. If Defendants prevailed on their assertion that Professor Feinstein used an incorrect "peer group" to calculate damages, this would result in removing $0.95 per unit from the 153,333,333 units issued in connection with the IPO, resulting in an additional aggregate reduction of approximately $145.6 million. Removing the sum of these reductions from Professor Feinstein's estimate of $691.5 million yields approximately $369.5 million in damages.

In contrast, a recent study of securities settlements from January 1996 to December 2012 (depicted below) indicates that such settlements have represented a median recovery of 1.8% of investor losses ranging from $400 million to $599 million, and 1.6% of losses ranging from $600 million to $999 million:



Figure 29.  Median of Settlement Value as a Percentage of Investor Losses
By Level of Investor Losses; January 1996 – December 2012

In addition, in considering the reasonableness of the Settlement, the Court should consider that the Settlement provides for payment to the Class now, rather than a speculative payment many years down the road. *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *44 (where settlement fund is in escrow earning interest, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). "The settlement at this point would save great expense and would give the Plaintiffs hard cash, a bird in the hand." *In re Enron Corp. Sec.*, 228 F.R.D. 541, 566 (S.D. Tex. 2005). Thus, this factor supports preliminary approval of the Settlement.

## III.   THE PROPOSED FORM AND METHOD OF CLASS NOTICE AND THE FORM OF THE PROOF OF CLAIM AND RELEASE ARE APPROPRIATE

### A.   The Scope of the Notice Program Is Adequate

There are no "rigid rules" that apply when determining the adequacy of notice for a class action settlement. Rather, when measuring the adequacy of a settlement notice under either the Due Process Clause or the Federal Rules, a court should look to its reasonableness. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450, at *26 (S.D.N.Y. Feb. 1, 2007). "Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." *Id.* at *27 (citing *Weigner v. New York*, 852 F.2d 646, 649 (2d Cir. 1988)).

In fact, notice programs such as the one proposed by Lead Counsel have been approved as adequate under the Due Process Clause and Rule 23 in a multitude of class action settlements. *See, e.g.*, *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 U.S. Dist. LEXIS 29062, at *41-*42 (E.D.N.Y. Apr. 19, 2007) (approving proposed notice program where notice mailed to shareholders of record listed on transfer records and to "more than 2500 of the largest banks, brokerages, and other nominees"); *In re Luxottica Group S.p.A., Sec. Litig.*, No. CV-01-3285 (JBW)(MDG), 2005 U.S. Dist. LEXIS 27765, at *5 (E.D.N.Y. Nov. 15, 2005) (approving notice program consisting of broker mailing and summary notice publication in *The Wall Street Journal* and *The New York Times*); *In re Prudential Sec. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y.) (approving proposed notice and noting mailing of notice to each identifiable class member's last known address is "a procedure that has been given wide-spread approval in other class actions"), *aff'd*, 107 F.3d 3 (2d Cir. 1996).

Here, in addition to reliance on Blackstone unit transfer records, the Claims Administrator, Gilardi & Co. LLC ("Gilardi"), will mail the Notice to over 4,000 banks, brokerage firms and other common nominees based on a proprietary list developed by Gilardi over its years of experience in administering class actions of this type.  Further, summary notice will be provided by publication in *Investor's Business Daily* and transmitted on three separate, staggered occasions over the *Business Wire* or other similar business-oriented wire service.  Thus, Lead Counsel is ensuring that every known avenue for obtaining the identity of Class Members is being utilized to disseminate the Notice.  Therefore, it is reasonable to conclude that the Notice will reach the vast majority of Class Members.  Lead Counsel respectfully submit that the proposed notice program, as set forth in the Notice Order, is adequate and should be approved by the Court.[4]

**B.     The Proposed Form of Notice Comports with the Requirements of Due Process, the Private Securities Litigation Reform Act of 1995, and Rule 23 and Is the Same or Similar to Notices Approved by Other Courts**

The content of a notice is generally reasonable if "the average class member understands the terms of the proposed settlement and the options provided to class members thereunder." *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 0962 (RCC), 2006 U.S. Dist. LEXIS 87825, at *22 (S.D.N.Y. Dec. 4, 2006); *see also Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (the notice must "'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings'") (citation omitted).

Moreover, the proposed Notice complies with the notice requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Specifically, the PSLRA provides that a

---

[4] Moreover, because Blackstone is widely regarded as a leading alternative asset management and private equity firm, the mainstream media will likely report or otherwise publicize the proposed Settlement. This will provide an additional layer of notice to potential Class Members.

notice of settlement must state: (i) the amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (ii) if the parties do not agree on the average amount of damages per share that would be recoverable in the event plaintiff prevailed, a statement from each settling party concerning the issue(s) on which the parties disagree; (iii) a statement indicating which parties or counsel intend to make an application for an award of attorneys' fees and costs (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought; (iv) the name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions concerning any matter contained in the notice of settlement published or otherwise disseminated to the class; (v) a brief statement explaining the reasons why the parties are proposing the settlement; and (vi) such other information as may be required by the court. *See* 15 U.S.C. §77z-1(a)(7)(A)-(F).

Here, the proposed Notice contains all of the information required by the PSLRA. *See* Notice, Exhibit A-1 to the Stipulation. The information is also provided in a format that is accessible to the reader. In addition, the Notice advises recipients that they have the right to exclude themselves from the Settlement, or to object to any aspect of the Settlement. Further, the Notice provides recipients with the contact information for Gilardi and Lead Counsel. Finally, the proposed format is the same or similar to formats that many other courts in the Second Circuit have approved, including this Court. Therefore, Lead Plaintiffs respectfully submit that the Court should approve the form of notice.

## IV.   PROPOSED SCHEDULE

If the Court grants preliminary approval of the proposed Settlement, the parties respectfully submit the following procedural schedule for the Court's review:

| Event | Time for Compliance |
|---|---|
| Deadline for mailing the Notice and Proof of Claim and Release form to Class Members | 7 business days after the entry of the Notice Order (the "Notice Date") |
| Deadline for publishing the Summary Notice in *Investor's Business Daily* and to begin publication over the *Business Wire* | 5 business days after the Notice Date |
| Deadline for filing Proof of Claim and Release forms | 90 days after the Notice Date |
| Filing of memoranda in support of approval of the Settlement and Plan of Distribution, or in support of Lead Counsel's application for an award of attorneys' fees and expenses | 30 days after the Notice Date |
| Deadline for submitting exclusion requests or objections | 60 days after the Notice Date |
| Filing of reply memoranda in support of the Settlement and Plan of Distribution, or in support of Lead Counsel's application for an award of attorneys' fees and expenses | 7 days before the Settlement Hearing |
| Settlement Hearing | Approximately 100 days following execution of the Notice Order, or later at the Court's convenience |

Certain events set forth above are tied to the date on which the Settlement Hearing will be held, which the parties respectfully request to be scheduled for approximately 100 days after the entry of the Notice Order.

## V.    CONCLUSION

Based on the foregoing, Lead Plaintiffs respectfully request that the Court enter the Notice Order in connection with the settlement proceedings, which will provide: (i) preliminary approval of the Settlement; (ii) approval of the form and manner of giving notice of the Settlement to the Class; and (iii) a hearing date and time to consider final approval of the Settlement and related matters.

DATED:  August 28, 2013

BROWER PIVEN
   A PROFESSIONAL CORPORATION
DAVID A.P. BROWER
BRIAN C. KERR


_____*/s/ David A.P. Brower*_____
DAVID A.P. BROWER

475 Park Avenue South, 33rd Floor
New York, NY  10016
Telephone:  212/501-9000
212/501-0300 (fax)
brower@browerpiven.com
kerr@browerpiven.com

BROWER PIVEN
   A PROFESSIONAL CORPORATION
CHARLES J. PIVEN
YELENA TREPETIN
1925 Old Valley Road
Stevenson, MD  21153
Telephone:  410/332-0030
410/685-1300 (fax)
piven@browerpiven.com
trepetin@browerpiven.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL J. DOWD
ELLEN GUSIKOFF STEWART
JONAH H. GOLDSTEIN
ROBERT R. HENSSLER, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
miked@rgrdlaw.com
elleng@rgrdlaw.com
jonahg@rgrdlaw.com
bobbyh@rgrdlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2013, I served true and correct copies of the foregoing Lead Plaintiffs' Memorandum Of Law In Support Of Unopposed Motion For Preliminary Approval Of Settlement on Defendants' counsel by causing copies to be sent by email.


*/s/ David A.P. Brower*
David A.P. Brower